ARCHER & GREINER
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121
Attorneys for Plaintiff
BY:   JAMES M. GRAZIANO, ESQUIRE
        MAUREEN T. COGHLAN, ESQUIRE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PENNEAST PIPELINE COMPANY, LLC,<br>One Meridian Boulevard, Suite 2C01<br>Wyomissing, PA  19610<br><br>                             Plaintiff,<br><br>     vs.<br><br>PERMANENT EASEMENT FOR 0.36 ACRES ± IN WEST AMWELL TOWNSHIP, HUNTERDON COUNTY, NEW JERSEY, TAX PARCEL NO. 1026-3.06-13 AND<br><br>PERMANENT EASEMENT FOR 0.12 ACRES ± IN WEST AMWELL TOWNSHIP, HUNTERDON COUNTY, NEW JERSEY, TAX PARCEL NO. 1026-3-13;<br><br>MICHAEL F. VOORHEES, WELLS FARGO BANK, N.A., JP MORGAN CHASE BANK, N.A., JERSEY CENTRAL POWER & LIGHT COMPANY, STATE OF NEW | CIVIL ACTION<br><br>Docket No. _____<br><br>**Electronically Filed** |

| JERSEY, DEPARTMENT OF TRANSPORTATION; AND ALL UNKNOWN OWNERS, Defendants. | |
| --- | --- |

## VERIFIED COMPLAINT IN CONDEMNATION OF PROPERTY PURSUANT TO FED. R. CIV. P. 71.1

Plaintiff, PennEast Pipeline Company, LLC, by the undersigned counsel, files this Verified Complaint in eminent domain pursuant to the Natural Gas Act, 15 U.S.C. § 717f(h) and Federal Rule of Civil Procedure 71.1, for its causes of action against Defendants, a Permanent Easement for 0.36 Acres ± in West Amwell Township, Hunterdon County, New Jersey, Tax Parcel Number 1026-3.06-13 and a Permanent Easement for 0.12 Acres ± in West Amwell Township, Hunterdon County, New Jersey, Tax Parcel Number 1026-3-13, Michael F. Voorhees, Wells Fargo Bank, N.A., JP Morgan Chase Bank, N.A., Jersey Central Power & Light Company, State of New Jersey, Department of Transportation and all Unknown Owners, and avers as follows:

### NATURE OF THE CASE

1.     This is a civil action under the Natural Gas Act, 15 U.S.C. § 717 *et seq*., for (a) the taking of rights of way and easements in property under the power of eminent domain granted by Section 7(h) of the Act, 15 U.S.C. § 717f(h), (b) for ancillary injunctive relief to allow immediate entry and possession of the same, and

(c) for the ascertainment and award of compensation to the owner of the property and any other parties in interest.

## DEFINITIONS

2.     The following definitions are used in this Complaint:

(a)     "**PennEast**" shall mean Plaintiff, PennEast Pipeline Company LLC, a Delaware limited liability company, duly registered to do business in the State of New Jersey, with its principal place of business at One Meridian Boulevard, Suite 2C01, Wyomissing, Pennsylvania, 19610.

(b)     "**FERC**" shall mean the Federal Energy Regulatory Commission.

(c)     "**FERC Order**" shall mean the Order issued by the FERC on January 19, 2018, at Docket No. CP15-558-000, authorizing the PennEast Pipeline Project and granting PennEast a Certificate of Public Convenience and Necessity. The FERC Order is a matter of public record that is subject to judicial notice under Federal Rule of Evidence 201.  The full FERC Order is attached here as Exhibit B.

(d)     The "**Project**" shall mean the PennEast Pipeline Project, which FERC reviewed and approved by the issuance of the FERC Order.  The Project will provide about 1.1 million dekatherms per day (Dth/d) of year-round natural gas transportation service from northern Pennsylvania to markets in New Jersey, eastern and southern Pennsylvania, and surrounding states.  It will involve the

construction and operation of approximately 120 miles of natural gas pipeline and associated equipment and facilities in Pennsylvania and New Jersey to provide infrastructure for the Project, including, without limitation, approximately 120 miles of new 36-inch-diameter pipeline extending from Luzerne County, Pennsylvania to Mercer County, New Jersey.

(e)     **"Property**" shall mean those contiguous properties located at:

1.    75 Alexauken Creek Road in West Amwell Township, Hunterdon County, New Jersey, described in a Deed dated October 7, 1983 recorded in Hunterdon County at Book 897 Page 968 and known as Tax Parcel Number 1026-3.06-13 and

2.    Route 202 in West Amwell Township, Hunterdon County, New Jersey described in a Deed dated March 2, 1992 recorded in Hunterdon County at Book1071 Page 481 and known as Tax Parcel Number 1026-3-13.

(f)     **"Rights of Way**"[1] shall mean the following easements and rights of way on the Property that are necessary to install and construct the Project and are depicted in the drawing attached here as Exhibit A:

Tax Parcel No. 1026-3.06-13 and Tax Parcel No. 1206-3-13:

1.    Permanent right of way and easements of 0.36 acres ± and 0.12 acres ± for the purpose of constructing, operating, maintaining, altering, repairing, changing the size of, replacing and removing a 36-inch diameter pipeline and all related equipment and appurtenances

---

[1] The acreages of the Rights of Way are approximate, as noted in Exhibit A, because a civil survey has not been performed.  The complaint shall be amended, if necessary, once a civil survey has been completed and the acreages have been confirmed.

thereto (including but not limited to meters, fittings, tie-overs, valves, cathodic protection equipment and launchers and receivers) for the transportation of natural gas, or its byproducts, and other substances as approved by the FERC Order; and conducting all other activities as approved by the FERC Order together with all rights and benefits necessary for the full enjoyment and use of the right of way and easement.  Further, Defendants shall not excavate, change the grade of or place any water impoundments or structures on the right of way and easement without the written consent of Plaintiff, nor may Defendants plant any trees, including trees considered as a growing crop, on the permanent right of way and easement; or use said permanent right of way or any part thereof in such a way as to interfere with Plaintiff's immediate and unimpeded access to said permanent right of way, or otherwise interfere with Plaintiff's lawful exercise of any of the rights herein granted without first having obtained Plaintiff's approval in writing; and Defendants will not permit others to do any of said acts without first having obtained Plaintiff's approval in writing.  Plaintiff shall have the right from time to time at no additional cost to Defendants to cut and remove all trees including trees considered as a growing crop, all undergrowth and any other obstructions that may injure, endanger or interfere with the construction and use of said pipeline and all related equipment and appurtenances thereto; and

2.   The Rights of Way shall include permanent rights of ingress to and egress from the Permanent Right of Way.

(g)   "**Appraised Value**" shall mean the fair market value of the Rights of Way to be condemned, as set forth in an appraisal prepared by an independent appraiser retained by PennEast.  The appraisal values the Permanent

Easement for both parcels at $3,800.00.  The total Appraised Value for the Rights of Way is $3,800.00.

(h)   "**Landowners**" shall mean Michael F. Voorhees, the fee simple owners of the Property on which PennEast is seeking to acquire the Rights of Way and having a mailing address of 75 Alexauken Creek Road, Lambertville, New Jersey 08530.

(i)   "**Interest Holders**" shall mean other persons and corporations appearing of record to have an interest in the said land and premises and person and corporations who have or may claim to have an interest therein as are known to PennEast and are as follows:

1.   Wells Fargo Bank, N.A., address: 420 Montgomery Street. San Francisco, CA 94104, by reason of a Mortgage dated February 23, 2005, *see* Exhibit C;

2.   JP Morgan Chase Bank, N.A., address: 270 Park Ave., New York, NY 10017, by reason of a Mortgage dated November 24, 2006, *see* Exhibit D;

3.   Jersey Central Power & Light Company, address: 300 Madison Avenue, Morristown, NJ 07962, by reason of a Right of Way dated June 8, 1946; by reason of a Right of Way dated October 28, 1960; by reason of a Right of Way dated October 28, 1960; by reason of a Right of Way dated October 28, 1960;. by reason of a Right of Way dated May 12, 1993, *see* Exhibit E; and

4.   State of New Jersey, Department of Transportation, address: 1035 Parkway Avenue, Trenton, NJ 08625, by reason of an indenture dated December 7, 1973, *see* Exhibit F.

(j)     "**Defendants**" shall collectively refer to Landowners, Interest Holders, and any other party who have or may claim some interest in the Property, whose names are currently unknown to PennEast despite diligent inquiry ("Unknown Owners").

## JURISDICTION AND VENUE

3.     Plaintiff, PennEast, is a Delaware limited liability company that proposes to construct a new greenfield pipeline system and upon commencement of its operations will become a Natural Gas Company within the meaning of the Natural Gas Act, 15 U.S.C. § 717a(6).

4.     Defendants are the Landowners, Interest Holders, and all Unknown Owners of the Property on which PennEast is seeking to acquire the Rights of Way.

5.     PennEast's authority to maintain the action in this Court derives from the Natural Gas Act, 15 U.S.C. § 717f(h), which states in relevant part:

> *When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district*

*in which such property may be located*, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: Provided, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

(Emphasis added).

6.     This Court has jurisdiction over this action because the Property is located within the District of New Jersey, and because the value of the property interests to be taken is claimed by the Landowner to exceed the sum of $3,000.

7.     Venue is proper in this District under 28 U.S.C. § 1391 because the Property is situated in the District of New Jersey.

## THE AUTHORITY TO CONDEMN

8.     On January 19, 2018, the FERC issued the FERC Order to PennEast approving the Project, authorizing PennEast to construct, operate, and maintain a new natural gas pipeline system, including pipeline transmission facilities in Pennsylvania and New Jersey.

9.     PennEast is the holder of a Certificate of Public Convenience and Necessity issued by the FERC – the FERC Order.

10.    Under the Natural Gas Act, the holder of a Certificate of Public Convenience and Necessity has the power to condemn land for a federally-approved natural gas pipeline project if:

a.    the company has been granted a Certificate of Public Convenience and Necessity from the FERC,

b.    the company has been unable to acquire the needed land by contract with the owner, and

c.    the value of the property at issue is claimed by the landowner at more than $3,000.

15 U.S.C. § 717f(h); *see Columbia Gas Transmission, LLC v. 1.01 Acres*, 768 F.3d 300, 304 (3d Cir. 2014); *E. Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 827-28 (4th Cir. 2004), *cert. denied*, 543 U.S. 978 (2004).

11.    PennEast meets these three requirements, as detailed below.

### PENNEAST IS A HOLDER OF A CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY

12.    On September 24, 2015, PennEast filed an application with the FERC for a Certificate of Public Convenience and Necessity for its Project to construct new pipeline facilities in Pennsylvania and New Jersey.  The Project will provide about 1.1 million dekatherms per day (Dth/d) of year-round natural gas transportation service from northern Pennsylvania to markets in New Jersey, eastern and southern Pennsylvania, and surrounding states.  It will involve the

construction and operation of approximately 120 miles of natural gas pipeline and associated equipment and facilities in Pennsylvania and New Jersey to provide infrastructure for the Project, including, without limitation, approximately 120 miles of new 36-inch-diameter pipeline extending from Luzerne County, Pennsylvania to Mercer County, New Jersey.  *See* Exhibit B at ¶¶ 1, 4.

13.    The Project underwent an extensive pre-filing and post-filing review process.  The FERC evaluated the public need for the Project (referred to as the "public convenience and necessity" under Section 7(c) of the Natural Gas Act), and completed a thorough review of environmental impacts and operational considerations before issuing the FERC Order authorizing the Project.

14.    The public was notified of the Project and was provided an opportunity to comment throughout the process, including through the following notices:  (a) FERC issued a Notice of Intent to Prepare an Environmental Impact Statement for the Planned PennEast Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings on January 13, 2015 in Docket No. PF15-1-000 (the FERC's pre-filing docket number for the Project), which was published in the Federal Register on February 3, 2015 and mailed to interested parties including federal, state, and local officials; agency representatives; environmental and public interest groups; Native American tribes; local libraries and newspapers; and affected property owners (*i.e.*, landowners

crossed or adjacent to the pipeline facilities or within 0.5 miles of a compressor station), and other stakeholders who had indicated an interest in the Project; (b) PennEast filed an Application for Certificates of Public Convenience and Necessity and Related Authorizations dated September 24, 2015, and FERC issued notice of PennEast's application on October 15, 2015; (c) FERC published a Draft Environmental Impact Statement ("EIS") on July 22, 2016 and invited public comments on the Draft EIS; and (d) FERC issued a Notice announcing the availability of the final EIS on April 7, 2017, which was published in the Federal Register on April 14, 2017 and mailed to interested parties and stakeholders.

15.     The FERC invited the public to participate in scoping meetings for the Project, provided public notice of PennEast's certificate application and EIS for the Project as stated above, and reviewed and considered hundreds of public comments received from interested parties and stakeholders, including federal, state, and local governmental agencies, elected officials, environmental and public interest groups, and potentially affected landowners, before issuing the FERC Order.

16.     When evaluating proposals for the construction of a new pipeline, the FERC must assess whether there is a need for the proposed project and whether the project will serve the public interest, as articulated in the FERC's Certificate Policy Statement:

> The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed

> project and whether the proposed project will serve the public interest. The Certificate Policy Statement explains that in deciding whether to authorize the construction of major new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences. The Commission's goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline facilities construction.

*See* Exhibit B at ¶ 16; *see also Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128 (2000), *further clarified*, 92 FERC ¶ 61,094 (2000).

17.     On January 19, 2018, FERC completed its assessment, found that there is a need for the PennEast Project and that the Project will serve the public interest, and issued the FERC Order. *See* Exhibit B.

18.     The FERC Order authorizes PennEast, among other things, to install a new 36-inch pipeline and the facilities described above.

19.     Rights of Way are needed to construct, install, operate and maintain the pipeline facilities approved in the FERC Order.

20.     The Rights of Way on the Property, as depicted in Exhibit A, are necessary to construct, install, operate, and maintain the pipeline facilities approved in the FERC Order.

21.    The Rights of Way on the Property were reviewed and approved by FERC prior to the issuance of the FERC Order.

22.    In issuing the FERC Order, the FERC considered the impact on landowners and communities along the route of the Project.  The FERC concluded that PennEast has taken steps to minimize any adverse impacts on landowners and communities that might be affected by the Project.  *See* Exhibit B at 39.

23.    The FERC found the Project is "required by the public convenience and necessity."  *See* Exhibit B at ¶ 29.

24.    The Rights of Way sought in this action are located within the area of the Project approved by the FERC for construction of the pipeline and facilities.

25.    Accordingly, PennEast has a valid FERC Order covering the Rights of Way sought in this action.

26.    PennEast has satisfied the first condition for the exercise of eminent domain under Section 7(h) of the Natural Gas Act.

## PENNEAST HAS BEEN UNABLE TO ACQUIRE THE RIGHTS OF WAY BY AGREEMENT

27.    PennEast has been working since August 2014 to identify the individual properties that would be impacted by the construction of the Project. Since this time, PennEast's agents have been continuously meeting with property owners in an attempt to obtain access to properties to complete civil and

environmental surveys for the Project and to purchase the easements required for the construction of the Project.

28.     PennEast has obtained several easements needed for the construction of the Project, however PennEast was not able to obtain access to the Property to complete civil and environmental surveys for the Project nor to acquire the Rights of Way identified in this Complaint despite numerous attempts to negotiate in good faith with the Landowner.

29.     PennEast's land agent, Western Land, contacted the Landowners several times in an effort to negotiate in good faith for the acquisition of the Rights of Way, including attempting to confer with the Landowners and sending correspondence.  The Landowners responded by rejecting PennEast's outreach.

30.     PennEast has been unable to acquire the Rights of Way by contract or to obtain an agreement with the Landowners on the amount of compensation to be paid for the Rights of Way.

31.     Accordingly, PennEast has satisfied the second condition required prior to the exercise of eminent domain under Section 7(h) of the Natural Gas Act.

## PENNEAST HAS OFFERED AT LEAST $3,000 FOR THE RIGHTS OF WAY

32.     PennEast offered to pay the Landowners at least $3,000 for the Rights of Way.  However, the Landowners refused that offer.

33.     Therefore, PennEast has satisfied the third condition required prior to the exercise of eminent domain under Section 7(h) of the Natural Gas Act.

34.     PennEast has satisfied all statutory requirements and is authorized to exercise eminent domain under Section 7(h) of the Natural Gas Act.

**FIRST CLAIM FOR RELIEF**
**AWARD OF POSSESSION BY EMINENT DOMAIN**

35.     Under the Natural Gas Act, PennEast has the power to condemn land for the federally approved PennEast Pipeline Project because:

    a.     PennEast holds a valid FERC Order that authorizes the construction, operation, and maintenance of the Project, including the construction, operation and maintenance of a pipeline on the Property,

    b.     PennEast has been unable to acquire the necessary property interests by agreement with the Landowners, and

    c.     The value of the property interests to be taken is claimed by the Landowners to exceed the sum of $3,000.

15 U.S.C. § 717f(h); *see Columbia Gas Transmission, LLC*, 768 F.3d at 304; *Sage*, 361 F.3d at 827-28.

36.     By virtue of the authority granted in the Natural Gas Act, 15 U.S.C. § 717f(h), and the FERC Order, PennEast is vested with federal eminent domain power to acquire an interest in the Property, and pursuant to such authority,

PennEast seeks to take the Rights of Way by eminent domain for the purpose of laying, constructing, operating, and maintaining a new 36-inch diameter pipeline and related appurtenances.

37.    PennEast has satisfied all of the conditions imposed by the FERC Order that are required to be satisfied prior to the exercise of eminent domain.

38.    It is necessary for PennEast to obtain immediate access to and possession of the Rights of Way on the Property in a timely manner, in order to meet construction deadlines, meet contractual obligations to its customers, and otherwise comply with the in-service date in the FERC Order.

### SECOND CLAIM FOR RELIEF
### DETERMINATION OF JUST COMPENSATION

39.    The Landowners are entitled to receive just compensation for the Rights of Way granted to PennEast in this action.

40.    PennEast requests that the just compensation to which the Landowners are entitled be determined and awarded in this action.

### THIRD CLAIM FOR RELIEF
### INJUNCTIVE RELIEF

41.    Pursuant to Federal Rule of Civil Procedure 65, PennEast requests preliminary and permanent injunctive relief granting PennEast immediate possession and entry onto the Property, in advance of any award of just compensation, in order to construct, operate, and maintain an interstate natural gas

transmission pipeline and appurtenances as approved by FERC, and enjoining Defendants and his/her agents, servants, and representatives from interfering in any way with the construction of the pipeline, including, without limitation, land surveys, tree-clearing, excavation, trenching, pipe laying, and post-construction restoration.

42.    It is necessary for PennEast to obtain immediate entry to the Property in order to commence construction and otherwise comply with the FERC-approved in-service date.

43.    Pursuant to its equitable powers, the Court may grant PennEast immediate entry onto the Property if the conditions for preliminary injunctive relief under Federal Rule of Civil Procedure 65 are met.  *Columbia Gas Transmission, LLC.*, 768 F.3d at 315-16; *Sage*, 361 F.3d at 823-24; *see also Transcontinental Gas Pipeline Co., LLC v. Permanent Easement for 2.59 Acres*, Civ. No. 17-1829, 2017 U.S. App. LEXIS 17580 (3d Cir. Sept. 12, 2017); and *Columbia Gas Transmission, LLC v. 1.092 Acres of Land*, 2015 U.S. Dist. LEXIS 9625, at *12-17 (D.N.J. Jan. 28, 2015) (Simandle, C.J.).

44.    PennEast is entitled to a preliminary injunction allowing it immediate entry onto the Property, and enjoining the Defendants, and his/her agents, servants, and representatives from interfering in any way with the exercise of the rights granted for the following reasons:

a.      PennEast is likely to succeed on the merits of its claim because (1) the Property is located within an area approved for pipeline construction by the FERC Order; (2) PennEast has the right to condemn the Rights of Way and easements needed for the Project under the Natural Gas Act and the FERC Order; (3) PennEast has been unable to acquire the necessary easements on the Property by agreement; and (4) the property rights that PennEast seeks to acquire are claimed by the Landowners to have a value in excess of $3,000.

b.      PennEast must begin construction of the pipeline and other appurtenant facilities and make them available for service by the in-service date in the FERC Order.  Consequently, PennEast will suffer irreparable harm absent the issuance of the requested preliminary injunction because delay in accessing the Property will substantially increase the risk that PennEast will be unable to timely complete the construction of facilities needed for the Project.

c.      The balance of the harms favors the issuance of the requested preliminary injunction because the Landowners will be justly

compensated for the taking of the Rights of Way on the Property.

d.   The issuance of the FERC Order demonstrates that the public interest will be furthered by allowing the Project to proceed in a timely fashion.

45.   PennEast is prepared to promptly post appropriate security in the form of a surety bond or other undertaking as the Court may direct.

WHEREFORE, PennEast requests that the Court issue an Order and demands judgment against the Rights of Way and Defendants as follows:

a.   Determining that PennEast has satisfied all of the statutory requirements of Section 7(h) of the Natural Gas Act and is duly vested with and has duly exercised its authority to condemn the Rights of Way;

b.   Granting PennEast's application for an Order of Condemnation of the Rights of Way;

c.   Determining that PennEast is entitled under the equitable powers of the Court, to an order for immediate possession of the property rights being condemned so as to allow the construction of the Project on the Landowners' Property;

    d.      Ordering that PennEast post appropriate security in the form of a surety bond or other undertaking as the Court may direct into the Court's Registry pursuant to Local Civil Rule 67.1(a);

    e.      Determining the compensation to be paid to the Landowners for the Rights of Way pursuant to Fed. R. Civ. P. 71.1(h);

    f.      Entering judgment transferring title of the Rights of Way condemned to PennEast; and

    g.      Granting such other relief as the Court deems just and proper.

Respectfully submitted,


By: /s/ James M. Graziano
    James M. Graziano, Esquire
    Maureen T. Coghlan, Esquire
      Archer & Greiner, P.C.
      One Centennial Square
      33 E. Euclid Ave.
      Haddonfield, NJ 08033
      (856) 795-2121
      *Attorneys for Plaintiff*

Dated:  February 6, 2018

## **VERIFICATION**

I, Jeffrey England, of full age, upon his oath deposes and says:

1.      I am Manager, Project Management and Construction, UGI Energy Services, LLC as Project Manager on behalf of PennEast Pipeline Company, LLC ("PennEast") for the PennEast Pipeline Project.

2.      I have reviewed the matters and statement set forth herein as well as the Exhibits attached to the Verified Complaint.  Additionally, I have consulted PennEast representatives and agents working on the Project regarding the matters and statements set forth herein as well as the Exhibits to the Verified Complaint.

3.      To the best of PennEast's knowledge and based on a review of all of the relevant facts, the matters and statements set forth in the Verified Complaint are true.

4.      To the best of PennEast's knowledge, the Exhibits to the Verified Complaint are accurate copies of the documents received by PennEast or issued on its behalf.

5.      Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Jeffrey D. England

Executed on February 6, 2018

212650289v1

# Exhibit A

**EXHIBIT A**



1026-3.06-13
PE-HU-216.000

Mountain Brook

202
202

130 Feet

PennEast

| Date: | 8/24/2017 | Temporary Workspace (Ac): | 0.00 |
|---|---|---|---|
| Line List No: | PE-HU-216.000 | Additional Temporary Workspace (Ac): | 0.00 |
| Parcel No: | 1026-3.06-13 | Permanent Easement (Ac): | 0.36 |
| Pipeline Length (feet): | 311.69 | Limits of Disturbance (Ac): | 0.36 |

NOTE: ACTUAL LOCATION OF EASEMENT IS DETERMINED BY THE PIPELINE AS INSTALLED. PROPERTY BOUNDARIES ARE BASED ON APPROXIMATIONS BASED ON
CURRENT AVAILABLE DATA AND ARE SUBJECT TO CHANGE.  PIPELINE CENTERLINE LOCATION IS BASED ON GPS DATA.

**Legend**
— Proposed Centerline
▭ Permanent Easement

**EXHIBIT A**



1026-3-13
PE-HU-217.000

Legend

— Proposed Centerline

☐ Permanent Easement

130 ☐☐☐☐ Feet

PennEast

| | | | |
|---|---|---|---|
| Date: | 8/24/2017 | Temporary Workspace (Ac): | 0.00 |
| Line List No: | PE-HU-217.000 | Additional Temporary Workspace (Ac): | 0.00 |
| Parcel No: | 1026-3-13 | Permanent Easement (Ac): | 0.12 |
| Pipeline Length (feet): | 104.23 | Limits of Disturbance (Ac): | 0.12 |

NOTE: ACTUAL LOCATION OF EASEMENT IS DETERMINED BY THE PIPELINE AS INSTALLED. PROPERTY BOUNDARIES ARE BASED ON APPROXIMATIONS BASED ON
CURRENT AVAILABLE DATA AND ARE SUBJECT TO CHANGE. PIPELINE CENTERLINE LOCATION IS BASED ON GPS DATA.

# Exhibit B

162 FERC ¶ 61,053
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Kevin J. McIntyre, Chairman;
Cheryl A. LaFleur, Neil Chatterjee,
Robert F. Powelson, and Richard Glick.

PennEast Pipeline Company, LLC                Docket No. CP15-558-000

ORDER ISSUING CERTIFICATES

(Issued January 19, 2018)

1.      On September 24, 2015, PennEast Pipeline Company, LLC (PennEast) filed an application pursuant to section 7(c) of the Natural Gas Act (NGA)[1] and Parts 157 and 284 of the Commission's regulations,[2] requesting authorization to construct and operate a new 116-mile natural gas pipeline from Luzerne County, Pennsylvania, to Mercer County, New Jersey, along with three laterals extending off the mainline, a compression station, and appurtenant above ground facilities (PennEast Project).  The project is designed to provide up to 1,107,000 dekatherms per day (Dth/d) of firm transportation service.  PennEast also requests a blanket certificate under Part 284, Subpart G of the Commission's regulations to provide open-access transportation services, and a blanket certificate under Part 157, Subpart F of the Commission's regulations to perform certain routine construction activities and operations.

2.      As explained herein, we find that the benefits that the PennEast Project will provide to the market outweigh any adverse effects on existing shippers, other pipelines and their captive customers, and on landowners and surrounding communities.  Further, as set forth in the environmental discussion below, we agree with Commission staff's conclusion in the Environmental Impact Statement (EIS) that the project will result in some adverse environmental impacts, but that these impacts will be reduced to acceptable levels with the implementation of the applicant's proposed mitigation and staff's recommendations, as modified herein, and adopted as conditions in the attached Appendix A of this order.  Therefore, for the reasons stated below, we grant the requested authorizations, subject to the conditions discussed herein.

---

[1] 15 U.S.C. § 717f(c) (2012).

[2] 18 C.F.R. pt. 157 (2017).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

Docket No. CP15-558-000                                                          - 2 -

## I.      Background and Proposal

3.      PennEast[3] is a Delaware limited liability company organized and existing under the laws of the State of Delaware, managed by UGI Energy Services, LLC, pursuant to a Project Management Agreement.  Upon the commencement of operations proposed in its application, PennEast will become a natural gas company within the meaning of section 2(6) of the NGA,[4] and will be subject to the Commission's jurisdiction.

### A.      Facilities and Services

4.      PennEast proposes to construct a new greenfield pipeline system to provide up to 1,107,000 Dth/d of firm natural gas transportation service to markets in New Jersey, New York, Pennsylvania, and surrounding states.  The project extends from various receipt point interconnections with the interstate natural gas pipeline system of Transcontinental Gas Pipe Line Company, LLC (Transco) and with gathering systems in the eastern Marcellus Shale region operated by UGI Energy Services, LLC, Williams Partners, L.P., and Energy Transfer Partners, L.P., to multiple delivery point interconnections in natural gas-consuming markets in New Jersey and Pennsylvania, terminating at a delivery point with Transco in Mercer County, New Jersey.[5]  PennEast states that the project is designed to bring lower cost natural gas to markets in New Jersey, Pennsylvania, and New York and to provide shippers with additional supply flexibility, diversity, and reliability.[6]

5.      PennEast proposes to construct the following facilities:

- approximately 116 miles of 36-inch-diameter mainline transmission pipeline originating in Luzerne County, Pennsylvania, and extending to Mercer County, New Jersey, traversing Luzerne, Carbon, Northampton, and Bucks Counties, Pennsylvania, and Hunterdon and Mercer Counties, New Jersey;

---

[3] PennEast is a joint venture owned by Red Oak Enterprise Holdings, Inc., a subsidiary of AGL Resources Inc. (20 percent interest); NJR Pipeline Company, a subsidiary of New Jersey Resources (20 percent interest); SJI Midstream, LLC, a subsidiary of South Jersey Industries (20 percent interest); UGI PennEast, LLC, a subsidiary of UGI Energy Services, LLC (20 percent interest); and Spectra Energy Partners, LP (20 percent interest).

[4] 15 U.S.C. § 717a(6) (2012).

[5] *See* PennEast's Application at 3.

[6] *Id*. at 4, 8-10.

Docket No. CP15-558-000                                                                        - 3 -

- three lateral pipelines extending off of the mainline consisting of:

  - the approximately 2.1-mile, 24-inch-diameter Hellertown Lateral in Northampton County, Pennsylvania to connect with Columbia Gas Transmission, LLC, and UGI Utilities, Inc.;

  - the approximately 0.6-mile, 12-inch-diameter Gilbert Lateral in Hunterdon County, New Jersey to connect with NRG REMA, LLC, and Elizabethtown Gas at the Gilbert Electric Generating Station; and

  - the approximately 1.54-mile, 36-inch-diameter Lambertville Lateral in Hunterdon County, New Jersey to connect with Algonquin Gas Transmission, LLC, and Texas Eastern Transmission, LP;

- one new compressor station in Carbon County, Pennsylvania; and

- various associated aboveground facilities, including interconnects, launchers, receivers, and mainline block valves.

PennEast estimates that the proposed facilities will cost approximately $1.13 billion.

6.     PennEast states that it conducted an open season for the project from August 11 to August 29, 2014.  As a result of the open season, PennEast states that it has executed long-term precedent agreements with the following 12 shippers for 990,000 Dth/d of firm transportation service, or approximately 90 percent of the project's capacity:

| Shipper (* indicates PennEast Affiliate) | Contracted Volumes (Dth/d) |
|---|---|
| New Jersey Natural Gas Company* | 180,000 |
| PSEG Power, LLC* | 125,000 |
| Texas Eastern Transmission, LP* | 125,000 |
| South Jersey Gas Company* | 105,000 |
| ConEd of New York | 100,000 |
| Elizabethtown Gas* | 100,000 |
| UGI Energy Services, Inc.* | 100,000 |
| Cabot Oil & Gas Corp. | 50,000 |
| Talen Energy Marketing, LLC | 50,000 |
| Enerplus Resources Corp. | 30,000 |
| Warren Resources, Inc. | 15,000 |
| NRG Rema LLC | 10,000 |

PennEast proposes to provide service to the project shippers at negotiated rates.

7.      PennEast also requests approval of its pro forma tariff.  PennEast proposes to offer open-access transportation services under Rate Schedules FTS (Firm Transportation Service), ITS (Interruptible Transportation Service), and PALS (Parking and Lending Service).

### B.      Blanket Certificates

8.      PennEast requests a blanket certificate of public convenience and necessity pursuant to Part 284, Subpart G of the Commission's regulations authorizing PennEast to provide transportation service to customers requesting and qualifying for transportation service under its proposed FERC Gas Tariff, with pre-granted abandonment authorization.[7]

9.      PennEast requests a blanket certificate of public convenience and necessity pursuant to Part 157, Subpart F of the Commission's regulations authorizing certain future facility construction, operation, and abandonment.[8]

## II.    Procedural Issues

### A.      Notice, Interventions, Protests,  and Comments

10.     Notice of PennEast's application was published in the *Federal Register* on October 15, 2015.[9]  Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure.[10]  Late interventions were granted by notice issued on March 23, 2017, and May 18, 2017.

11.     Numerous entities, landowners, individuals, and New Jersey State representatives filed protests and adverse comments raising the following issues:  (1) the need for an evidentiary hearing; (2) the need for the project; and (3) whether the use of eminent domain is appropriate for this project.  On November 13, 2015, PennEast filed a Motion for Leave to Answer and Answer to the protests, as well as to various comments filed on the project.  Although the Commission's Rules of Practice and Procedure generally do not permit answers to protests,[11] we will accept PennEast's answer because it clarifies the

---

[7] 18 C.F.R. § 284.221 (2017).

[8] *Id.* § 157.204 (2017).

[9] 80 Fed. Reg. 62,068 (2015).

[10] 18 C.F.R. § 385.214 (2017).

[11] *Id.* § 385.214(c) (2017).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

Docket No. CP15-558-000                                              - 5 -

concerns raised and provides information that has assisted in our decision making.  These concerns are addressed below.

12.    In addition, numerous comments were filed raising concerns over the environmental impacts of the project.  These comments are addressed in the Final Environmental Impact Statement (EIS) and, as appropriate, below.

### B.    Request for Evidentiary Hearing

13.    New Jersey Senator Shirley K. Turner, New Jersey Assemblyman Reed Gusciora, and New Jersey Assemblywoman Elizabeth Muoio requested an evidentiary hearing to determine the need for the project, and explore whether less disruptive, more cost-effective alternatives exist to meet demand.  Similarly, the New Jersey Conservation Foundation (NJCF) and Stony Brook-Millstone Watershed Association (Stony Brook) assert that a hearing is necessary in order to develop a record to determine the public benefits of the project and whether the project is viable without subsidies.

14.    An evidentiary, trial-type hearing is necessary only where there are material issues of fact in dispute that cannot be resolved on the basis of the written record.[12]  No party has raised a material issue of fact that the Commission cannot resolve on the basis of the written record.  As demonstrated by the discussion below, the existing written record provides a sufficient basis to resolve the issues relevant to this proceeding.  The Commission has satisfied the hearing requirement by giving all interested parties a full and complete opportunity to participate through evidentiary submission in written form.[13]  Therefore, we will deny the request for a trial-type evidentiary hearing.

### III.   Discussion

15.    As PennEast's proposed pipeline system would be used to transport natural gas in interstate commerce subject to the Commission's jurisdiction, the construction and operation of the facilities are subject to the requirements of subsections (c) and (e) of section 7 of the NGA.[14]

---

[12] *See, e.g., Southern Union Gas Co. v. FERC*, 840 F.2d 964, 970 (D.C. Cir. 1988); *Dominion Transmission, Inc.,* 141 FERC ¶ 61,183, at P 15 (2012).

[13] *Moreau v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993).

[14] 15 U.S.C. §§ 717f(c), (e) (2012).

Docket No. CP15-558-000                                    - 6 -

### A.  Application of the Certificate Policy Statement

16.    The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[15]  The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  The Certificate Policy Statement explains that in deciding whether to authorize the construction of major new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences.  The Commission's goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline facilities construction.

17.    Under this policy, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the construction.  If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, we will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test.  Only when the benefits outweigh the adverse effects on economic interests will we proceed to consider the environmental analysis where other interests are addressed.

### 1.  Subsidization and Impact on Existing Customers

18.    As discussed above, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from existing customers.  As PennEast is a new company, it has no existing customers.  As such, there is no potential for subsidization on PennEast's system or degradation of service to existing customers.

---

[15] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128 (2000), *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

## 2.    Need for the Project

19.    Numerous parties and commenters challenge the need for the project.[16]  They raise a variety of arguments including:  (1) insufficient demand for natural gas in New Jersey and Pennsylvania; (2) the need for a regional analysis to determine if the project is needed; (3) the availability of alternatives, including renewable energy and capacity on existing and proposed interstate pipelines, to meet future demand; (4) the public benefits of the project, including cost savings, supply flexibility and reliability, and local employment impacts are unfounded or are overstated; (5) the use of precedent agreements with affiliated entities to demonstrate project need; and (6) that a portion of the gas transported on the project may be exported.

20.    A number of commenters claim that the project is not needed because there is little or no forecasted load growth in New Jersey and Pennsylvania.[17]  In addition, the New Jersey Division of Rate Counsel (NJRC) cites to filings made by local distribution companies (LDCs) before state regulatory agencies in Pennsylvania and New Jersey which show that the peak day requirements of the LDCs will be largely stable through 2020, and can be met through existing supply arrangements.[18]

21.    Numerous commenters suggest that increased use of renewable resources to generate electricity and energy conservation could eliminate the need for the project. Several other commenters claim that there is no need to construct a new pipeline, as

---

[16] Many of the commenters conflate the balancing of economic benefits (market need) and effects under the Certificate Policy Statement with the distinct description of purpose and need in the final EIS.  The purpose and need statement in the final EIS complied with Council on Environmental Quality (CEQ) regulations that provide that this statement "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed actions" for purposes of its environmental analysis.  40 C.F.R. § 1502.13 (2017).

[17] *See, e.g.*, October 29, 2015 Comments of NJCF at 9; February 11, 2016 Comments of Delaware Riverkeeper (citing attached affidavit of David Berman, Labyrinth Consulting Services); October 27, 2015 Comments of the West Amwell Citizens Against the Pipeline.

[18] *See* September 12, 2016 Comments of NJCF (citing attached Affidavit of David E. Dismukes).  On October 17, 2016, PennEast filed an answer to NJRC.  On November 14, 2016, the New Jersey Division of Rate Council (NJRC) filed a Motion for Leave to Answer and Answer to PennEast.  Although the Commission's Rules of Practice and Procedure generally do not permit answers to answers, we will accept NJRC's answers because it clarifies the concerns raised and provides information that has assisted in our decision making.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

PennEast's shippers could source gas on existing pipelines or on other to be constructed, but already-authorized pipeline capacity.[19]  NJRC states that the fact that utilization rates of several long-haul pipelines declined from 2007 to 2013 suggests that there is available firm capacity on these existing pipelines.[20]

22.    Multiple commenters assert that PennEast's claims that the project will provide cost-savings for end users, and provide increased reliability and supply diversity are unfounded or overstated.[21]  The NJCF filed a report prepared by Skipping Stone, LLC, (Skipping Stone Report) which challenges the findings in the Concentric study filed by PennEast[22] that the PennEast Project would lower costs to consumers.[23]  Among other things, the Skipping Stone Report concludes that local gas distribution companies already have more than enough capacity to meet peak winter demand, suggesting that increased demand by providers of gas-fired electric generation could be more cost effectively met by dual fuel switching or by purchasing gas from LNG facilities, and that the PennEast Project could increase, rather than decrease costs to consumers.  Commenters also claim

---

[19] *See, e.g.,* October 29, 2015 Comments of NJCF at 10.

[20] September 12, 2016 Comments of NJCF at 6-8 (citing Denny Young, Black & Veatch, *Has Emerging Natural Gas Shale Production Affected Financial Performances of Interstate pipelines?* (2013).

[21] *See, e.g.*, November 14 Answer of NJRC, October 27, 2015 Comments of the West Amwell Citizens Against the Pipeline.

[22] In Exhibit F-1, Resource Report 5, PennEast submitted a study by Concentric Energy Advisors, *Estimated Energy Market Savings from Additional Pipeline Infrastructure Serving Eastern Pennsylvania and New Jersey*) (Concentric Study) that finds that the project would provide increased access to low-cost natural gas in New Jersey and Pennsylvania that could save consumers nearly $900 million. Resource Report 5 also includes a study by Econsult Solutions & Drexel University, *Economic Impact Report and Analysis: PennEast Pipeline Project Economic Impact Analysis* (2015) (Econsult Study) that estimates the total (direct, indirect, and induced) jobs that would be supported during construction and operation of the project.

[23] *See* Report of Skipping Stone, LLC, attached to NJCF's December 1, 2016 Comments (Skipping Stone Report).

Docket No. CP15-558-000                                                    - 9 -

that the employment and economic benefits of the project contained in the Econsult study cited by PennEast have been overstated, possibly significantly so.[24]

23.     Several commenters allege that because a large portion of the project's capacity has been subscribed by affiliates of the pipeline, additional evidence of need must be presented as precedent agreements with pipeline affiliates may not be the result of an "arms-length negotiation," or reflect the competitive market.[25]   Commenters further claim that the project is being cross-subsidized by the captive customers of the affiliated shippers, and may not be financially viable without these subsidies.[26]

24.     The NJCF and Stony Brook claim that the NGA requires the Commission to evaluate the need for new pipeline infrastructure on a regional basis.[27]   They state that the public interest cannot be effectively safeguarded through the approval of individual pipelines without coordinated planning to ensure that pipeline proposal fits within long-term, regional plans.  Therefore, they assert that the Commission should implement a planning process for natural gas infrastructure development that is similar to the planning process for electric transmission.

25.     Finally, a few commenters contend that the PennEast Project is not being proposed to benefit United States markets but to support the growing LNG export market.[28]

**PennEast's Answers**

26.     PennEast filed several answers disputing commenters' claims that the project was not needed.  PennEast maintains that that substantial need for the project has been demonstrated by precedent agreements for long-term firm service for approximately

---

[24] *See* November 7, 2015 Comments of NJCF (citing attached Report of the Goodman Group, ltd.), September 8, 2016 Comments of the NJCF; September 8, 2016 Comments of Jeffrey R. Shafer.

[25] *Id.* at 9-10.

[26] *See* October 20, 2016 Comments of the Eastern Environmental Law Center, citing attached Report of Dr. Steve Isser, "*Natural Gas Pipeline Certification and Ratemaking.*

[27] NJCF Comments at 24-27.

[28] *See, e.g.*, October 27, 2015 Comments of West Amwell Citizens Against the Pipeline at 15-17; February 11, 2016 Comments of Delaware Riverkeeper (attaching opinion of Labyrinth Consulting Services, Inc.).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

90 percent of the project's capacity.[29]  PennEast filed a study that responds to NJRC's assessment of the need for the project that explains that shippers contract for pipeline capacity for a variety of reasons beyond simply the need to be able to meet peak demands, including costs savings, supply security, and price stability.[30]  PennEast asserts that the various studies by market experts that it filed in the proceeding provide ample market data and analysis supporting the market need for the project.

**Commission Determination**

27.     The Certificate Policy Statement established a policy under which the Commission will allow an applicant to rely on a variety of relevant factors to demonstrate need, rather than continuing to require that a percentage of the proposed capacity be subscribed under long-term precedent or service agreements.[31]  These factors might include, but are not limited to, precedent agreements, demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of capacity currently serving the market.[32]  The Commission stated that it will consider all such evidence submitted by the applicant regarding need.  Nonetheless, the Certificate Policy Statement made clear that, although precedent agreements are no longer required to be submitted, they are still significant evidence of demand for the project.[33]  As the court stated in *Minisink Residents for Environmental Preservation & Safety v. FERC*, and again in *Myersville Citizens for a Rural Community, Inc., v. FERC,* nothing in the Certificate Policy Statement or in any precedent construing it suggest that the policy statement requires, rather than permits, the Commission to assess a project's benefits by looking beyond the market need reflected by the applicant's precedent agreements with shippers.[34]

---

[29] *See* PennEast's October 17, and December 1, 2016 Answers.

[30] PennEast's October 17 Answer (attaching report of Concentric Energy Advisors, Inc).

[31] Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,747.  Prior to the Certificate Policy Statement, the Commission required a new pipeline project to have contractual commitments for at least 25 percent of the proposed project's capacity.  *See* Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,743.  PennEast, at 90 percent subscribed, would have satisfied this prior, more stringent, requirement.

[32] *Id.* at 61,747.

[33] *Id.* at 61,748.

[34] *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 110 n.10 (D.C. Cir. 2014); *see also Myersville Citizens for a Rural Cmty., Inc., v. FERC*, 183 F.3d 1301, 1311 (D.C. Cir. 2015).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

Moreover, it is current Commission policy to not look beyond precedent or service agreements to make judgments about the needs of individual shippers.[35]

28.     We find that PennEast has sufficiently demonstrated that there is market demand for the project.  PennEast has entered into long-term, firm precedent agreements with 12 shippers for 990,000 Dth/d of firm transportation service, approximately 90 percent of the project's capacity.[36]  Further, Ordering Paragraph (C) of this order requires that PennEast file a written statement affirming that it has executed contracts for service at the levels provided for in their precedent agreements prior to commencing construction. PennEast has entered into precedent agreements for long-term, firm service with 12 shippers.  Those shippers will provide gas to a variety of end users, including local distribution customers, electric generators, producers, and marketers and those shippers have determined, based on their assessment of the long-term needs of their particular customers and markets, that there is a market for the natural gas to be transported and the PennEast Project is the preferred means for delivering or receiving that gas.  Given the substantial financial commitment required under these contracts by project shippers, we find that these contracts are the best evidence that the service to be provided by the project is needed in the markets to be served.  We also find that end users will generally benefit from the project because it would develop gas infrastructure that will serve to ensure future domestic energy supplies and enhance the pipeline grid by providing additional transportation capacity connecting sources of natural gas to markets in Pennsylvania and New Jersey.

29.     We are unpersuaded by the studies submitted by commenters in their attempt to show that there is insufficient demand for the project and by their assertions that the Commission is required to examine the need for pipeline infrastructure on a regional basis.  Commission policy is to examine the merits of individual projects and assess whether each project meets the specific need demonstrated.  While the Certificate Policy Statement permits the applicant to show need in a variety of ways, it does not suggest that the Commission should examine a group of projects together and pick which project(s) best serve an estimated future regional demand.  In support of their arguments regarding demand, commenters cite general forecasts for load growth in Pennsylvania and New

---

[35] *Id.* at 61,744 (citing *Transcontinental Gas Pipe Line Corp.*, 82 FERC ¶ 61,084, at 61,316 (1998)).

[36] *Constitution Pipeline Company, LLC*, 154 FERC ¶ 61,046, at P 21 (2016) ("Although the Certificate Policy Statement broadened the types of evidence certificate applicants may present to show the public benefits of a project, it did not compel an additional showing … [and] [n]o market study or other additional evidence is necessary where … market need is demonstrated by contracts for 100 percent of the project's capacity.").

20180119-3110 FERC PDF (Unofficial) 01/19/2018

Jersey or certain LDC supply forecast projections through 2020 made to state commissions.[37]  However, projections regarding future demand often change and are influenced by a variety of factors, including economic growth, the cost of natural gas, environmental regulations, and legislative and regulatory decisions by the federal government and individual states.  Given this uncertainty associated with long-term demand projections, including those presented in the studies noted by commenters above, where an applicant has precedent agreements for long-term firm service, the Commission deems the precedent agreements to be the better evidence of demand. The Commission evaluates individual projects based on the evidence of need presented in each proceeding. Under section 7(c) of the NGA, the Commission shall issue a certificate for any proposal found to be required by the public convenience and necessity.[38]  Where, as here, it is demonstrated that specific shippers have entered into precedent agreements for project service, the Commission places substantial reliance on those agreements to find that the project is needed.

30.     Commenters also overlook the fact that shippers on PennEast's system have noted several reasons other than load growth for entering into precedent agreements with PennEast to source gas from the Marcellus Shale region.[39]  Project shippers state they believe that the project will provide a reliable, flexible, and diverse supply of natural gas that will lead to increased price stability, and the opportunity to expand natural gas service in the future.[40]  Based on the record before us, we find no reason to second guess the business decisions of these shippers that they need the service to which they have subscribed.

31.     With respect to the ability of alternatives to meet the project's need, our environmental review considered the potential for renewable energy and energy conservation, and the availability of capacity on existing or proposed natural gas systems, to serve as alternatives to the project and concluded that they do not presently serve as

---

[37] NJRC Comments at 5.

[38] 15 U.S.C. § 717(f) (2012).

[39] *See* Exhibit F-1 of PennEast's application, Resource Report 1 – General Project Description, section 1.1 – Purpose and Need.

[40] *See* Motion to Intervene and Comments in Support of New Jersey Natural Gas Co. (filed October 28, 2015); Pivotal Utility Holdings, Inc., d/b/a Elizabethtown Gas (filed October 28, 2015); Consolidated Edison Company of New York, Inc. (filed October 29, 2015); Texas Eastern Transmission, LP (filed October 29, 2015); PSEG Energy Resources & Trade LLC (filed October 29, 2015); and South Jersey Gas (filed October 29, 2015).

practical alternatives to the project.[41]  Specifically, the final EIS stated that renewable energy and energy efficiency measures to reduce the dependence on natural gas is not a comparable replacement for the transportation of natural gas to be provided by the project.[42]  Moreover, the final EIS found that there is not sufficient available capacity on existing pipeline systems to transport all of the volumes contemplated to be transported by the PennEast Project to the range of delivery points proposed by PennEast, and that expansion of existing pipeline systems was not a feasible alternative.[43]  The EIS also found that the proposed Atlantic Sunrise Project could not serve as a practical system alternative because there is customer demand for both projects (noting that approximately 100 percent of capacity of the Atlantic Sunrise Project, and 90 percent of the capacity of the PennEast Project has been contracted for), as well as the fact that the Atlantic Sunrise Project would not provide for the same delivery points for customers that have been identified for the PennEast Project.[44]

32.     We also find that NJRC's assertion that the PennEast Project is not needed based on the fact that pipeline utilization on long-haul pipelines from the Gulf Coast to markets in the Northeast has declined in recent years is unavailing.  Pipeline utilization rates reflect actual gas flows over the facilities but do not indicate whether there is available firm capacity on the pipelines.  As indicated above, the EIS found that there was insufficient firm capacity available on existing pipeline systems to provide the service proposed by PennEast.

33.     Moreover, the fact that 6 of the 12 shippers on the PennEast Project are affiliated with the project's sponsors does not require the Commission to look behind the precedent agreements to evaluate project need.[45]  There is no evidence in the record of any

---

[41] Final EIS at 3-1 – 3-8.

[42] *Id.* at 3-3.

[43] *Id.* at ES-16; 3-4 - 3-7.

[44] *Id.* at 3-7 – 3-8.  The Atlantic Sunrise Project was authorized by Commission order issued February 3, 2017 (*see Transcontinental Gas Pipe Line Company, LLC,* 158 FERC ¶ 61,125 (2017)) and is currently under construction.

[45] *Millennium Pipeline Co., L.P.*, 100 FERC ¶ 61,277, at P 57 (2002) ("as long as the precedent agreements are long-term and binding, we do not distinguish between pipelines' precedent agreements with affiliates or independent marketers in establishing the market need for a proposed project"); *Eastern Shore Natural Gas Co.*, 132 FERC ¶ 61,204, at P 31 (2010) ("the Commission gives equal weight to contacts with affiliates and non-affiliates."  *See also* Certificate Policy Statement, 88 FERC at 61,748 (explaining that the Commission's policy is less focused on whether the contracts are with affiliated or unaffiliated shippers and more focused on whether existing ratepayers would *(continued ...)*

impropriety or abuse in connection with any of the affiliate agreements. The mere fact that six of the shippers are affiliates of PennEast does not call into question their need for the new capacity or otherwise diminish the showing of market support. Indeed, three of the six affiliates, subscribing to 38 percent of the total project design capacity, are LDCs with service obligations toward their retail customers. The Commission has found it reasonable for LDCs seek additional sources of supply, and has emphasized its disinclination to second-guess reasoned business decisions by pipelines' customers evidenced by precedent agreements, as well as binding contracts.[46] Further, when considering applications for new certificates, the Commission's primary concern regarding affiliates of the pipeline as shippers is whether there may have been undue discrimination against a non-affiliate shipper.[47] Here, no such allegations have been made, nor have we found that the project sponsors have engaged in any anticompetitive behavior. As discussed above, PennEast held an open season for capacity on the project and all potential shippers had the opportunity to contract for service. Moreover, PennEast's tariff, as discussed below, ensures that any future shipper will not be unduly discriminated against.

34.     We also do not find merit in the commenters' assertion that the proposed project will be subsidized by the affiliated LDC shippers' captive customers. First, to the extent a ratepayer receives a beneficial service, paying for that service does not constitute a "subsidy."[48] Further, state regulatory commissions are responsible for approving any expenditures by state-regulated utilities. Moreover, PennEast is required to calculate its recourse rates based on the design capacity of the pipeline, thereby placing PennEast at risk for costs associated with any unsubscribed capacity.

---

subsidize the project); *see also id.* at 61,744 (the Commission does not look behind precedent agreements to question the individual shippers' business decisions to enter into contracts) (citing *Transcontinental Gas Pipe Line Corp.*, 82 FERC ¶ 61,084, at 61,316 (1998)).

[46] *See Millennium Pipeline Co., L.P.*, 100 FERC ¶ 61,277, at P 201 (2002). *See also*, *Midwestern Gas Transmission Co.*, 116 FERC ¶ 61,182, at P 42 (2006); *Southern Natural Gas Co.*, 76 FERC ¶ 61,122, at 61,635 (1996), *order issuing certificate and denying reh'g*, 79 FERC ¶ 61,280 (1997), *order amending certificate and denying stay and reh'g*, 85 FERC ¶ 61,134 (1998), *aff'd Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960 (D.C. Cir. 2000).

[47] *See* 18 C.F.R. § 284.7(b) (2017) (requiring transportation service to be provided on a non-discriminatory basis).

[48] *See* Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,746.

35.     Finally, allegations that the project is not needed because gas that is transported by it may be exported through an LNG terminal are not persuasive.  There is no evidence in the record that indicates that the expansion capacity will be used to transport natural gas for export.  A number of the project shippers are LDCs, which will locally distribute gas or use it to generate electricity.  Further, even if there was evidence that some of the gas would be exported, the Commission does not have jurisdiction over the exportation or importation of natural gas.  Such jurisdiction resides with the Secretary of Energy, who must act on any applications for natural gas export or import authority.[49]

36.     In conclusion, we find that the PennEast Project will provide reliable natural gas service to end use customers and the market.  Precedent agreements signed by customers for approximately 90 percent of the project's capacity adequately demonstrate that the project is needed.

### 3.     Existing Pipelines and their Customers

37.     PennEast's project is not intended to replace service on other pipelines, and no pipelines or their customers have filed adverse comments regarding PennEast's proposal.  Thus, we find that PennEast's project will not adversely affect other pipelines or their captive customers.

---

[49] Section 3(a) of the NGA provides, in part, that "no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so."  15 U.S.C. § 717b(a) (2012).  In 1977, the Department of Energy Organization Act transferred the regulatory functions of section 3 of the NGA to the Secretary of Energy.  42 U.S.C. § 7151(b) (2012).  Subsequently, the Secretary of Energy delegated to the Commission authority to "[a]pprove or disapprove the construction and operation of particular facilities, the site at which such facilities shall be located, and with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports."  DOE Delegation Order No. 00-004.00A (effective May 16, 2006).  The proposed facilities are not located at a potential site of exit for natural gas exports.  Moreover, the Secretary of Energy has not delegated to the Commission any authority to approve or disapprove the import or export of the commodity itself, or to consider whether the exportation or importation of natural gas is consistent with the public interest.  *See Corpus Christi Liquefaction, LLC*, 149 FERC ¶ 61,283, at P 20 (2014) (*Corpus Christi*).  *See also National Steel Corp.*, 45 FERC ¶ 61,100, at 61,332-61,333 (1988) (observing that DOE, "pursuant to its exclusive jurisdiction, has approved the importation with respect to every aspect of it except the point of importation" and that the "Commission's authority in this matter is limited to consideration of the place of importation, which necessarily includes the technical and environmental aspects of any related facilities").

Docket No. CP15-558-000                                    - 16 -

### 4.    Landowners and Communities

38.    Regarding the project's impacts on landowners and communities, the project would impact approximately 1,588 acres of land during construction, and approximately 788.3 acres of land during operation.  Approximately 44.5 miles, or 37 percent of the 120.2 mile-long pipeline route, will be located alongside existing rights-of-way.

39.    While we are mindful that PennEast has been unable to reach easement agreements with a number of landowners, for purposes of our consideration under the Certificate Policy Statement, we find that PennEast has generally taken sufficient steps to minimize adverse impacts on landowners and surrounding communities.  The Commission encourages pipeline companies to engage with project stakeholders throughout the life of the project, and provide all stakeholders and potential impacted residents with informational materials, and hold community meeting to enable stakeholders to learn about the project, and educate project developers about local concerns.[50]  PennEast participated in the pre-filing process, and held over 200 meetings with public officials, as well as 15 "informational sessions" for impacted landowners.[51]  PennEast incorporated 70 of 101 identified route variations into its final proposed pipeline route for various reasons, including landowner requests, community impacts, and the avoidance of sensitive resources.[52]  Accordingly, we find that PennEast's proposal has taken appropriate steps to minimize impacts on landowners and the surrounding communities.

### 5.    Conclusion

40.    Based on the benefits the project will provide to the shippers, the lack of adverse effects on existing customers, other pipelines and their captive customers, and effects on landowners and surrounding communities, we find, consistent with the Certificate Policy Statement and section 7 of the NGA, that the public convenience and necessity requires approval of PennEast's proposal, subject to the conditions discussed below.

### B.    Eminent Domain Authority

41.    Several commenters assert that it is inappropriate for PennEast to obtain property for the project through eminent domain, as PennEast is a for-profit company, and has not

---

[50] Commission, *Suggested Best Practices for Industry Outreach Programs to Stakeholders* at 11-17 (2015).

[51] PennEast Application at 5.

[52] Final EIS at 3-27 – 3-32.

shown that there is a genuine need for the project, or that the public it is intended to serve will benefit from it.[53]

42.     Under section 7 of the NGA, the Commission has jurisdiction to determine if the construction and operation of proposed interstate pipeline facilities are in the public convenience and necessity.  Once the Commission makes that determination, it is section 7(h) of the NGA that authorizes a certificate holder to acquire the necessary land or property to construct the approved facilities by exercising the right of eminent domain if it cannot acquire the easement by an agreement with the landowner.[54]  In constructing this provision, Congress made no distinction between for-profit and non-profit companies.  Further, as discussed above, need for the project has been demonstrated by the existence of long-term precedent agreements for approximately 90 percent of the project's capacity.  Just as the precedent agreements provide evidence of market demand/need, they are also evidence of the public benefits of the project.[55]

## C.     Blanket Certificates

43.     PennEast requests a Part 284, Subpart G blanket transportation certificate to provide open-access transportation services to its shippers.  Since a Part 284 blanket certificate is required for PennEast to offer these services, we will grant PennEast a Part 284, Subpart G blanket certificate, subject to the conditions imposed herein.

44.     PennEast has also applied for a Part 157, Subpart F blanket construction certificate to automatically, or after prior notice, perform certain activities related to the construction, acquisition, abandonment, and replacement and operation of pipeline facilities.  This blanket certificate includes requirements for landowner notification before construction may begin.

45.     The Trustees of the Joseph D. Ceader Family Memorial Fund (Ceader Family) express concern over issuing PennEast a Part 157, Subpart F blanket certificate, alleging that doing so would grant PennEast "*carte blanche*" (emphasis included) authority to condemn land via eminent domain, and construct significant facilities that could have negative impacts on the environment and their property value, without "extensive environmental review" or findings of need.  In addition, Hopewell Township Citizens

---

[53] *See, e.g.,* Homeowners Against Land Taking-PennEast.

[54] 15 U.S.C. § 717f(h) (2012).

[55] *See Sierra Club v. FERC,* 867 F.3d 1357, 1379 (D.C. Cir. 2017); *see also Florida Southeast Connection, LLC*, 156 FERC ¶ 61,160, at P 5 (2016); *see also Minisink Residents for Environmental Preservation and Safety v. FERC,* 762 F.3d 97, 111, at n.10 (D.C. Cir. 2014).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

Against the PennEast Pipeline, LLC, (Hopewell Township) oppose the issuance of a blanket certificate to PennEast as it would be a "'one size fits all solution'" that is inappropriate for such a project.

46.     Neither the Ceader Family nor Hopewell Township) present any arguments why PennEast's specific request for a blanket certificate should be denied; rather they seem to take general issue with the Commission's blanket certificate program.  Part 157, Subpart F of the Commission's regulations authorizes a certificate holder to engage in a limited number of routine activities under a blanket certificate, subject to certain reporting, notice, and protest requirements.[56]  The blanket certificate procedures are intended to increase flexibility and reduce regulatory and administrative burdens.  Because the eligible activities permitted under a blanket certificate regulations can satisfy our environmental requirements and meet the blanket certificate cost limits, they will have minimal impacts, such that the close scrutiny involved in considering applications for case-specific certificate authorization is not necessary to ensure compatibility with the public convenience and necessity.  For almost all eligible activities, a certificate holder seeking to engage in such activities must notify landowners prior to commencing the activity.[57]  For activities that require prior notice, an opportunity to protest is afforded once notice of the certificate holder's request is issued to the public.[58]  If a protest cannot be resolved, then the certificate holder may not perform the requested activity under a blanket certificate.[59]

47.     Receipt of a Part 157 blanket certificate does confer the right of eminent domain authority under section 7(h) of the NGA.[60]  However, Commission regulations require companies to include information on relevant eminent domain rules in notices to potentially affected landowners.[61]  The compensation landowners receive for property rights is a matter of negotiation between the pipeline company and landowner, or is determined by a court in an eminent domain proceeding.  In view of the above-noted

---

[56] *See* 18 C.F.R. § 157.203 (2017).

[57] *See id.* § 157.203(d).

[58] *See id.* § 157.205.

[59] *See id.* § 157.205(f).

[60] *See* 15 U.S.C. § 717f(h) (2012); *also Columbia Gas Transmission, LLC v. 1.01 Acres*, 768 F.3d 300, 314 (3rd Cir. 2014) (finding that the plain meaning of the Commission's Part 157 blanket certificate regulations grants the holder of a blanket certificate the right of eminent domain to obtain easements from landowners.).

[61] 18 C.F.R. § 157.203(d)(2)(v) (2017).

blanket program procedures and protections, we expect the Ceader Family and Hopewell Township will have the opportunity to raise specific concerns and seek specific relief regarding PennEast's reliance on blanket authority in undertaking a future activity.

48.     Because PennEast will become an interstate pipeline with the issuance of a certificate to construct and operate the proposed facilities, we will issue PennEast the requested blanket certificate authority under Parts 157 and 284 of the Commission's regulations.

### D.   Rates

#### 1.   Initial Rates

49.     PennEast proposes an initial maximum reservation recourse charge of $16.0799 per Dth per month, and an initial usage charge of $0.0024 per Dth for firm transportation service under Rate Schedule FTS.[62]   PennEast developed its proposed initial rates based on a total first-year cost of service of $224,270,492.  The proposed cost-based rates reflect a Straight-Fixed Variable rate methodology.  The FTS reservation rate is designed using the fixed costs of the project[63] and annual reservation design determinants of 13,905,896 Dth.[64]   The FTS usage rate is derived using the variable costs of the project and billing determinants of 282,838,500 Dth, based on a 70 percent load factor of the project's annual design throughput.[65]

50.     The proposed cost of service is based on a depreciation rate of 2.5 percent for pipeline facilities and 4 percent for compression and metering facilities.[66]   PennEast proposes a capital structure of 40 percent debt and 60 percent equity.  PennEast's proposed rates include a return on equity of 14 percent and a cost of debt of 6 percent.  PennEast states that the overall rate of return of 10.8 percent is consistent with the range

---

[62] Exhibit P, Schedule 2, of PennEast's Application.

[63] Id. PennEast estimates the first year fixed costs of the project to be $223,604,821.

[64] Id.  The annual reservation design determinants are based on the project's daily design capacity of 1,107,000 Dth plus 51,825 Dth of imputed IT billing determinants, as described further, times 12.

[65] The project's daily design capacity of 1,107,000 Dth, times 365, times 70 percent.

[66] Exhibits L, O and P of PennEast's Application.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

the Commission has found acceptable for new greenfield pipelines.[67] PennEast's proposed cost of service also includes a federal corporate income tax rate of 35 percent.[68]

51.     PennEast proposes an initial charge of $0.5310 per Dth for interruptible service under Rate Schedule IT and for interruptible parking and lending service under Rate Schedule PAL, based on a 100 percent load factor equivalent of its Rate Schedule FTS rates.[69]

52.     Commission policy requires new pipelines to allocate costs to all services (including interruptible and short-term firm transportation) or credit revenues generated by these services to maximum rate shippers.[70]   To comply with this policy, PennEast proposes to assign $10 million of costs to interruptible services, reflected as 51,825 Dth/d of imputed billing determinants for interruptible service.  PennEast included the additional imputed billing determinants for interruptible service in the calculation of the FT reservation charge, which results in a lower FT reservation charge for firm shippers.

53.     The Commission has reviewed PennEast's proposed initial rates, cost of service, use of the Straight Fixed-Variable method of cost classification, billing determinants, and the treatment of interruptible services and interruptible rate calculations, and finds they reasonably reflect current Commission policy, with the modifications and conditions imposed below.

### Return on Equity, Capital Structure, Debt Costs, and Federal Corporate Tax Issues

54.     In comments on the draft environmental impact statement, the NJRC argues that PennEast's requested 60 percent equity capitalization, 14 percent return on equity, and 6 percent debt costs are excessive.

### Return on Equity and Capital Structure

55.     NJRC asserts that a 14 percent return on equity is too high because PennEast faces little risk as a new market entrant constructing a new greenfield pipeline.  In support, NJRC notes that PennEast's system capacity is 90 percent subscribed, and that the majority of that capacity is subscribed by local distribution companies that are "all but

---

[67] PennEast's Application at 32.

[68] *Id.*

[69] Exhibit P, Schedule 2, of PennEast's Application.

[70] *Transcontinental Gas Pipe Line Corp.*, 78 FERC ¶ 61,057, at 61,209-61,210 (1997).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

guaranteed to pay their bills."[71]  In addition, NJRC claims that markets have changed significantly since the Commission began granting 14 percent returns nearly 20 years ago due to the increase in hydraulic fracturing and liquefied natural gas exports, and that current capital markets lack the risk to necessitate such high equity returns.[72]

56.     NJRC also asserts that returns on equity have been trending down over the last few years as reflected in both pipeline rate cases and a number of Federal Power Act complaints regarding electric utilities, and points out that average approved rates of return over the last 5 years for LDCs has been less than 10 percent.[73]  NJRC further points to a recent Commission order in which it claims the Commission "ordered a new pipeline" to use a 10.55 percent return on equity,[74] and asserts that the Commission should not "reflexively" award PennEast a 14 percent return on equity "simply because earlier pipelines have received that return on equity."[75]

57.     Alternatively, if the Commission approves a 14 percent return on equity, NJRC contends that recent Commission orders require the Commission to limit PennEast's capital structure to no more than 50 percent equity.[76]

**Commission Determination**

58.     For new pipelines, the Commission has approved equity returns of up to 14 percent as long as the equity component of the capitalization is no more than 50 percent.[77]  As pointed out by NJRC, PennEast has proposed to establish its rates based

---

[71] NJRC Comments at 11.

[72] *Id.* at 11-12 (citing *Alliance Pipeline L.P.*, 80 FERC ¶ 61,149, at 61,552 (1997)).

[73] *Id.* at 9-13.

[74] *Id.* at 13 (citing *First ECA Midstream LLC*, 155 FERC ¶ 61,222, at P 23 (2016) (*First ECA Midstream*)).

[75] *Id.*

[76] *Id.* at 14 (citing *Ingleside Energy Center, LLC*, 112 FERC ¶ 61,101, at PP 32-33 (2005), *vacated on other grounds*, 136 FERC ¶ 61,114 (2011) (reducing a proposed 70% equity structure to 50%).

[77] S*ee, e.g., Florida Southeast Connection, LLC,* 154 FERC ¶ 61,080 (2016) (approving a 14 percent return on equity after requiring the capital structure be modified to include at least 50 percent debt), *MarkWest Pioneer, L.L.C.*, 125 FERC ¶ 61,165, at P 27 (2008) (approving 14 percent return on equity based on 50 percent debt and 50 percent equity ratios); *Corpus Christi LNG, L.P.*, 111 FERC ¶ 61,081, at P 33 (2005) *(continued ...)*

only on a 40 percent debt capitalization.  With such a debt ratio, everything else being
equal, PennEast will not face the same level of financial risks as any of the new
pipelines that have been previously granted a 14 percent return on equity.  Imputing a
capitalization containing a 60 percent equity ratio is more costly to ratepayers, since
equity financing is typically more costly than debt financing, and also because the interest
on indebtedness is tax deductible.[78]  Accordingly, the Commission will approve
PennEast's proposed 14 percent return on equity, but will require that it design its cost-
based rates on a capital structure that includes at least 50 percent debt.  As a result of the
change to the capital structure required here, we will require PennEast to recalculate its
rates in its compliance filing.

59.     However, we reject NJRC's request that we reduce the proposed return of
14 percent, in addition to requiring a lower equity capitalization.  In modifying
PennEast's proposed capital structure, we are ensuring that consumers are protected and
that PennEast's rates are on a level playing field with other new pipelines.  The
Commission's policy of approving equity returns of up to 14 percent with an equity
capitalization of no more than 50 percent for new pipeline companies reflects the fact that
greenfield pipelines undertaken by a new entrant in the market face higher business risks
than existing pipelines proposing incremental expansion projects.  For example, in
contrast to an existing pipeline company, a new pipeline entrant does not have historical
cost data on which to base its cost-of-service estimates.  In addition, a new pipeline
entrant is likely to face higher risks in securing financing than an existing pipeline.[79]
Thus, approving PennEast's requested 14 percent return on equity in this instance is not
merely "reflexive;" it is in response to the risk PennEast faces as a new market entrant,
constructing a new greenfield pipeline system.

60.     NJRC's reliance on the Commission's decision in *First ECA Midstream* is
misplaced.  That proceeding did not involve a greenfield project undertaken by a new

---

approving a 14 percent return on equity based on 50 percent debt and 50 percent equity
ratios); *Gulfstream Natural Gas System*, L.L.C., 105 FERC ¶ 61,052, at n.26 (2003) and
91 FERC ¶ 61,119, at 61,463 (2000) (approving 14 percent return on equity based on
70 percent debt and 30 percent equity ratios); *Georgia Strait Crossing Pipeline LP*,
98 FERC ¶ 61,271, at 62,054 (2002) (approving 14 percent return on equity based on
70 percent debt and 30 percent equity ratios).

[78] *MarkWest Pioneer, L.L.C.,* 125 FERC ¶ 61,165, at P 27 (2008).

[79] *See, e.g., Rate Regulation of Certain Natural Gas Storage Facilities,* Order
No. 678, 115 FERC ¶ 61,343, at P 127 (2006) ("As a going concern with existing
customers and financial relationships, the risk associated with acquiring financing is
lower for incremental expansions than the risk associated with a greenfield project
undertaken by a new entrant in the market.").

20180119-3110 FERC PDF (Unofficial) 01/19/2018

entrant in the market.  Rather, the applicant was an existing company proposing to operate its existing non-jurisdictional gathering system as an interstate pipeline.  In approving a 10.55 percent return on equity, the Commission specifically found that the applicant had "more in common with existing pipelines than with the greenfield pipeline projects that have received returns of 14 percent."[80]

61.    In addition, we find no support for NJRC's assertion that PennEast faces less risk than other new pipelines that have received returns of 14 percent due to its 90 percent subscription level.  We have consistently approved equity returns of 14 percent for new pipelines that have firm contracts subscriptions equivalent or higher than PennEast's 90 percent subscription level.[81]  Moreover, the returns approved for electric utilities and LDCs are not relevant because there is no showing that these companies face the same level of risk as faced by greenfield projects proposed by a new natural gas pipeline company.[82]

62.    Further, as explained below, we are requiring PennEast to file a cost and revenue study at the end of its first three years of actual operation to justify its existing cost-based rates.  The three-year study will provide an opportunity for the Commission and the public to review PennEast's original estimates, upon which its initial rates are based, to determine whether PennEast is over-recovering its cost of service with its approved initial rates, and whether the Commission should exercise its authority under section 5 of the NGA to establish just and reasonable rates.  Alternatively, PennEast may elect to make a NGA section 4 filing to revise its initial rates.  Should PennEast elect to make such a filing, the public would have an opportunity to review PennEast's proposed return on equity and other cost of service components at that time and would have an opportunity to raise issues relating to the rate of return, as well as all other cost components.

63.    In section 7 certificate proceedings, the Commission reviews initial rates for service using proposed new pipeline capacity under the public convenience and necessity standard, which is a less rigorous standard than the just and reasonable standard under

---

[80] *First ECA Midstream* at P 23.

[81] *See, e.g. Florida Southeast Connection, LLC.* 154 FERC ¶ 61,080 (2016). (approving a 14 percent return on equity where project was 94 percent subscribed); *Sierrita Gas Pipeline, LLC*, 147 FERC ¶ 61,192 (2014), *clarified* 149 FERC ¶ 61,101 (2014) (approving a 14 percent return on equity where project was fully subscribed).

[82] The Commission has previously concluded that distribution companies are less risky than a pipeline company.  *See, e.g. Trailblazer Pipeline Co.,* 106 FERC ¶ 63,005, at P 94 (2004) (rejecting inclusion of LDCs in a proxy group because they face less risk than a pipeline company.).

Docket No. CP15-558-000                                          - 24 -

NGA sections 4 and 5.[83]  As conditioned herein, we find that the approved initial rates will "hold the line" and "ensure that the consuming public may be protected," until just and reasonable rates can determined through the more thorough and time-consuming ratemaking sections of the NGA.[84]

**Debt Costs**

64.     NJRC argues that PennEast has not supported its request for a 6 percent cost of debt.  Referencing a Moody's report for Long-term Bond Yields in 2016, NJRC states that long-term utility bond rates have declined from January 2016 to July.[85]  Thus, NJRC asserts that the Commission should impute a debt cost consistent with "actual debt market rates" and consistent with the Commission's approval of a debt cost of 3 percent.[86]

---

[83] *Atlantic Refining Co. v. Public Serv. Comm'n of New York*, 360 U.S. 378, 390-391 (1959) (*Atlantic Refining*).  In *Atlantic Refining,* the Court contrasted the Commission's authority under sections 4 and 5 of the NGA to approve changes to existing rates using existing facilities and its authority under section 7 to approve initial rates for new services and services using new facilities.  The court recognized "the inordinate delay" can be associated with a full-evidentiary rate proceeding and concluded that was the reason why, unlike sections 4 and 5, section 7 does not require the Commission to make a determination that an applicant's proposed initial rates are or will be just and reasonable before the Commission certificates new facilities, expansion capacity, and/or services. *Id*. at 390. The Court stressed that in deciding under section 7(c) whether proposed new facilities or services are required by the public convenience and necessity, the Commission is required to "evaluate all factors bearing on the public interest," and an applicant's proposed initial rates are not "the only factor bearing on the public convenience and necessity." *Id*. at 391.  Thus, as explained by the Court, "[t]he Congress, in §7(e), has authorized the Commission to condition certificates in such manner as the public convenience and necessity may require when the Commission exercises authority under section 7," *id*., and the Commission therefore has the discretion in section 7 certificate proceedings to approve initial rates that will "hold the line" and "ensure that the consuming public may be protected" while awaiting adjudication of just and reasonable rates under the more time-consuming ratemaking sections of the NGA.  *Id*. at 392.

[84] *Id.* at 392.

[85] NJRC Comments at 15.

[86] *First ECA Midstream LLC,* 115 FERC ¶ 61,222 at PP 22-23.

Docket No. CP15-558-000                                              - 25 -

65.     We find that PennEast's proposed 6 percent cost of debt is consistent with the cost of debt the Commission has approved for recent greenfield pipeline projects. The Commission has approved cost of debt percentages ranging from 4.8 to 9.3.[87]  Moreover, as explained above, the initial rates established in *First ECA Midstream*, including approval of the applicant's proposed 3 percent cost of debt, are inapplicable to this proceeding.  Therefore, we will approve PennEast's proposal to utilize a 6 percent cost of debt.

**Federal Corporate Tax Issues**

66.     As noted above, PennEast used a federal corporate income tax rate of 35 percent in calculating its proposed cost of service.  However, effective January 2018, the Tax Cuts and Jobs Act of 2017 changed several provisions of the federal tax code, including a reduction in the federal corporate income tax rate to 21 percent and allowing certain investments to receive bonus depreciation treatment.  Because these changes impact PennEast's proposed cost of service and the resulting initial recourse rates, we direct PennEast to recalculate its initial recourse rates consistent with the new 2018 federal corporate tax law when it files actual tariff records.  In order to ensure compliance with this directive, we also require PennEast to provide supporting work papers in electronic spreadsheet format, including formulas.

            **2.     Negotiated Rates**

67.     PennEast states that it will provide service to the project's shippers under negotiated rate agreements pursuant to its negotiated rate authority in section 24 of its *pro forma* General Terms and Conditions (GT&C).  PennEast must file either its negotiated rate agreements or tariff records setting forth the essential terms of the agreements in accordance with the Alternative Rate Policy Statement[88] and the

---

            [87] *UGI Sunbury, LLC*, 155 FERC ¶ 61,115, at 20 (2016) (7 percent cost of debt); *Florida Southeast Connection, LLC,* 154 FERC ¶ 61,080 at n.141 (7 percent cost of debt); *Ruby Pipeline, L.L.C.*, 128 FERC ¶ 61,224, at P 43 (2009) (9.3 percent cost of debt); *Sierrita Gas Pipeline, LLC*, 147 FERC ¶ 61,192, at P 40 (2014) (4.8 percent cost of debt).

            [88] *Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines; Regulation of Negotiated Transportation Services of Natural Gas Pipelines*, 74 FERC ¶ 61,076 (1996); *clarification granted*, 74 FERC ¶ 61,194 (1996), *order on reh'g*, 75 FERC ¶ 61,024 (1996).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

Commission's negotiated rate policies.[89]  PennEast must file the negotiated rate agreements or tariff records at least 30 days, but not more than 60 days, before the proposed effective date for such rates.[90]

### 3.   Fuel

68.     PennEast states it will use an in-kind fuel tracking mechanism to recover fuel and lost and unaccounted for gas (L&U) through a fuel retainage percentage (FRP).  PennEast has proposed an initial FRP of 0.81 percent, calculated using engineering principles and manufacturer's specifications for the proposed compressor engines, and an L&U percentage of 0.00 percent.  We will approve PennEast's proposed initial FRP rate of 0.81 percent, and its proposed initial L&U rate of 0.00 percent.

69.     In addition, PennEast proposes a fuel tracker as part of its *pro forma* tariff. Section 20.3(a) of the GT&C of PennEast's *pro forma* tariff states:

> With each filing hereunder for a specified calendar period Pipeline shall calculate a FRP as the quotient obtained by dividing (a) the projected annual quantities of Fuel for the upcoming calendar period, plus the amount of any under-collection of Gas in-kind pursuant to the prior period FRP or less the amount of any over-collection of Gas in-kind pursuant to the prior period FRP and (b) the projected annual throughput for the upcoming calendar period.

70.     Section 154.403(c)(10) of the Commission's regulations[91] states that "[a] step-by step explanation of the methodology used to reflect changes in the fuel reimbursement percentage including the allocation and classification of the fuel use and unaccounted-for natural gas" must be included in the GT&C.  PennEast is directed to revise section 20 of the GT&C to include an explanation of how the projected annual quantities of fuel and projected annual throughput are determined.

---

[89] *Natural Gas Pipelines Negotiated Rate Policies and Practices; Modification of Negotiated Rate Policy,* 104 FERC ¶ 61,134 (2003), *order on reh'g and clarification,* 114 FERC ¶ 61,042 (2006), *reh'g dismissed and clarification denied,* 114 FERC ¶ 61,304 (2006).

[90] Pipelines are required to file any service agreement containing non-conforming provisions and to disclose and identify any transportation term or agreement in a precedent agreement that survives the execution of the service agreement.

[91] 18 C.F.R. § 154.403(c)(10) (2017).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

71.     In addition, PennEast's proposed language in section 20.3(b) of the GT&C explains that it will estimate the L&U quantities, but does not explain the methodology PennEast will use to calculate those estimates.  Therefore, when PennEast files actual tariff records in accordance with the ordering paragraphs herein, it is directed to revise section 20 of the GT&C to include an explanation of how PennEast will calculate the estimates for the L&U quantities required for the upcoming calendar period.

### 4.     Three-Year Filing Requirement

72.     Consistent with Commission precedent, PennEast is required to file a cost and revenue study no later than three months after the end of its first three years of actual operation to justify its existing cost-based firm and interruptible recourse rates.[92]  In its filing, the projected units of service should be no lower than those upon which PennEast's approved initial rates are based.  The filing must include a cost and revenue study in the form specified in section 154.313 of the Commission's regulations to update cost of service data.[93]  PennEast's cost and revenue study should be filed through the eTariff portal using a Type of Filing Code 580.  In addition, PennEast is advised to include as part of the eFiling description, a reference to Docket No. CP15-558-000 and the cost and revenue study.[94]  After reviewing the data, the Commission will determine whether to exercise its authority under NGA section 5 to investigate whether the rates remain just and reasonable.  In the alternative, in lieu of this filing, PennEast may make a NGA general section 4 rate filing to propose alternative rates to be effective no later than three years after the in-service date for its proposed facilities.

### 5.     Tariff

73.     As part of its application, PennEast filed a *pro forma* open-access tariff for the Commission's approval.  PennEast proposed tariff generally conforms to the Commission's requirements.  We will approve the tariff, as conditioned below.

### Rate Schedule ITS

74.     Section 2.5 of Rate Schedule ITS provides that the pipeline shall not be required to provide transportation service if the quantities tendered are so small as to cause operational difficulties, such as with measurement.  Under sections 284.7(b) and 284.9(b)

---

[92] *Bison Pipeline,* LLC, 131 FERC ¶ 61,013, at P 29 (2010); *Ruby Pipeline, LLC,* 128 FERC ¶ 61,224, at P 57 (2009) (Bison); *MarkWest Pioneer, L.L.C.*, 125 FERC ¶ 61,165, at P 34 (2008).

[93] 18 C.F.R. § 154.313 (2017).

[94] *Electronic Tariff Filings*, 130 FERC ¶ 61,047, at P 17 (2010).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

of the Commission's regulations, a transporter may not discriminate as to the level of volumes transported.[95]  In previous determinations, however, the Commission has allowed a pipeline to include a minimum volume restriction in its tariff when the pipeline was able to show that the transportation of quantities below the threshold were too small to be metered, and where the company has provided operational and cost justification for the restriction.[96]  For example, the Commission accepted a proposal for a 100 Dth/d threshold for connections of new receipt and delivery points, where the applicant demonstrated that serving small volume points presented operational challenges because these receipt points were difficult to measure, increasing the potential for lost system gas, and that the cost of operating these delivery points was greater than the maximum rate for service.  In addition, the applicant demonstrated that the costs associated with operating small points would be greater than the maximum rate would cover.[97]

75.    Here, PennEast has neither provided justification nor has it provided a proposed threshold for minimum volumes to be transported.  Therefore, the Commission requires PennEast to eliminate the proposed minimum volume condition or, in the alternative, state what that minimum volume is and provide the justification to support it.

### Rate Schedule PAL

76.    Section 8.6 of Rate Schedule PAL provides that parked quantities of gas shall become the property of PennEast when:  1) a customer fails to comply with notifications that receipts of parked quantities are to be suspended or reduced; 2) a customer fails to comply with notifications that customer's parked quantities must be removed; or 3) a PAL account reflects a balance at the termination date of a PAL Service Agreement.  The Commission has found that a pipeline's confiscation of gas is an operationally justified deterrent to shipper behavior that could threaten the system or degrade service to firm shippers.  However, the Commission requires that the value of such confiscated gas be

---

[95] Section 284.7(b)(1) provides "[a]n interstate pipeline or intrastate pipeline that offers transportation service on a firm basis under Subpart B, C, or G must provide such service without undue discrimination, or preference, including undue discrimination or preference in the quality of service provided, the duration of service, the categories, prices, or *volumes of natural gas to be transported*, customer classification, or undue discrimination or preference of any kind." (emphasis added).  Section 284.9(b) applies these provisions regarding non-discriminatory access to interruptible service.

[96] *See, e.g., Gulf South Pipeline Co., LP,* 103 FERC ¶ 61,105, at P 13, n.7 (2003) (*Gulf South*); *Trailblazer Pipeline Co.*, 39 FERC ¶ 61,103, at 61,336 (1987); *Texas Eastern Transmission Corp.*, 37 FERC ¶ 61,260, at 61,680-61,681 (1986).

[97] *Gulf South,* 103 FERC ¶ 61,105, at PP 9-13.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

credited to existing customers.[98]  PennEast has not proposed a crediting mechanism in its tariff.  Therefore, we direct PennEast to revise its tariff to include a mechanism to credit the value of any confiscated gas, net of costs, to non-offending shippers.

### GT&C Section 5:  Service Nomination Procedures

77.     PennEast proposes at section 5.1(c) of the GT&C:

> Pipeline shall have the right to refuse to receive or deliver any Gas not timely and properly nominated.  Pipeline shall not be liable to Customer or any other person as a direct or indirect consequence of such refusal and Customer shall indemnify Pipeline from and against any and all losses, damages, expenses, claims, suits, actions and proceedings whatsoever threatened, incurred or initiated as a result of such refusal unless such refusal was due to Pipeline's gross negligence, undue discrimination or willful misconduct.

78.     The Commission has found that a simple negligence standard is appropriate for the liability and indemnification provisions of open-access tariffs, as this standard prohibits pipelines from limiting their liability in a way that would immunize them from direct damages resulting from simple negligence and "gives service providers a powerful incentive to operate their systems in a reasonable and prudent manner."[99]  The Commission, however, has allowed pipelines to limit their liability for simple negligence to direct damages, so that they are only liable for indirect, consequential, incidental or punitive damages where there is gross negligence, willful misconduct, or bad faith.[100]

79.     PennEast's proposed liability standard is inconsistent with Commission policy because it immunizes the pipeline from direct damages resulting from simple negligence. Therefore, when it submits its actual tariff filing, the Commission will require PennEast to revise its liability standard proposed in section 5.1(c) of the GT&C so as to not exclude it from liability for direct damages arising from its own simple negligence.  Similarly, PennEast must revise sections 8.6 (Curtailment), 12.5 (Quality of Gas), and 37

---

[98] *AES Sparrows Point LNG, LLC and Mid-Atlantic Express, LLC*, 126 FERC ¶ 61,019, at P 42 (2009), (citing *Colorado Interstate Gas Co.,* 122 FERC ¶ 61,256, at P 102 (2008)).

[99] *See, e.g.*, *Trailblazer Pipeline Co. LLC*, 142 FERC ¶ 61,007, at P 8 (2012); *CenterPoint Energy Gas Transmission Co., LLC*, 139 FERC ¶ 61,064, at P 19 (2012); *Orbit Gas Storage, Inc.*, 126 FERC ¶ 61,095, at P 58 (2009)).

[100] *See, e.g.*, *Bison*, 131 FERC ¶ 61,013, at P 37; *El Paso*, 130 FERC ¶ 61,096, at P 4-5; *ANR Pipeline Co.*, 100 FERC ¶ 61,132, at 61,505 (2002).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

(Nonrecourse Obligation of Pipeline's Members and Operator) of the GT&C, which also immunize the pipeline from direct damages resulting from simple negligence.

## GT&C Section 6:  Service Scheduling

80.     Section 6.1 of PennEast's GT&C lists the priority order in which quantities nominated for transportation will be scheduled.  Section 6.1(c) states:

> Pro rata among firm service Customers utilizing a Secondary Point or Points with at least one of such points being outside the Contract Path *or the nominated quantity being in excess of the firm contractual entitlement(s) for any pipeline segment as described in subsection (g) below*. (emphasis added)[101]

The emphasized language above appears to address authorized overrun quantities. However, section 6.1(d) of the GT&C provides that authorized overrun quantities will have the same scheduling priority as interruptible services ("All interruptible service Customers, excluding park and loan service Customers, and Customers nominating authorized overrun quantities in sequence starting with the Customer paying the highest rate.").[102]  Commission policy requires that nominations for authorized overrun and interruptible services should have the same scheduling priority.[103]  Thus, we find that the emphasized language in section 6.1 (c) of the GT&C that applies to authorized overrun quantities is inconsistent with Commission policy, as well as other provisions of PennEast's tariff.  We direct PennEast to delete this provision.

---

[101] Section 6.1(g) of the GT&C provides, in part, "[i]n addition, for any movement of Gas that traverses a segment(s) in which the total nominated quantity for that contract exceeds the firm contractual entitlement, the quantity in excess of the contractual entitlement shall be deemed to be outside of the Customer's Contract Path."

[102] Section 6 of Rate Schedule FTS also provides that authorized daily overrun quantities will be transported on an interruptible basis.

[103] *Sierrita Gas Pipeline, LLC,* 147 FERC ¶ 61,192, at P 66 (2014); *Central New York Oil and Gas Co., LLC,* 114 FERC ¶ 61,105, at P 9 (2006) (citing *CNG Transmission Corp.,* 81 FERC ¶ 61,346, at 62,592 (1997) and *Tennessee Gas Pipeline Co.,* 62 FERC ¶ 61,250, at 62,676 (1993)).

Docket No. CP15-558-000                                                                - 31 -

## GT&C Section 8:  Curtailment

81.     PennEast proposes at section 8.1 of the GT&C:

>        Pipeline shall have the right to curtail or discontinue transportation
>        services, in whole or in part, on all or a portion of its system at any time for
>        reasons of Force Majeure *or when, in Pipeline's sole judgment, capacity or
>        operating conditions so require or it is desirable or necessary to make
>        modifications, repairs or operating changes to its system.* (emphasis
>        added.)

82.     The Commission has held that pipelines should plan routine repair, maintenance,
and improvements through the scheduling process, and should not curtail confirmed
scheduling nominations in order to perform such work.[104]  The Commission has found
that pipelines may only "curtail" service in an emergency situation or when an
unexpected capacity loss occurs after the pipeline has scheduled service, and the pipeline
is therefore unable to perform the service which it has scheduled.[105]  The term
"modifications, repairs or operating changes" is not limited to an emergency situation or
an unexpected loss of capacity, and the pipeline should take outages required for routine
repair, maintenance, and operating changes into account when it is scheduling service,
rather than curtailing service after it is scheduled.  Therefore, PennEast is required to
revise the emphasized phrase to comply with Commission policy.

83.     In sections 8.2 (a) through (e) of the GT&C, PennEast provides the order in which
it would curtail service.  Sections 8.2 (d) and (e) of the GT&C set forth the priorities for
curtailing firm service and provide:

>        (d)     Fourth, Pipeline shall curtail scheduled service to those Customers
>        receiving service under the firm rate schedule at a Secondary Point or
>        Points, with at least one of such points being outside the Contract Path, if
>        the operating condition that necessitates the curtailment affects a location
>        outside of the Customers' Contract Path, on a pro rata basis among affected
>        Customers;
>
>        (e)     Fifth, Pipeline shall curtail scheduled service to those Customers
>        receiving service under the firm rate schedule at Primary Points of Receipt
>        and Primary Points of Delivery and at a Secondary Point or Points, which

---

[104] *CenterPoint Energy Gas Transmission Co., LLC*, 144 FERC ¶ 61,195, at P 75
(*CenterPoint*).

[105] *Id.; Ryckman Creek Resources, LLC*, 136 FERC ¶ 61,061, at P 68 (2011);
*MarkWest Pioneer, L.L.C.*, 125 FERC ¶ 61,165, at P 52 (2008).

points are wholly within the Contract Path pro rata on the basis of scheduled quantities.

84.     The Commission rejects PennEast's proposal as it relates to curtailing firm transportation services.  Commission policy requires that once firm service is scheduled, all scheduled firm transactions, whether primary or secondary, must be curtailed on a *pro rata* basis.[106]  PennEast's proposed tariff is inconsistent with this policy because it would curtail certain types of scheduled firm transportation before other scheduled firm transportation.  PennEast is required, in its tariff compliance filing, to revise sections 8.2 (d) and (e) to provide that scheduled firm volumes may only be curtailed on a *pro rata* basis.

85.     Section 8.4 of PennEast's GT&C states:

> All volumes received and/or taken in violation of Pipeline's curtailment or interruption orders shall constitute unauthorized receipts or deliveries of Gas for which a penalty charge equal to the higher of $50.00 per Dth and 150% times the Platts *Gas Daily* "Daily Price Survey" High Common price for "Transco, zone 6 non-N.Y. North" per Dth shall be assessed, in addition to any other applicable rate, charge *or penalty*. (emphasis added).

86.     In addition to the above penalty, PennEast's tariff contains a "Usage Rate outside Tolerances"[107] penalty provision that may result in penalizing the same infraction twice.  Commission policy prohibits multiple penalties for the same infraction.[108]  Therefore, PennEast is directed to revise its tariff to be consistent with Commission policy.[109]

---

[106] *Algonquin Gas Transmission Co.*, 104 FERC ¶ 61,118, at P 34 (2003); Order No. 636-B, 61 FERC ¶ 61,272, at 62,013 (1992).

[107] Sections 3.2.B(2) of Rate Schedule FTS and 3.2A(2) of Rate Schedule ITS provide, in part:  "The Usage Charge outside Tolerances as set forth on the Statement of Rates for Rate Schedule FTS or the Statement(s) of Negotiated Rates, as applicable, multiplied by that portion of the total quantity of Gas deliveries on any Day pursuant to the effective Service Agreement, except for authorized overrun quantities, which is in excess of the lesser of 110% of scheduled service levels for such Day or 102% of MDQ."

[108] *Columbia Gas Transmission Corp.*, 100 FERC ¶ 61,084, at P 201 (2002).

[109] *E.g. MoGas Pipeline LLC,* 151 FERC ¶ 61,201, at PP 22-23 (2015) (approving tariff language that permitted the imposition of the greater penalty).

Docket No. CP15-558-000                                                      - 33 -

## GT&C Section 26:  Force Majeure

87.     PennEast's proposed definition of *force majeure* events in section 26.1 of the GT&C includes "compliance with any court order, law, regulation or ordinance promulgated by any governmental authority having jurisdiction, whether federal, Indian, state or local, civil or military, the necessity for testing (as required by governmental authority or as deemed necessary for safe operation by the testing party)."  PennEast's proposed tariff language conflicts with Commission policy because it can be interpreted to include regular, periodic maintenance activities required to comply with government actions as *force majeure* events.  The Commission has clarified the basic distinction as to whether outages resulting from governmental actions are *force majeure* or non-*force majeure* events.[110]  The Commission found that outages necessitated by compliance with government standards concerning the regular, periodic maintenance activities a pipeline must perform in the ordinary course of business to ensure the safe operation of the pipeline, including the Pipeline and Hazardous Materials Safety Administration's (PHMSA) integrity management regulations, are non-*force majeure* events requiring full reservation charge credits.  Outages resulting from one-time, non-recurring government requirements, including special, one-time testing requirements after a pipeline failure, are *force majeure* events requiring only partial crediting.[111]

88.     In addition, PennEast's proposed definition of *force majeure* events in section 26.1 includes "any other cause, whether of the kind herein enumerated, or otherwise, *not within the control of the party claiming suspension* and which by the exercise of due diligence such party is unable to prevent or overcome." (emphasis added).  The Commission has defined *force majeure* outages as events that are both "unexpected and uncontrollable."[112]  The Commission directs PennEast to revise section 26.1 of the GT&C to comply with Commission Policy, as discussed above.

---

[110] *Kinder Morgan Louisiana Pipeline LLC,* 154 FERC ¶ 61,145, at P 30 (2016); *DBM Pipeline, LLC,* 152 FERC ¶ 62,056, at 64,159 (2015); *TransColorado Gas Transmission Co., LLC,* 144 FERC ¶ 61,175, at PP 35-43 (2013); *Gulf South Pipeline Co., LP,* 141 FERC ¶ 61,224, at PP 28-47 (2012), *order on reh'g,* 144 FERC ¶ 61,215, at PP 31-34 (2013).

[111] *See Algonquin Gas Transmission LLC*, 153 FERC ¶ 61,038, at P 104 (2015).

[112] *North Baja Pipeline, LLC v. FERC*, 483 F.3d 819, 823 (D.C. Cir. 2007), *aff'g*, *North Baja Pipeline, LLC*, 109 FERC ¶ 61,159 (2004), *order on reh'g*, 111 FERC ¶ 61,101 (2005).  *See also Kinder Morgan Louisiana Pipeline LLC,* 154 FERC ¶ 61,145, at P 29 (2016); *Algonquin Gas Transmission LLC*, 153 FERC ¶ 61,038 at P 103.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

### GT&C Section 32:  North American Energy Standards Board (NAESB)

89.     PennEast adopted the Business Practices and Electronic Communications Standards of NAESB Wholesale Gas Quadrant's (WGQ) Version 2.0.  PennEast has identified those standards incorporated by reference in GT&C Section 32.  Those standards not incorporated by reference by PennEast have also been identified, along with the tariff record in which they are located.  In the event an updated version of the NAESB WGQ standards is adopted by the Commission prior to PennEast's in-service date, the Commission directs PennEast to file revised tariff records, 30 to 60 days prior to its in-service date, consistent with the then current version.

### GT&C Section 39:  Reservation Charge Crediting

90.     Sections 39.1 and 39.2 of the GT&C provide that the pipeline will provide full reservation charge credits to shippers during non-force majeure events and partial reservation credits during force majeure events, respectively, except as provided for in section 39.3.

91.     Section 39.3 exempts PennEast from providing reservation charge credits in a number of circumstances including:

> (xi)     if Customer is provided service pursuant to a negotiated rate agreement executed after November 1, 2017, or any successor negotiated rate agreement thereto, and such agreement does not explicitly require reservation charge credits."

92.     The Commission has found that it is unreasonable for a pipeline to apply a proposed new contractual prerequisite for negotiated rate contracts to qualify for reservation charge credits to agreements entered into before the effective date of the proposed tariff language.[113]  Although section 39.3 (xi) of the GT&C provides such protection to the agreements prior to the filing of PennEast's application, this provision does not address any agreements that may be reached with shippers before the effective date of the tariff.  Acceptance of PennEast's proposal with respect to existing negotiated rate agreements would unreasonably deny reservation charge credits to shippers which may have been unaware of PennEast's future contracting requirement.  Therefore, the Commission directs PennEast to revise this language to apply only to negotiated rate contracts entered into after the effective date of that tariff provision.

---

[113] *Florida Southeast Connection, LLC, et al.*, 154 FERC ¶ 61,080, at P 176 (2016); *Iroquois Gas Transmission Sys., LP*, 145 FERC ¶ 61,233, at PP 67-71 (2013).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

### E.      Environmental Analysis

#### 1.      Pre-filing and Application Review

93.     Commission staff began a pre-filing environmental review of the project on October 10, 2014.  On January 13, 2015, Commission staff issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Planned PennEast Pipeline Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings* (NOI).  This notice was published in the *Federal Register* on February 3, 2015,[114] and sent to more than 4,300 interested entities, including representatives of federal, state, and local agencies; elected officials; environmental and public interest groups; Native American tribes; potentially affected landowners as defined in the Commission's regulations (i.e., landowners crossed or adjacent to pipeline facilities or within 0.5 mile of a compressor station); concerned citizens; and local libraries and newspapers.  The NOI briefly described the project and the environmental impact statement (EIS) process, provided a preliminary list of issues identified by staff, invited written comments on the environmental issues that should be addressed in the EIS, and listed the date and location of five public scoping meetings.[115]  On January 28, 2015, Commission staff issued a *Notice of Extension of Comment Period and Clarification of Location of Public Comment Meetings for the PennEast Pipeline Project*, which extended the comment period until February 27, 2015.[116]  At the public scoping meetings, a total of 250 speakers provided verbal comments about the project.  In addition, more than 6,000 letters were filed providing comments about the project.[117]

94.     To satisfy the requirements of the National Environmental Policy Act (NEPA), Commission staff prepared a draft EIS for the project.  The U.S. Army Corps of Engineers (USACE), U.S. Environmental Protection Agency (EPA), and the U.S. Department of Agriculture's Natural Resources Conservation Service participated in the NEPA review as cooperating agencies.  Commission staff issued the draft EIS for the project on July 22, 2016, which addressed the issues raised during the scoping period and included staff's independent analysis of the environmental impacts of the project.

---

[114] 80 Fed. Reg. 5744 (2015).

[115] Commission staff held the public scoping meetings between February 10 and 12, 2015 and February 25 and 26, 2015 in Bethlehem, Jim Thorpe, and Wilkes-Barre, Pennsylvania; and Trenton and Hampton, New Jersey.

[116] 80 Fed Reg. 4557 (2015).

[117] Table 1.4-1 of the final EIS provides a detailed and comprehensive list of issues raised during scoping.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

95.     Notice of the draft EIS was published in the *Federal Register* on July 29, 2016, establishing a 45-day public comment period that ended on September 12, 2016.[118]  The draft EIS was mailed to over 4,280 stakeholders, which included the entities that were mailed the NOI and additional interested entities.  Commission staff held six public comment sessions between August 15 and 17, 2016, to receive comments on the draft EIS.[119]  Approximately 670 individuals attended these public sessions, including 420 who provided verbal comments.  A total of 4,169 comment letters were filed in response to the draft EIS before the comment period closed on September 12, 2016.  The transcript of the public comment sessions and all written comments on the draft EIS are part of the public record for the project.

96.     On September 23, 2016, PennEast filed 33 route modifications, totaling 21.3 miles in length, to address environmental and engineering concerns.  On November 4, 2016, Commission staff issued a letter to newly affected landowners describing the route modifications and inviting comments on the route modifications, and opening an additional 30-day comment period, which concluded on December 5, 2016.  Comments received after the close of the comment periods (between September 12 and November 4, 2016, and after December 5, 2016) continued to be posted to the Commission's eLibrary website and were reviewed by staff for substantive concerns.

97.     The final EIS for the project was issued on April 7, 2017, and a public notice of the availability of the final EIS was published in the *Federal Register* on April 14, 2017.[120]  The final EIS addresses all substantive comments received on the draft EIS, the November 4, 2016 letter, and comments received prior to December 31, 2016.[121]  The final EIS was mailed to the same parties as the draft EIS, as well as additional parties.[122]  The final EIS addresses geology; soils; water resources; wetlands; aquatic resources; vegetation and wildlife; threatened, endangered, and special status species; land use,

---

[118] 82 Fed. Reg. 49,971 (2017).

[119] Commission staff held draft EIS comment sessions in Bethlehem, Pennsylvania; Jim Thorpe, Pennsylvania; Clinton, New Jersey; Lahaska, Pennsylvania; Wilkes-Barre, Pennsylvania; and Trenton, New Jersey.

[120] 82 Fed. Reg. 17,988 (2017).

[121] All comments received prior to the end of the comment period and in response to the November 4, 2016 letter that included additional substantive concerns are included in the comment responses contained in Appendix M of the final EIS (Volume II).  Any new issues raised after December 31, 2016, which were not previously identified, are addressed in this order.

[122] The distribution list is provided in Appendix A of the final EIS.

20180119-3110 FERC PDF (Unofficial) 01/19/2018
Case 3:18-cv-01938-BRM-DEA  Document 1  Filed 02/09/18  Page 62 of 168 PageID: 62

Docket No. CP15-558-000                                                        - 37 -

recreation, and visual resources; socioeconomics; cultural resources; air quality and noise; reliability and safety; cumulative impacts; and alternatives. The major environmental issues raised during this proceeding, and comments from stakeholders not addressed in the final EIS, as well as substantive comments on the final EIS, are discussed below.

98.     The final EIS concludes that while the project will result in some adverse environmental impacts, these impacts will be reduced to less than significant levels with the implementation of PennEast's proposed impact avoidance, minimization, and mitigation measures, together with staff's recommended environmental conditions, now adopted, as modified, as conditions in the attached Appendix A of this order. While, the Commission recognizes that there are incomplete surveys due to lack of access to landowner property, the conclusions in the final EIS, and affirmed by the Commission here, were based on the information contained in the record, including PennEast's application and supplements, as well as information developed through Commission staff's data requests, field investigations, the scoping process, literature research, alternatives analysis, and contacts with federal, state, and local agencies, as well as with individual members of the public. As part of its environmental review, staff developed specific mitigation measures that we find will adequately and reasonably reduce the environmental impacts resulting from the construction and operation of the PennEast Project. We believe that the substantial environmental record and mitigation measures sufficiently support reaching a decision on this project.

99.     Once a certificate is issued, the Commission's environmental staff is charged with ensuring that the project will be constructed in compliance with the Commission's order, including the conclusions regarding the project's expected impacts upon the environment. Recognizing that there are necessary field surveys that are outstanding on sections of the proposed route where survey access was denied, we are imposing several environmental conditions that require filing of additional environmental information for review and approval once survey access is obtained. This includes items such as site-specific plans, survey results, documentation of consultations with agencies, and additional mitigation measures. The additional information ensures the EIS's analyses and conclusions are verified based on the best available data, enabling us to improve and finalize certain mitigation plans and ensure stakeholder concerns are addressed. The information will also provide Commission staff with the site-specific details necessary to appropriately evaluate compliance during the construction process. In addition, Environmental Condition 10 requires that before construction can commence, PennEast must file documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

100.    Further, the final EIS has adequately identified, as required by section 1502.22 of the Council on Environmental Quality (CEQ) regulations, where information is

Docket No. CP15-558-000                                              - 38 -

lacking.[123]  CEQ regulations recognize that some information simply may not be available.[124]  Moreover, the final EIS contains mitigation plans that provide for using the correct mitigation measures, sediment control measures, and restoration requirements based on the actual site conditions experienced during construction.  The conditions in the order will ensure that all environmental resources will be adequately protected.

101.    The Commission needs to consider and study environmental issues before approving a project, but it does not require all environmental concerns to be definitively resolved before a project's approval is issued.  NEPA does not require every study or aspect of an analysis to be completed before an agency can issue a final EIS, and the courts have held that agencies do not need perfect information before it takes any action.[125]  In *U.S. Department of the Interior v. FERC*, the court held that "[v]irtually every decision must be made under some uncertainty; the question is whether the Commission's response, given uncertainty, is supported by substantial evidence and is not arbitrary and capricious."[126]  Similarly, in *State of Alaska v. Andrus*, the court stated that "[i]f we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project could ever be initiated."[127]  There must, however, be sufficient information in the record to enable the Commission to take the requisite "hard look" required by NEPA.  As indicated above, we believe the record in this proceeding meets that requirement.[128]

---

[123] 40 C.F.R. § 1502.22 (2017).

[124] *Id.*

[125] *U.S. Dep't of the Interior v. FERC*, 952 F.2d 538, 546 (D.C. Cir. 1992); *State of Alaska v. Andrus*, 580 F.2d 465, 473 (D.C. Cir. 1978), *vacated in part sub nom. W. Oil & Gas Ass'n v. Alaska*, 439 U.S. 922, 99 S. Ct. 303, 58 L. Ed. 2d 315 (1978) ("NEPA cannot be 'read as a requirement that complete information concerning the environmental impact of a project must be obtained before action may be taken'").

[126] *U.S. Dep't of the Interior v. FERC*, 952 F.2d 538, 546.

[127] *State of Alaska v. Andrus*, 580 F.2d 465, 473.

[128] *See also Independence Pipeline Co.*, 91 FERC ¶ 61,102, at 61,352 (2000) (finding that despite landowners denying survey access, the final EIS was sufficiently detailed to inform the Commission and the public for purposes of NEPA); *Southern Natural Gas Co.,* 85 FERC ¶ 61,134, at 61,512 (1998) (finding paper record sufficient even though landowners denied pipeline survey access).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

## 2.  The EIS Process and Procedural Concerns

102.   Commenters requested public meetings be held in areas affected by PennEast's minor route modifications, as identified in PennEast's September 23, 2016 Supplemental Information filing.  Commission staff mailed notice on November 4, 2016, to all landowners potentially affected by the modifications, government officials, and other stakeholders.  The notice described the proposed route changes, invited participation, and opened a special 30-day limited scoping period.  Over 400 comments were filed in response to the notice, which are addressed in the final EIS.  Commission staff determined that additional public meetings were not required and that written comments received from the public were sufficient to identify potential concerns associated with the minor route changes.

103.   In addition, several commenters asserted that the comment period for the draft EIS was not sufficient, and should have been extended in order to allow parties additional time to study the draft EIS and provide comment.  Commission staff continued to accept and review comments after the close of the comment period for the draft EIS.  All filings are available on the docket for public review and inspection.  For these reasons, we concur that an extended comment period was not needed.

## 3.  Major Environmental Issues and Comments on the Final EIS

### a.  Geology

104.   Several commenters express concern regarding construction near active quarries and in karst terrain.  Comments were also filed regarding the potential for naturally occurring arsenic to mobilize and contaminate groundwater, drinking water wells, and surface waters.  Commenters also express concerns for landslide risks, as well as the potential for soil compaction.

105.   After the close of the draft EIS comment period, United States Representative Matt Cartwright of Pennsylvania forwarded a letter from his constituent, Phyllis Jacewicz, particularly for residences on East Saylor Avenue in Plains Township, Luzerne County, Pennsylvania, citing concerns about construction of the project near an active quarry.  As stated in the final EIS, PennEast has adjusted the pipeline route through Luzerne County to avoid future expansion of the quarry, PennEast also evaluated average quarry blasting vibration, concluding there would be no effect from these activities on the pipeline.[129]  Additionally, PennEast provided documentation regarding the expansion of the Trap Rock Quarry located at milepost (MP) 99 in Delaware Township, New Jersey, and provided a blasting assessment based on site-specific data (geology, distance and wave propagation) and a scaling relationship to solve for blast-induced effects (peak

---

[129] *See* final EIS at 4-5.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

particle velocity) on the pipeline.  Based on the blasting analysis, the EIS concludes that no impacts on the pipeline from quarry blasting are anticipated.[130]  In response to comments received regarding the accuracy of the explosive weights for the blasting analysis, Environmental Condition 14 requires PennEast to file an updated report verifying the explosive weights used by the quarry operator; incorporate this information this into the final design of the project; and to seek concurrence from Trap Rock Quarry regarding the input parameters to the blasting analysis.  The updated report will be reviewed by Commission staff prior to construction to confirm the conclusions in the EIS remain valid.

106.    In comments on the final EIS, Susan D. Meacham discusses the potential risks of construction in karst areas and the potential risk for scouring where the pipeline will cross the floodplain along the New Jersey side of the proposed horizontal directional drill (HDD) crossing of the Delaware River.  The final EIS determines that there are approximately 13.8 miles of the project, in Carbon, Northampton, and Bucks Counties, Pennsylvania, and Hunterdon County, New Jersey, where a karst hazard may be present; approximately 50 percent of the karst survey has been completed.[131]  As discussed in the EIS, PennEast developed a project-specific Karst Mitigation Plan, as well as a specific HDD plan for drilling through karst terrain.  The project-specific Karst Mitigation Plan, which provides guidance to mitigate karst-related concerns during construction, was developed using maps of known or suspected karst areas, and field investigations completed to-date.  The HDD Drilling Plan for Karst Terrain establishes operational procedures and responsibilities for the prevention, containment, and clean-up of inadvertent returns of drilling muds and losses associated with HDD through karst areas.  Further, we note that PennEast continues to complete additional geophysical investigations as landowner access becomes available, and will incorporate the findings into an updated Karst Mitigation Plan.  The final updated plan will enable PennEast to finalize its HDD design based on a detailed understanding of the subsurface conditions, and more precisely identify locations where the approved mitigation procedures will be implemented.  Accordingly, Environmental Condition 16 requires PennEast to file for approval a final Karst Mitigation Plan prior to construction, which includes the results of all outstanding field investigations, as well as requirements of the Pennsylvania Department of Environmental Protection (PADEP), New Jersey Department of Environmental Protection (NJDEP) and local planning commissions.  Based on staff's review of the Karst Mitigation Plan, the HDD Drilling Plan for Karst Terrain, and compliance with Environmental Condition 16, we agree with the final EIS's conclusion that PennEast will adequately minimize impacts in geologically sensitive areas.[132]

---

[130] *Id.* at 4-5.

[131] *Id.* at 4-10.

[132] *See* final EIS at ES-5.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

Regarding the risk of scour, PennEast's HDD of the Delaware River will drill underneath the river's flood plain, with the HDD entry/exit point on the New Jersey side of the river approximately 1,100 feet east of the river's edge, outside of the flood zone and below the potential scour depth. The segment of pipeline installed by HDD will be considerably deeper than sections of pipeline installed by standard trenching and will be below the potential scour depths. Thus, scour from flooding on the Delaware River will not affect the pipeline.

107.    Several commenters expressed concern that the final EIS contains an inadequate analysis of the potential for construction and operation of the project to contribute to arsenic contamination of groundwater and the release of radioactivity. Comments were filed from stakeholders, including a letter from Congressman Brian Fitzpatrick on behalf of Bucks County, Pennsylvania, from Dr. Tullis Onstott from the Princeton University Department of Geosciences, Dr. Julia Barringer, a retired U.S. Geologic Survey research geochemist, and from the Township of Kingwood, New Jersey, regarding the potential risk of arsenic contamination of groundwater. Drs. Onstott and Barringer contend that the final EIS fails to address the potential for the project to increase arsenic mobility, as well as the release of radioactivity. Drs. Onstott and Barringer also comment that the pipeline has the potential to cause boron contamination of the Lambertville, New Jersey drinking water supply reservoir, and further state that cathodic protection on the pipeline has the potential to "promote the growth of microbes that stimulate arsenic" while a potential methane leak would input carbon into the soil, which could serve to stimulate microbial activity, which in turn could stimulate arsenic.[133] Further, Drs. Barringer and Onstott state that the final EIS fails to fully analyze the potential release of arsenic to local streams from HDDs. In addition, several comments were filed stating that the final EIS does not sufficiently address the risk of uranium and uranium decay product radionuclides potentially being released by blasting of Newark Basin sedimentary bedrock.

108.    PennEast conducted a laboratory arsenic mobilization study, leaching experiments, and dilution modeling to determine if trench excavation and the use of HDDs will oxidize, release, and mobilize naturally occurring arsenic and potentially increase arsenic exposure to nearby groundwater users and/or ecological receptors within waterbodies. The results of the laboratory study demonstrate that broken fragments of naturally occurring arsenic-enriched rock generated during trenching activities and subsequently returned as backfill, would not result in an increased risk of arsenic mobilization in groundwater; that drilling mud would not become contaminated with particles of naturally occurring arsenic enriched rock; and that concentrations of arsenic in groundwater will be below the EPA maximum contaminant level (MCL) of

---

[133] *See* Comments of Drs. Julia Barringer and Tullis Onstott, filed May 5, 2017 in Docket No. CP15-558-000.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

10 micrograms per liter (ug/L) for public water supplies and the New Jersey MCL of 5 micrograms per liter (µg/L) for both public and private water supplies. Regarding comments on the project's ability to contaminate Lambertville's water supply from boron, the EIS found that the pipeline alignment does not cross any stream that provides water to Lambertville's water supply and the Lambertville reservoir is located up-gradient of the planned PennEast pipeline.

109.    As discussed in the final EIS, Drs. Onstott and Barringers' comments regarding the chemical mechanisms that could mobilize arsenic and other analytes during construction and operation were found to be speculative, based upon misapplication of physical principles, containing misinformation about pipeline corrosion and corrosion prevention systems, and not supported by empirical data for construction and operation of natural gas pipelines. Further, the final EIS found that radionuclides present in groundwater and household air are "absolutely not specific" to Newark Basin sedimentary bedrock (Stockton, Lockatong, and Passaic formations), and that human exposure issues related to radionuclides are not likely to play a role in the construction and operation of natural gas pipelines. Regarding the potential for methane leaks to increase arsenic mobility, PennEast has committed to several specific measures to reduce the risk of methane leaks, which would in turn further reduce the risk of increased arsenic mobility.[134]

110.    PennEast has prepared a Well Monitoring Plan and proposes to conduct groundwater quality testing of potentially affected wells prior to construction. This will provide a baseline to determine whether any arsenic increases in groundwater occur after the pipeline is installed. In the unlikely event that construction results in any arsenic impacts on a water-supply well, PennEast will provide a treatment system to remove arsenic from the drinking water at individual properties or find an alternative water source.

111.    In its September 20, 2016 comments on the DEIS, the United States Department of the Interior (DOI) expressed concern regarding the potential for arsenic mobilization, and the potential for arsenic contamination of individual wells, drinking water, and groundwater. To address these concerns, we require in Environmental Condition 23 that PennEast revise and file for review and approval its above-described Well Monitoring Plan to incorporate the well sampling quality assurance/quality control elements suggested by the DOI into its well sampling protocol and to include provisions for treatment for groundwater users impacted by increased arsenic levels, as well as provisions for monitoring and maintaining such treatment systems.

112.    In comments on the final EIS, Lorraine Crown of Holland Township expressed concern regarding Route Deviation 1710, which she claims would lead to an increased

---

[134] *Id.* at 4-250.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

risk of landslides on Gravel Hill.  The final EIS' conclusion that that landslide incidences are low in New Jersey is based on PennEast's Phase I Terrain Mapping and Geohazard Risk Evaluation, which included the review of federal, state and local geographic information system data, published maps, available print and digitized terrain data, and site-specific data collected by PennEast.  The final EIS notes that while generalized data from the United States Geological Survey indicates that there is a low risk of landslide potential for the New Jersey portion of the project, several locations in New Jersey have recorded landslides in close proximity to the proposed pipeline.[135]  This includes the area near steep slopes 75 and 76 near route deviation 1710 as identified in Phase 1 of PennEast's Terrain Mapping and Geohazard Risk Evaluation Report.  PennEast identified these as areas where it will conduct further field investigation and analysis.  We require in Environmental Condition 15 that, prior to construction, PennEast shall file results of the outstanding site-specific Phase 2 and 3 portions of the Geohazard Risk Evaluation Report, which will include a final landslide hazard inventory.  The finalized report will also include any specific measures and locations where PennEast will implement specialized pipeline design to mitigate for potential soil stability or landslide hazards; and include a post-construction monitoring plan.

113.    In comments on the final EIS, the NJDEP submitted a letter referencing previous comments by the New Jersey Geological and Water Survey (NJGWS) which indicate that there are important paleontological sites that are significantly closer than 0.25 mile to the proposed route.  The NJDEP requests that PennEast consult with Dr. William Gallagher and provide him with the proposed project route alignment shape files as over 90 percent of the route crosses rock formations within the Newark Basin.

114.    PennEast provided the NJGWS with updated mapping of the proposed pipeline route in relation to sites identified as significant paleontological locations containing trace Triassic-age fossils and various casts, including footprints.  After analyzing the NJDEP comments on the final EIS, we determined there is potential for fossilized vertebrate footprints to be affected by construction of the project through Newark Basin sedimentary bedrock.  Therefore, we have included a new condition to address potential discovery of paleontological resources during project construction.  Environmental Condition 20 requires that PennEast prepare an unanticipated discovery plan for paleontological resources in coordination with the NJGWS and Dr. William Gallagher.  The plan shall be focused on areas where bedrock would have allowed preservation of any significant paleontological resource.  We believe that Environmental Condition 20 sufficiently addresses NJDEP's concerns and that any adverse impacts on significant paleontological resources will be appropriately mitigated.

---

[135] *Id.* at 4-7.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

### b.    Soils

115.    The project will cross numerous soil types, which may be affected by pipeline construction activities, such as clearing, grading, trench excavation, backfilling, and the movement of construction equipment along the right-of-way.

116.    In comments on the final EIS, Emma A. Switzler discusses the potential for soil compaction from an HDD work space proposed on her property.  PennEast identified certain measures which will be implemented to reduce the potential for soil compaction, including regular testing of topsoil and subsoil for compaction.  PennEast indicated that it would avoid construction during periods of high soil saturation in order to minimize the risk of soil compaction.  Severely compacted topsoil will be plowed or a green manure such as alfalfa will be planted and plowed to decrease bulk density and improve soil structure.[136]  Given these measures and PennEast's adherence to the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* (Plan), which includes specific measures designed to mitigate for soil compaction, the final EIS finds that the project activities will not result in significant adverse soil structural damage or compaction.[137]

117.    As stated in the final EIS, implementation of PennEast's *Erosion and Sediment Control Plan* (E&SCP), FERC's Plan and FERC's *Wetland and Waterbody Construction and Mitigation Procedures* (Procedures), and other project-specific plans, will adequately avoid, minimize, or mitigate construction impacts on soil resources.  Permanent impacts on soils will mainly occur at the aboveground facilities where the sites will be converted to industrial use.  Based on the final EIS, we conclude that potential impacts on soils will be avoided or effectively minimized or mitigated.

### c.    Water Resources

118.    The project will cross 269 waterbodies.[138]  Approximately 74 percent of these waterbodies are classified as minor, 22 percent as intermediate, and 3 percent classified as major.  Numerous commenters expressed concern regarding the potential effects of the construction and operation of the project on state designated streams, with a particular emphasis on locations where HDD crossing would occur.  The final EIS states that while minor impacts on waterbodies may occur during construction, with the implementation of PennEast's planned, and the Commission's required mitigation plans, no long-term effects on surface waters are anticipated.  In addition, PennEast will comply with state

---

[136] *Id.* at 4-28.

[137] *Id.* at 4-21 to 4-22.

[138] Id. at 4-45 (table 4.3.2-1).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

regulations regarding riparian buffers.  Finally, PennEast will comply with regulatory permit conditions that address scour and sedimentation, flooding, or the introduction of foreign or toxic substances into the aquatic system.  Accidental spills and leaks during construction and operations will be prevented or adequately minimized through implementation of PennEast's *Spill Prevention Control and Countermeasure Plan*.

119.    Several comments addressed potential impacts on state-designated waterbodies. Appendices G-7 through G-9 of the final EIS provide state classifications for individual waterbody crossings in Pennsylvania and New Jersey by milepost.  The final EIS analyzes construction impacts on waterbodies, and determines that the mitigation measures identified in our Procedures will adequately minimize impacts on Pennsylvania and New Jersey state-designated waters, including High Quality, Exceptional Value and Category 1 waters.[139]  Generally, PennEast will minimize impacts on state-designated waterbodies and associated riparian zones by locating temporary workspace in actively disturbed areas with a vegetation buffer between the workspace and the riparian zone. Where the riparian zone cannot be avoided entirely, PennEast will reduce the workspace to 75 feet in width and relocate additional temporary workspaces upslope, or into actively disturbed areas, to the extent practicable.  For dry-crossings, the workspace through the waterbody will be reduced to 60 feet in width and the workspace outside the waterbody will have a total width of 75 feet on both sides of the waterbody until actively disturbed areas are encountered.  Where site constraints are favorable, PennEast will use the HDD method, which will not require tree clearing or workspace adjacent to the waterbody, to directly avoid impacts within the waterbody.  PennEast has committed to preparing site-specific plans prior to construction for each waterbody to be crossed via HDD.  These site-specific HDD Plans would include a description of the HDD work site, justification of the work space required, cleanup plans in the event of the inadvertent release of drilling mud, as well as a contingency plan in the event the HDD is unsuccessful.[140]

120.    In comments on the final EIS, West Amwell Township, New Jersey, expresses concern regarding the crossing of Alexauken Creek, including the feasibility of and dangers associated with using the HDD crossing method; potential temperature and sedimentation impacts; and PennEast's plans for hydrostatic testing.  The majority of the HDD crossings have had some geotechnical work performed, and staff reviewed this data along with PennEast's HDD Inadvertent Returns and Contingency Plan and HDD profiles.  We require in Environmental Condition 19 that PennEast file the final design plans for each HDD crossing for review and approval.  The final design plan will include the results for all geotechnical borings conducted at each HDD crossing (lithology, standard penetration testing and bedrock quality designation), and a HDD feasibility

---

[139] *See* final EIS at 4-49.

[140] *Id.* at 4-62.

20180119-3110 FERC PDF (Unofficial) 01/19/2018
Case 3:18-cv-01938-BRM-DEA   Document 1   Filed 02/09/18   Page 71 of 168 PageID: 71

Docket No. CP15-558-000                                                    - 46 -

assessment based on the soil boring results, including an assessment of the risk for hydrofracturing and inadvertent return of drilling fluids at each crossing. Completion of all geotechnical borings for each specific crossing will allow for a comprehensive HDD feasibility and hydrofracture/inadvertent return analysis that staff will review to ensure PennEast has adequately minimized environmental risks in the final design of the HDD.

121.    Further, as indicated above and in the final EIS, PennEast will prepare a detailed plan for each waterbody that will be crossed via HDD that includes site-specific construction diagrams of work areas; identification of any aboveground disturbance or clearing between the HDD entry and exit; and a contingency plan for crossing the waterbody or wetland in the event the HDD is unsuccessful. PennEast's HDD crossing of the Alexauken Creek will avoid any in-stream disturbance and any direct impact to the riparian areas between the drilling entry and exit sites, thus minimizing any potential for sedimentation or temperature changes. In the unlikely event that PennEast is required to cross this waterbody using an alternative crossing method, Commission staff must review and approve the plans to verify appropriate mitigation measures will be implemented to minimize sedimentation. Furthermore, PennEast's Erosion and Sedimentation Control Plan requires site-specific plans to mitigate sedimentation.

122.    We reviewed the hydrostatic test water source and discharge locations provided by PennEast. However, during exceptional dry periods when low flow conditions may be encountered, PennEast will assess if alternative sources would be necessary. Thus, Environmental Condition 28 requires that PennEast file its final hydrostatic test plan identifying the final hydrostatic test water sources and discharge locations and provide documentation that it has obtained all necessary permits and approvals for withdrawal from each source prior to construction. PennEast has indicated that its hydrostatic testing program will comply with state- and Delaware River Basin Commission-issued water withdrawal and National Pollutant Discharge Elimination System permits.

123.    Several comments were received regarding potential impacts on groundwater supplies, specifically supplies from private wells and community aquifers. The final EIS evaluates potential impacts on groundwater resources, and because PennEast has not yet completed surveys for water supply wells along the entire project, includes a recommendation that PennEast complete all necessary surveys for water supply wells and groundwater seeps and springs, identify public and private water supply wells within the construction workspace, and file a revised list of wells, seeps, and springs within 150 feet of any construction workspace (500 feet in areas characterized by karst terrain).[141] We incorporate this requirement as Environmental Condition 21 in Appendix A.

124.    Although the precise locations of all water supply wells have not yet been determined, the avoidance and mitigation measures that will be implemented are

---

[141] *Id.* at 4-38.

20180119-3110 FERC PDF (Unofficial) 01/19/2018
Case 3:18-cv-01938-BRM-DEA  Document 1  Filed 02/09/18  Page 72 of 168 PageID: 72

Docket No. CP15-558-000                                             - 47 -

evaluated in the EIS. The final EIS determines that no significant impacts to groundwater resources are anticipated from the construction or operation of the project. Installation of the pipeline would include digging a trench approximately 7-10 feet deep, which would have minor impacts on surficial aquifers, and not impact deeper bedrock or sole-source aquifers, including their discharge and recharge patterns.[142] In addition PennEast reviewed publicly available information regarding wellhead protection areas to formulate alternatives and has committed to several mitigation measures in order to further reduce the potential for impacts to wellhead protection areas, including prohibition of certain activities and material storage in proximity to these areas, and consultation with the appropriate wellhead protection authorities.[143]

125.    Several comments were received regarding PennEast's Well Monitoring Plan. The final EIS concludes that the current Well Monitoring Plan contains acceptable measures. As part of its initial Well Monitoring Plan, PennEast commits to conduct pre- and post-construction monitoring for water quality and yield for private and public wells within 150 feet of the proposed construction workspace (500 feet in areas of karst terrain), with the well owner's permission.[144] However, the final EIS recommends additional information regarding DOI's comments on PennEast's initial Well Monitoring Plan, and landowner comments on the draft EIS. Therefore, as is discussed above, we require in Environmental Condition 23 that PennEast file a revised Well Monitoring Plan. The revised plan will provide responses to address the DOI's comments on the draft plan; include an analysis and mitigation for radon, radium 226, and radium 228; and provide more information regarding the types of treatment systems used, including provisions for monitoring and maintenance of any treatment systems PennEast provides.

126.    Several commenters raised concerns regarding impacts to the Swan Creek Upper Reservoir, which is the primary source of drinking water for the City of Lambertville. As discussed in the final EIS, the Swan Creek Upper Reservoir is located approximately 400 feet east of the proposed pipeline route, with the water supply intake structure located upstream of the pipeline. Due to the downstream location of the proposed pipeline crossing, water quality of the active reservoir will not be adversely affected. Blasting is not anticipated near the Swan Creek Reservoir; however, geotechnical evaluations are ongoing.[145] Therefore, we require in Environmental Condition 25 that PennEast provide the results of investigations regarding any anticipated blasting near the Swan Creek Reservoir prior to construction.

---

[142] *Id.* at 4-42 – 4-43.

[143] *See* final EIS at 4-37.

[144] *See* final EIS at 4-38.

[145] *See* final EIS at 4-52.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

127.    In comments on the final EIS, the EPA recommends that PennEast consult with state drinking water authorities to ensure state-defined source water protection areas are not crossed by the project.  PennEast and Commission staff consulted with federal, state and regional entities to identify source water protection areas to be crossed by the project.  As noted above, PennEast has proposed several mitigation measures to prevent impacts to wellhead protection areas that staff determined will adequately address potential impacts.  In addition, the final EIS responds to concerns about blasting impacts on an existing water transmission tunnel managed by the Bethlehem Authority.  The pipeline will be installed substantially above the location of the tunnel, with about 480 feet of clearance at the point where it first crosses the tunnel, and about 75 feet of clearance at the second crossing.  Environmental Condition 44 requires that PennEast file additional information on the crossing, including a site-specific crossing plan and details regarding potential blasting within 2,000 feet of the water tunnel, and documentation of working meetings with water authority to ensure its concerns are adequately addressed, prior to construction.

128.    Several commenters, including the USACE, PADEP, and the New Jersey Highlands Water Protection and Planning Council, commented on the final EIS and PennEast's PADEP/USACE Joint Permit Application, stating that more surveys needed to be completed before the applications could be processed, and the true environmental impacts could be assessed.  On April 25, 2017, the PADEP filed a letter concerning the same application.  The PADEP and USACE state that the application was incomplete due to lack of survey access.  On April 26 and 28, 2017, the NJDEP commented on the final EIS and PennEast's freshwater wetlands individual permit application, stating that PennEast's application was determined administratively deficient, and that until an application is determined by the NJDEP to be complete, it is not possible to issue the permit or to determine a proposed permit issuance date.

129.    As previously noted, we are aware that remaining field surveys need to be completed prior to construction.  For areas where PennEast was unable to complete field surveys, remote-sensing resources were used to approximate the locations and boundaries of wetlands and waterbodies within the project area.  Remote-sensing delineations were conducted using a combination of high-resolution aerial photographic imagery, National Wetland Inventory data, National Hydrography Dataset data, hydric soil data maintained by the Natural Resources Conservation Service, floodplain and flood elevations maintained by the Federal Emergency Management Agency, watershed data from the USGS, and field survey results on adjacent land parcels where access could be obtained.  Once surveys are completed following issuance of this order, PennEast will submit any outstanding survey information to the USACE, PADEP, and NJDEP to enable the final processing of its permit applications.  Further, we require in Environmental Condition 10 that no construction will be allowed to commence until PennEast provides documentation that it has received all applicable authorizations required under federal law.

130.    Sondra Wolferman filed comments on the final EIS regarding the potential impact to waterways and wetlands within Beltzville State park that could occur if inadvertent releases of HDD drilling muds were to occur.  PennEast will be required to describe, in the site specific plan for Beltzville State Park and Reservoir, how an inadvertent release of drilling mud will be contained and cleaned up.[146]  In the unlikely event of any release of drilling muds, including any occurring in or near the Beltzville State Park, PennEast will implement the mitigation measures in its HDD Inadvertent Returns and Contingency Plan.[147]

131.    Based on the foregoing, and on PennEast's proposed and the Commission's required prevention and mitigation measures, we agree with the final EIS's conclusion that the construction and operation of the PennEast project will not have adverse long-term impacts on waterbodies, including surface water and groundwater resources.

### d.    Wetlands

132.    Construction of the project will temporarily impact approximately 36 acres of wetlands (20 acres in Pennsylvania and 16 acres in New Jersey) and permanently impact about 20 acres of wetlands (12 acres in Pennsylvania and 8 acres in New Jersey). Construction impacts include 17.3 acres of forested wetlands, 3.0 acres of scrub-shrub wetlands, 6.6 acres of emergent wetlands, 0.2 acre of vernal pools, and 8.8 acres of modified agricultural wetlands.[148]  With the exception of 0.01 acre of palustrine emergent wetland, no permanent fills or loss of wetlands will result from the construction or operation of the project.

133.    As described in the final EIS, construction activities at wetland crossings will be performed in accordance with applicable regulatory requirements, PennEast's E&SCP, and FERC's Plan and Procedures.  PennEast is currently developing project-specific mitigation measures in consultation with the USACE and state agencies.

134.    PennEast will also conduct routine wetland monitoring of all wetlands affected by construction until revegetation is successful.   Once wetland delineations are completed and available, we require in Environmental Condition 30 that PennEast file with the Commission its wetland delineation report as submitted to the USACE and applicable state agencies.  As described above, the EIS utilized remote-sensing surveys to analyze wetlands for areas where access was denied.  Completion of the wetland delineations will allow for a more precise determination of wetland boundaries in order for PennEast to

---

[146] *See* final EIS at 2-12.

[147] *See* final EIS at 4-14.

[148] *See* final EIS at 4-81 (table 4.4.2-1).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

accurately apply wetland construction and restoration methods in the appropriate locations.

135.   In its comments on the final EIS, the EPA recommends that PennEast develop a compensatory mitigation plan for waterbodies and wetlands to include appropriate success criteria, compensation for exceptional value resources, and consideration of temporal loss.  PennEast has agreed to provide offsite compensatory mitigation in accordance with agency-approved compensatory wetland mitigation plans.  As mitigation design progresses, further coordination with USACE, PADEP, and the NJDEP Mitigation Unit will be required to incorporate site-specific design features and/or modifications, as applicable.  Accordingly, we require in Environmental Condition 32 that PennEast file a final project-specific Wetland Restoration Plan developed in consultation with the USACE and applicable state agencies in Pennsylvania and New Jersey.

136.   With implementation of the acceptable avoidance and minimization measures, as well as the environmental conditions in Appendix A of this order, we agree with the final EIS's conclusion that impacts on wetland resources, including exceptional value wetlands, will be appropriately mitigated and reduced to less than significant levels.[149]

### e.      Vegetation, Forested Land, and Wildlife

137.   The project area currently supports a diverse array of wildlife species, including wildlife adapted to natural forested and open habitat types, as well as disturbed habitats such as residential, industrial, and agricultural areas.  Forested areas will be the most common habitat type affected by the project (consisting of approximately 37 percent of the project's impacts), followed by agricultural areas, residential/industrial/commercial areas, open lands, and open water habitats.  The project will affect vegetation communities of special concern, including ephemeral/fluctuating natural pools, herbaceous vernal ponds, Leatherleaf – Cranberry bog shrubland, Pitch pine – rhodora – scrub oak woodland, and red spruce palustrine woodland.  To avoid and minimize effects on interior forest habitat, PennEast routed the pipeline adjacent to existing rights-of-way when possible, with 44.5 miles of the pipeline collocated with existing right-of-ways.[150] The project will affect 220.6 acres of interior forest during construction and 63.6 acres during operation.[151]  Additionally, the project will have an indirect impact (through edge

---

[149] *See* final EIS at 5-7.

[150] *See* final EIS at 4-101.

[151] *See* final EIS at 4-90 (table 4.5.1-2).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

effects, potentially resulting in avoidance of habitats or decreased habitat quality) on 1,725 acres of interior forest.[152]

138.    In response to the final EIS, West Amwell Township discusses the Goat Hill Natural Heritage Priority site.  West Amwell Township notes in its comments that PennEast has repeatedly and erroneously understated the impacts on the Goat Hill Natural Heritage Priority site, and misidentified its location.  PennEast believed the priority site was strictly contained in the park near George Washington Road, but it has been demonstrated that in fact the Goat Hill Priority Site encompasses the entire hill (as West Amwell Township indicated in a map submitted to FERC showing the Priority Site Delineation, and where PennEast will be impacting it).  The final EIS acknowledges the biological importance of Goat Hill and Gravel Hill,[153] and the potential for the area to contain sensitive biological resources.  As identified in the final EIS, and based on consultations with the NJDEP, the Goat Hill Priority Site may contain several vegetative communities of special concern and is known to support three state endangered plant species.  Though state-required mitigation measures have not been determined for state listed plant species, the EIS identifies procedures that have been successfully implemented for rare plants by similar projects, including flagging/fencing the plant or population to facilitate avoidance during construction, minor alignment shifts to avoid larger populations, topsoil segregation, and relocation of individual plants and/or collection of seeds for cold storage/stockpiling and replanting at a later date. These measures also typically include monitoring to ensure that they are successful.  PennEast will adhere to the recommendations and requirements of NJDEP-Division of Fish and Wildlife in order to avoid or minimize impacts on these species, including completing all necessary surveys for state species.[154]

139.    The Goat Hill Priority Site is located in the Sourland Mountain region.  The final EIS evaluated route alternatives in the Sourland Mountain area and determined that the proposed route will have less environmental impacts than the alternative routes.  In addition, the pipeline will be collocated with an existing utility line in this area, further minimizing impacts.  In addressing visual impacts, the pipeline will cross Sourland Mountain region for about 0.75 mile to the east of Goat Hill Overlook.  The pipeline will be separated from the overlook by about 0.75 mile of mature forest and therefore will have minimal visual impact in this area.  Once surveys are completed, PennEast will file its survey findings and documentation of consultations/permits required and Commission

---

[152] *See* final EIS at 4-90 (table 4.5.1-2).

[153] *See* Appendix M of the final EIS at M-266.

[154] *See* final EIS at 4-139.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

staff will review and verify that the new biological information does not alter the EIS conclusions.[155]

140.   In comments on the final EIS, the EPA recommends that PennEast develop a revegetation plan for nature preserves and parklands and that PennEast plant larger plant stocks (as opposed to seedlings).  Areas temporarily disturbed during construction will be reseeded in accordance with our Plan and Procedures, as well as any recommendations made by the local soil conservation district or land managing agency/individual.  In accordance with PennEast's E&SCP, PennEast will implement and monitor revegetation efforts to ensure successful post-construction revegetation as outlined in our Plan and Procedures.  The seed mixes used for reseeding will be selected based on consultation with local soil conservation districts, or appropriate land management agencies.  Therefore, we find that recommending revegetation plans and additional measures regarding revegetation are not warranted.

141.   In comments on the final EIS, the NJDEP comments that the project is subject to the New Jersey No Net Loss Compensatory Reforestation Act (NNLRA) and recommends that the Commission require compensatory mitigation for impacts on forested areas.  To mitigate impacts on forested areas, the final EIS states that PennEast will assess the purchase and permanent conservation of forested lands in key watersheds and reforest areas within the same municipality in which the impact occurs; or develop mitigation measures for restoring areas of temporary project impacts in New Jersey.  Compensation will be determined based on final project acreage impacts and grid method assessment techniques consistent with the NNLRA requirements.[156]

142.   We received comments concerning construction impacts on forest disease, as well as concern with noxious weeds invading revegetation efforts.  The final EIS addresses these issues and concludes that with implementation of the measures in the E&SCP and our Plan, the measures will minimize forest disease spread and deter noxious weeds from occurring/spreading.  However, further mitigation measures are needed to address invasive species.  Based on staff's analysis of the proposed project route, invasive species were observed in areas that were surveyed along the pipeline.  An Invasive Species Management Plan has yet to be developed by PennEast.  Therefore, we support the recommendation in the final EIS and require in Environmental Condition 33 that, prior to construction, PennEast file complete results of its noxious weed surveys and a final Invasive Species Management Plan for review and approval that includes measures PennEast will implement during construction and operation to minimize invasive and noxious species from occurring on the right-of-way.

---

[155] *See* Appendix M of the final EIS at M-266.

[156] *See* final EIS at 4-91.

20180119-3110 FERC PDF (Unofficial) 01/19/2018
Case 3:18-cv-01938-BRM-DEA   Document 1   Filed 02/09/18   Page 78 of 168 PageID: 78

Docket No. CP15-558-000                                          - 53 -

143.    Impacts will be short-term in non-forested areas, and it is expected that these
non-forested areas will, with implementation of PennEast's E&SCP and the
Commission's Plans and Procedures, be successfully restored within three years
following construction.[157]   However, all impacts on forested habitats will be considered
long-term because of the time required to restore woody vegetation to preconstruction
conditions (i.e., more than 30 years, and possibly hundreds of years for some forested
areas).[158]

144.    Regarding wildlife, PennEast will implement restrictions on the timing and
location of construction, based on the requirements of local and state wildlife agencies, in
order to mitigate impacts on wildlife and their habitat.  Further, PennEast will prepare a
Migratory Bird Conservation Plan, and implement the U.S. Fish and Wildlife Service's
(FWS) recommended measures, to protect bald eagles and comply with the Migratory
Bird Treaty Act.  We require in Environmental Condition 34 that PennEast file a
migratory Bird Conservation Plan developed in consultation with the FWS.

145.    Based on the analysis in the final EIS, and PennEast's proposed and the
Commission's required mitigation measures, we have determined that the project will not
significantly impact vegetation, forested land or wildlife.

### f.    Threatened, Endangered, and Other Special Status Species

146.    Based on input from the FWS, the final EIS identified eight federally-listed
species that potentially occur in the project area:  the Indiana bat, northern long-eared bat,
bog turtle, dwarf wedge mussel, rusty patched bumble bee, northeastern bulrush, Atlantic
sturgeon, and Shortnose sturgeon.[159]  The final EIS concludes that the project may affect
and is likely to adversely affect the northern long-eared bat, Indiana bat, bog turtle, and
northeastern bulrush, while it may affect but is not likely to adversely affect the dwarf
wedge mussel.[160]  The final EIS found that the Atlantic sturgeon and the Shortnose
sturgeon, while found downstream of the project, do not occur in the project area and will
not be affected.  The final EIS concludes that the project may affect and is likely to
adversely affect the rusty patched bumble bee; however, based on information made
available by the FWS since issuance of the final EIS,[161] Commission staff has changed

---

[157]  *See* final EIS at 4-89.

[158]  *See* final EIS at 4-89.

[159]  Final EIS at 4-109 (table 4.6-1).

[160]  *Id.*

[161]  Notes from April 24, 2017 teleconference between FWS, Pennsylvania Field
*(continued ...)*

Case 3:18-cv-01938-BRM-DEA   Document 1   Filed 02/09/18   Page 79 of 168 PageID: 79

the determination for this species, finding that the project would not affect the rusty patched bumble bee. Complete surveys of all potentially suitable habitat within the project area have yet to be completed, due to lack of access granted by affected landowners. In accordance with section 7 of the Endangered Species Act, Commission staff prepared a Biological Assessment to support formal consultation with the FWS for the northern long-eared bat, Indiana bat, bog turtle, and northeastern bulrush. The Biological Assessment was submitted to the FWS on July 14, 2017.

147.    On November 29, 2017, the FWS provided its biological opinion (BO) for the project, along with its recommended conservation measures. The FWS has determined that the project is not likely to adversely affect the dwarf wedge mussel, Indiana bat, and the northeastern bulrush. In addition, the FWS stated that the project, as proposed, is not likely to jeopardize the continued existence of the bog turtle or northern long-eared bat. Accordingly, after receiving the FWS' BO, we are not including the final EIS's Environmental Conditions 33, 34, and 36 through 41 (which are obviated by the BO) in this order, and are adding to this order a new Environmental Condition 36, which requires that PennEast adopt the recommended measures in FWS' BO into its project-specific implementation plan. These include implementing reasonable and prudent measures, adopting terms and conditions for the bog turtle; avoidance measures for bulrush; and adopting monitoring and reporting requirements; consulting with the FWS regarding conservation recommendations for the bog turtle and the northern long-eared bat; and providing FWS with all remaining survey results for FWS comment. With implementation of these measures we conclude our consultation with the FWS under section 7 of the Endangered Species Act for the bog turtle, Indiana bat, northern long-eared bat, and northeastern bulrush.

148.    Based on input from state wildlife management agencies, the EIS identified 24 state listed species that could potentially occur in the project area.[162] PennEast has stated that it will adhere to the recommendations and requirements of the respective state agencies with jurisdiction over state listed species and state species of concern (including the Pennsylvania Game Commission, Pennsylvania Fish and Boat Commission, Pennsylvania Department of Conservation and Natural Resources (PADCNR), and NJDEP-Division of Fish and Wildlife) in order to avoid or minimize impacts on these species, including completing all necessary surveys for state species. PennEast has indicated that ongoing permit review by Pennsylvania and New Jersey wildlife agencies may result in the identification of additional avoidance, minimization, or mitigation measures that will be attached as permit conditions from respective state agencies with

Office, and PennEast, as provided to Commission staff by the FWS via email on May 22, 2017.

[162] Table 4.6-2 in the final EIS features a complete listing of all state listed species.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

jurisdiction over state listed species and state species of concern.  As recommended in the final EIS, we require in Environmental Condition 39 that prior to construction, PennEast file a comprehensive list of measures developed in consultation with applicable state wildlife agencies to avoid or mitigate impacts on state-listed species and state species of concern.  Commission staff will review these measures prior to construction to verify consistency with the Commission's order.

149.    Comments were received from several individuals regarding potential impacts on bird species, including bald eagles and peregrine falcons.  The final EIS recommends that PennEast develop a Migratory Bird Conservation Plan and implement measures recommended by the FWS to protect bald eagles in order to comply with the Migratory Bird Treaty Act and Bald and Golden Eagle Protection Act.  As a result, we require in Environmental Condition 34 that PennEast file a Migratory Bird Conservation Plan developed in consultation with the FWS.  In addition, PennEast has committed to following the FWS' recommendations for implementation of adaptive management practices to minimize impacts on migratory birds during construction and operation of the project, as well as adhering to a more restrictive window (September 11 to March 14) for vegetation maintenance activities.[163]

150.    After the close of the draft EIS comment period, comments were filed on behalf of Dr. Ned Heindel, Dr. Linda Heindel, and the Linda Heindel Living Trust concerning potentially occurring threatened and endangered species on their property, including species within vernal pools.  As stated above, we acknowledge that not all surveys for threatened and endangered species have been completed due to lack of survey access.  To address sensitive vernal pools that may be crossed, we require in Environmental Condition 31 that PennEast survey all areas mapped as being potential vernal pool habitat and identify if any vernal pool habitat will be affected by project construction and/or operation.  Such survey shall be submitted for review.  Based on current information, the final EIS identifies less than 0.3 acre of vernal pool habitat that will be impacted by construction, with about 0.1 acre permanently impacted during operation.  Should additional vernal habitats be discovered in supplemental surveys, PennEast will implement a time of year restriction if vernal habitats cannot be avoided.  This time of year restriction would be observed during the key breeding period (i.e., March through June) for obligate and facultative amphibian species.  All disturbed areas would be restored to pre-construction conditions following pipeline installation.  Based on the mitigation measures and completion of remaining surveys, the EIS concludes that impacts on vernal pools would be effectively minimized or mitigated.[164]

---

[163] *See* final EIS at 4-104 to 4-105.

[164] *See* final EIS at 5-7.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

151.    In comments on the final EIS, Sondra Wolferman states that the Habitat Mitigation Plan discussed in the final EIS is insufficient to protect the northern flying squirrel, a Pennsylvania-listed endangered species, and suggests additions to the Habitat Mitigation Plan for the species in Hickory Run State Park.  In general, PennEast has stated that it will adhere to the recommendations and requirements of the respective state agencies with jurisdiction over state-listed species and state species of concern.  Pennsylvania Game Commission requires a northern flying squirrel mitigation plan related to the species' loss of habitat as a result of the project.  PennEast has not yet developed this plan, but has committed to working with the state agencies to develop an adequate plan.[165]  We are confident that the Habitat Mitigation Plan developed with Pennsylvania Game Commission will be sufficient to protect the northern flying squirrel.

152.    In comments on the final EIS, NJDEP notes two discrepancies in tables 4.3.3-1 and G-13 of the final EIS.  NJDEP notes that channel catfish (*Ictalurus punctatus*) and northern pike (*Esox luclus*) are listed in table 4.3.3 - twice.  Both species are representative fish species in waterbodies crossed by the project in Pennsylvania and New Jersey, therefore they are listed twice.  NJDEP also notes that Atlantic sturgeon (*Acipenser oxyrinchus*) is noted as "Not Listed" for Federal Status in table G-13.  The Federal Status of this species is correctly identified in table 4.6-1 of the final EIS.  There are four distinct population segments (DPS) of the Atlantic sturgeon that are listed as endangered:  the New York Bight DPS, the Chesapeake Bay DPS, the Carolina DPS, and the South Atlantic DPS; the Gulf of Maine DPS is listed as threatened.  None of these DPS occur within the project area, but the New York Bight DPS could occur downstream of the project area.[166]  The final EIS concludes that there will be no effect on the Atlantic sturgeon, given that its known occurrence is at least 20 miles downstream of the Delaware River crossing, which will be avoided via HDD.  We concur.

153.    Based on implementation of these measures and the environmental conditions in Appendix A of this order, we agree with the final EIS's conclusion that impacts on special-status species will be adequately avoided or minimized.

### g.    Land Use, Recreation, and Visual Resources

154.    Construction of the project will impact about 1,588 acres.  About 61 percent of this acreage will be utilized for the pipeline facilities, including the construction right-of-way and additional temporary work space.  The remaining acreage affected during construction will be associated with aboveground facilities (4 percent), pipe and contractor ware yards (25 percent), and access roads (9 percent).[167]  During operation, the

---

[165] *See* final EIS at 4-127 to 4-128.

[166] *See* final EIS at (table 4.6-1).

[167] Due to rounding error, percentages do not add up to 100.

20180119-3110 FERC PDF (Unofficial) 01/19/2018
Case 3:18-cv-01938-BRM-DEA   Document 1   Filed 02/09/18   Page 82 of 168 PageID: 82

Docket No. CP15-558-000                                             - 57 -

new permanent pipeline right-of-way, aboveground facilities, and permanent access roads will impact 788 acres.[168]  Land uses impacted by the project will include forest, agriculture, open land, residential, industrial/commercial, and some open water.  About 37 percent of the pipeline will be collocated with existing rights-of-way.  We agree with the final EIS's conclusion that, with adherence to PennEast's proposed impact avoidance, minimization, and mitigation plans, and implementation of the environmental conditions in Appendix A of this order, the overall impacts on land use will be adequately minimized.

155.    Several comments were received regarding the use of public and private roads as access roads, including driveways and the historic "Stymiest Road."  The final EIS lists the access roads proposed for use for the project, whether their use is temporary or permanent, and considers these impacts.  PennEast is committed to maintaining access for landowners to residences, driveways, fields, and other agricultural facilities during construction to the extent possible.[169]  PennEast continues to communicate at the state, county, local, and private level in its effort to minimize impacts on access roads, and discuss potential post-construction restoration, and PennEast has stated it would repair any damage to public or private roadways resulting from construction.  All temporary access roads used for construction will be restored in accordance with the provisions in PennEast's ECS&P, our Plan, and landowner agreements after construction.  In addition, PennEast will determine current average daily transit and evaluate current conditions to finalize its Residential Access and Traffic Management Plan.  To further ensure PennEast takes all appropriate mitigation measures to minimize impacts on traffic and landowner access, we require in Environmental Condition 40 that PennEast file a revised Residential Access and Traffic Management Plan which includes traffic counts, peak traffic volumes, and site-specific mitigations measures.

156.    West Amwell Township filed comments on the final EIS regarding the impact on septic systems, contending that the final EIS and PennEast erred in stating that no septic systems were located within 150 feet of the pipeline and that such systems may be adversely impacted during construction and operation of the project.  Because pipeline construction could damage septic systems, including septic tanks, distribution piping, and drain fields, we have included a new condition to address potential septic system impacts.  Environmental Condition 22 requires that PennEast identify septic systems within 150 feet of any construction workspace and develop a plan that describes how PennEast will avoid impacts on septic systems where possible, as well as how PennEast will mitigate or restore impacted systems to applicable regulatory requirements.

---

[168] *See* final EIS at 4-140.

[169] *See* final EIS at 4-153.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

157.    William E. Markus filed comments regarding impacts on a structure on his property which could be damaged due to HDD operation and requests that PennEast re-route the project to the opposite side of the property. The final EIS points out that PennEast has responded to landowner concerns, and has evaluated, and incorporated, several pipeline variations based on landowner requests. We acknowledge that PennEast will continue to evaluate minor route changes. To ensure that Residential Construction Plans address landowner comments such as Mr. Markus', we require in Environmental Condition 41 that PennEast file additional information for residences in close proximity to the project prior to construction.

158.    Several comments were received discussing potential impacts on protected lands, including conservancies and lands held in trust. In addition, the EPA recommends that additional measures be taken to monitor whether protected land impacted by new easements lose quality and value to conservancy patrons. Impacts on conservation easements are addressed fully in section 4.7.2 of the final EIS. There are no changes expected in the conservation status of public lands crossed by the project, including state game lands and state highways and maintenance areas. No changes are expected in the conservation status of private lands crossed by the project in Pennsylvania. New Jersey parcels crossed by the project that are subject to types of conservation or open space protective easements will generally retain their conservation and open space characteristics, except with respect to the limited circumstance of New Jersey State Agriculture Development Committee (SADC) easements, as described in section 4.7.4 of the final EIS.

159.    The SADC asserts that table G-17 from Appendix G of the final EIS is incomplete, as three New Jersey farms encumbered by farmland preservation development easements and impacted by the project are not included. This comment is noted. The description of impacts and mitigation for impacts on farmlands with preservation easements included in sections 4.7.4.2 and 4.7.4.4 of the final EIS apply to the three farms identified from SADC, even though they are not listed in table G-17 of the final EIS.

160.    The New Jersey Highlands Water Protection and Planning Council states that the final EIS does not adequately address the Highlands Region, nor the Highlands Regional Master Plan. The final EIS states that the New Jersey Highlands Water Protection and Planning Council will review the proposed project against the Highland Regional Master Plan and will be responsible for issuing a Consistency Determination in accordance with the Highlands Water Protection and Planning Act Rules.[170] Additionally, PennEast has indicated that it will voluntarily prepare a Comprehensive Mitigation Plan to detail proposed efforts to avoid, minimize, and mitigate impacts on resources associated with

---

[170] N.J. Admin. Code §§ 7:15, 7:38-1.1 (2017).

20180119-3110 FERC PDF (Unofficial) 01/19/2018
Case 3:18-cv-01938-BRM-DEA   Document 1   Filed 02/09/18   Page 84 of 168 PageID: 84

Docket No. CP15-558-000                                                    - 59 -

the New Jersey Highlands Region.[171]  Based on PennEast's voluntary commitment to prepare the Comprehensive Mitigation Plan, we find these concerns have been adequately addressed.

161.    In response to the USACE's Draft Finding of No Significant Impacts, Sondra Wolferman asserts that it will be impossible to restore Beltzville State Park to its original condition after project construction.  Ms. Wolferman argues that the project right-of-way will permanently and significantly alter the appearance of the trails within the park.  However, we believe that any impacts to visual of park patrons will be minimal, since PennEast will keep a 300-foot recreational and aesthetic buffer around these areas and adhere to any vegetation management request from the PADCNR.[172]

162.    Several comments were filed regarding the potential for impacts on visual resources, particularly for recreational and conserved lands in New Jersey.  PennEast prepared site-specific crossing plans for federal, state, and local lands that are used recreationally and the EIS concludes the mitigation measures proposed by PennEast, including site-specific safety measures, modified construction schedules, and the use of special construction techniques, adequately mitigate potential visual impacts resulting from the project.

163.    In general, the final EIS concludes that the effects of the project on recreational and special interest areas occurring outside of forestland will be temporary and limited to the period of active construction, which typically lasts several weeks or months in any one area.[173]  These effects will be minimized by implementing the measures in PennEast's E&SCP, FERC's Plan and Procedures, and other project-specific construction plans.  In addition, we require in Appendix A of this order that PennEast continue to consult with the owners and managing agencies of recreation and special interest areas regarding the need for specific construction mitigation measures.[174]

### h.    Socioeconomics

164.    Construction of the project will require approximately 2,400 workers, with a maximum of 600 people working on any one section at any one time.  PennEast estimates that up to 40 percent of the workforce will consist of local hires; operation of the project will require 24 new permanent employees to operate the new pipeline and compressor

---

[171] *See* final EIS at 4-170 to 4-171.

[172] *See* final EIS at 4-164.

[173] *See* final EIS at 5-11.

[174] *See* Environmental Conditions 42 and 43 in Appendix A.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

station. Temporary impacts on traffic during construction will result from the workforce commuting daily to the construction site; however, PennEast will explore site-specific mitigation measures in its revised Residential Access and Traffic Management Plan that it may implement to minimize impacts on local traffic.[175]  The project would cross one census block that could be considered a minority population, and one census block that could be considered low-income; however, construction and operation of the project is not expected to have high and adverse human health or environmental effects on any nearby communities or result in adverse and disproportionate human health or environmental effects to minority or low income communities.

165.     After the close of the draft EIS comment period, Phyllis Jacewicz filed comments regarding the potential increase in homeowner's insurance due to proximity to the project.  As noted in the final EIS, insurance advisors consulted on previous natural gas projects have indicated that natural gas pipelines do not impact the rates or eligibility for residential insurance applications.  The final EIS finds that homeowner's insurance rates would be unlikely to change due to construction and operation of the proposed project.[176]  However, to address any potential insurance-related issues, we require in Environmental Condition 45 that PennEast file reports describing any documented complaints from a homeowner that the construction of a pipeline, or the existence of a pipeline right-of-way, directly impacted a homeowner's insurance.  Additionally, as is typical for similar projects, PennEast will maintain insurance coverage for the project from the start of the survey process through the lifetime of the project, with coverage that will apply to qualifying claims from third-parties, including landowners.[177]

166.     In comments on the final EIS, Kelly Kappler discusses potential impacts on local tourism.  The final EIS finds that while the potential exists for the project to have localized effects on recreation resources, construction and operation of the project would not be expected to substantially impact the recreation and tourism sector in the affected counties.[178]  We concur.  Emma Switzler comments on the final EIS that noise from construction will impact her son's ability to teach tennis lessons.  As discussed further below, any noise impacts from construction will be highly localized and temporary.

167.     In its comments on the final EIS, the EPA recommends that meaningful coordination and outreach be conducted with communities of concern, including Environmental Justice communities.  Consistent with Executive Order 12898, all public

---

[175] S*ee* Environmental Condition 40 in Appendix A.

[176] *See* final EIS at 4-195.

[177] *See* final EIS at 4-195.

[178] *See* final EIS at 4-185.

documents, notices, and meetings were made readily available to the public during the Commission's review of the project. The final EIS provides additional detail about coordination and outreach as well as an assessment of impacts on Environmental Justice communities. As noted above, the final EIS concludes that construction and operation of the project will not have high and adverse human health or environmental effects on any nearby communities or result in adverse and disproportionate human health or environmental effects to minority or low income communities.[179]

### i. **Cultural Resources**

168.    The final EIS identifies ten archaeological sites in Pennsylvania and three sites in New Jersey in the direct area of potential effect. Additionally, there are 110 aboveground historic resources identified in Pennsylvania and 41 in New Jersey. This is based on completed cultural resources identification surveys for 69 miles in Pennsylvania and 15 miles in New Jersey, as well as desktop research.[180] Although the Pennsylvania and New Jersey State Historic Preservation Offices (SHPOs) concurred with some of the final EIS recommendations, they did not agree with all of the recommendations by PennEast. Consultation is ongoing with the Pennsylvania and New Jersey SHPOs.

169.    Commission staff consulted, and PennEast conducted outreach, with 15 federally recognized tribes, as well as several other non-governmental organizations, local historical societies, museums, historic preservation heritage organizations, conservation districts, and other potential interested parties to provide them an opportunity to comment on the project.[181] We have not received any responses to the letters sent to the federally recognized tribes.

170.    On January 24, 2017, after the close of the draft EIS comment period, John P. Hencheck filed comments regarding potential impacts on "The Road Along the Rocks," a historic resource associated with the American Revolution. PennEast has a number of evaluation studies, reports, and potential treatment plans pending, including an architectural survey of The Road Along the Rocks.[182]

171.    In letters dated August 7 and August 9, 2017, the New Jersey SHPO commented on two historic architecture survey report addenda for Hunterdon and Mercer Counties, New Jersey. The New Jersey SHPO agreed that no additional studies were necessary for

---

[179] *See* final EIS at 4-197 to 4-202.

[180] *See* final EIS at 5-14.

[181] *See* final EIS at 4-210 to 4-211.

[182] *See* final EIS at 4-226 (table 4.9.2-7).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

ten of the properties investigated. Further, they stated that the John Moore Farmhouse and Angel Farmstead are considered eligible for listing on the National Register of Historic Places. However, five properties (Kappus Farm, Cedarknoll Farm, Flemington Branch of the Belvidere-Delaware Railroad Historic District, Rock Road/Rocktown Road/Road Along the Rocks/Bungtown Road, and 1465 NJ Route 179- Olde York Road) would require additional information from PennEast for the New Jersey SHPO to provide comments. Additionally, the New Jersey SHPO noted that the Hopewell Township Historic Preservation Commission should be provided an opportunity to review and comment on cultural resources reports for the Hopewell Township within Mercer County. Environmental Condition 47 requires PennEast to file the results of the New Jersey SHPO's assessment of these properties, and any related site avoidance or mitigation plans. We find this adequate to address the concerns raised.

172.    On May 25, 2017, in comments on the final EIS, the NJDEP submitted a letter noting that 68 percent of the project alignment in New Jersey still needed to be surveyed for historic properties. As identified in the final EIS, compliance with Section 106 of the NHPA is not complete due to pending surveys, evaluation of certain archaeological sites and historic architecture, as well as avoidance and potential treatment plans for the project, both in New Jersey and Pennsylvania. These activities are specifically identified in tables 4.9.2-2, 4.9.2-4, 4.9.2-5 and 4.9.2-7 of the final EIS. In addition, Environmental Conditions 46 through 50 identify certain assessments, mitigation plans, and consultations that PennEast must complete and file with the Secretary prior to construction to address stakeholder comments and address mitigation requirements identified by Commission staff. To ensure that our compliance with section 106 of the National Historic Preservation Act,[183] we require in Environmental Condition 51 that PennEast not begin construction until any additional required surveys are completed, and survey reports and treatment plans (if necessary) have been reviewed by consulted parties, including the appropriate SHPO, and all appropriate documentation is filed with the Secretary. Commission staff will review all filings to ensure PennEast completes all pending activities identified in the final EIS, and required by Environmental Conditions 46 through 51. Fulfillment of these conditions will enable the Commission to complete section 106 consultation, thereby, along with the foregoing discussion, addressing all concerns on this subject.

### j.    Air Quality Impacts

173.    General Conformity Determinations stem from section 176(c) of the Clean Air Act,[184] which requires a federal agency to demonstrate that a proposed action conforms to the applicable State Implementation Plan, a state's plan to attain the National Ambient

---

[183] 54 U.S.C.A. §§ 300101 et seq. (West 2016).

[184] 42 U.S.C. § 7506(c) (2012).

Air Quality Standards (NAAQS) for nonattainment pollutants. A General Conformity Determination is required when the federal agency determines that an action will generate emissions exceeding conformity threshold levels of pollutants in the nonattainment area, in order to assess whether the federal action will indeed conform to the State Implementation Plan. Because portions of the project will be located in five different counties with a nonattainment or maintenance designation for at least one pollutant, Commission staff reviewed the criteria pollutant emissions expected to be generated during construction of the project and compared them to the General Conformity thresholds in section 93.153(b)(1) of the EPA's regulations.[185]

174.   Based on PennEast's May 2016 revised construction emission estimates, the final EIS determines that project construction emissions will not exceed any General Conformity applicability thresholds.[186]  Because no thresholds are triggered, a General Conformity Determination is not required to be made. To ensure this finding is based on the most up-to-date information, however, Environmental Condition 52 requires PennEast to file revised construction emissions estimates if changes to the project construction schedule and/or design occur that will materially impact the construction nitrogen oxide ($NO_x$) emissions generated in a calendar year. If the revised emissions exceed a General Conformity applicability threshold, then the Commission will need to prepare a draft General Conformity Determination at that time and prior to any construction.

175.   In comments on the final EIS, the NJDEP expresses concerns over the potential air emissions associated with the USACE permits, and whether these emissions were included in the General Conformity analysis, as well as the emission totals presented in tables 4.10.1-4 and 4.10.1-5 of the final EIS. The project will not include any additional facilities related to the USACE permit. Therefore, no additional emissions are anticipated.

176.   NJDEP states that its Bureau of Evaluation and Planning previously submitted a comment on the draft EIS asking whether air emissions associated with transporting pipe within the nonattainment/maintenance areas to the staging areas/worksites were included in tables 4.10.1-4 and 4.10.1-5, and states that Appendix M does not appear to respond to the Bureau of Evaluation and Planning's comment. These pipe transport emissions are accounted for by the "Float, Lowboy, Tractor Trucks" line items provided in Appendix L-2 of Resource Report 9 in PennEast's application, and are accounted for in Tables 4.10.1-4 and 4.10.1-5 in the final EIS.

---

[185] 40 C.F.R. § 93.153(b)(1) (2017).

[186] *See* final EIS at 4-240.

20180119-3110 FERC PDF (Unofficial) 01/19/2018
Case 3:18-cv-01938-BRM-DEA   Document 1   Filed 02/09/18   Page 89 of 168 PageID: 89

Docket No. CP15-558-000                                           - 64 -

177.    NJDEP states that the Bureau of Evaluation and Planning previously submitted a comment on the draft EIS inquiring as to whether the construction equipment list included HDD, and if tables 4.10.1-4 and 4.10.1-5 included emissions associated with HDD activity, and states that Appendix M does not appear to respond to the Bureau of Evaluation and Planning's comment.  NJDEP further comments that the 150 horsepower rating for the category of "Skidder, Trencher, Boring" equipment (as provided by PennEast in Appendix L-2 of Resource Report 9), may not be the appropriate horsepower rating for HDD equipment used on a "major" crossing such as the Delaware River.  NJDEP requests that the horsepower rating used for the HDD equipment be re-evaluated and that the HDD air emissions for the Delaware River crossing, as well as the emission totals used in the General Conformity analysis and in tables 4.10.1-4 and 4.10.1-5, be revised accordingly.

178.    The comments from the Bureau of Evaluation and Planning that were included in NJDEP's September 12, 2016 letter on the draft EIS do not refer to HDD activity.  Regardless, the construction equipment list, as provided by PennEast in Appendix L-2 of Resource Report 9, includes HDD equipment, and that tables 4.10.1-4 and 4.10.1-5 of the final EIS appropriately include air emissions associated with HDD activity.  However, we acknowledge the possibility that the HDD crossing of the Delaware River may require HDD equipment with higher horsepower ratings than those used to estimate construction emissions in the EIS.  Incorporating the increased emissions associated with using appropriately-sized HDD equipment for the Delaware River crossing into the General Conformity analysis will not change the conclusion, as the increase in emissions will be insignificant relative to overall total construction emissions.  As demonstrated below, even by updating the General Conformity analysis to include updated HDD equipment, construction emissions in Bucks County, Pennsylvania, and Hunterdon County, New Jersey, will remain well below the applicability thresholds that would trigger the requirement for a General Conformity determination.

179.    In order to approximate the potential increase in construction emissions due to higher-rated HDD equipment for the Delaware River crossing, we scaled up emissions provided for the "Skidder, Trencher, Boring" equipment in Pipeline Spread 3 (which encompasses the Delaware River crossing), and applied the net emission increase to the values presented in tables 4.10.1-4 and 4.10.1-5 of the final EIS.  The provided "Skidder, Trencher, Boring" emissions were based on a horsepower rating of 150, and we scaled these up by a factor of 3.33 to approximate a horsepower rating of 500 hp, which was the rating used by another similar pipeline project, as suggested by NJDEP.  Tables 4.10.1-4 and 4.10.1.-5 of the final EIS are reproduced below with the emission increase applied, and show that the increased emissions will remain well below the General Conformity applicability thresholds.

| TABLE 4.10.1-4 |
| --- |
| General Conformity Applicability Evaluation |

Docket No. CP15-558-000                                                    - 65 -

| Project Component | Location (County, State) | County Nonattainment or Maintenance Pollutants a/ b/ | Construction Emissions c/ | General Conformity "de minimis" rates for Nonattainment or Maintenance Areas | General Conformity Determination Required? (Yes/No) |
|---|---|---|---|---|---|
| 23.1 miles of pipeline | Luzerne, PA | None | N/A | N/A | No |
| 28.2 miles of pipeline, Compressor Station | Carbon, PA | $O_3$ | 28.2 tons NOx<br>3.4 tons VOC | 100 tpy NOx<br>50 tpy VOC | No |
| 24.8 miles of pipeline, 2.1 miles of lateral | Northampton, PA | $PM_{2.5}$<br>$O_3$ | 82.5 tons $PM_{2.5}$<br>0.1 tpy SO2<br>21.7 tons NOx<br>2.7 tons VOC | 100 tpy $PM_{2.5}$<br>100 tpy SO2<br>100 tpy NOx<br>50 tpy VOC | No |
| 1.7 miles of pipeline | Bucks, PA | $PM_{2.5}$<br>$O_3$ | 4.6 tons $PM_{2.5}$<br>0.0 tpy SO2<br>1.9 NOx<br>0.3 tons VOC | 100 tpy $PM_{2.5}$<br>100 tpy SO2<br>100 tpy NOx<br>50 tpy VOC | No |
| 26.6 miles of pipeline, 1.9 miles of lateral | Hunterdon, NJ | $O_3$ | 20.7 tons NOx<br>2.6 tons VOC | 100 tpy NOx<br>50 tpy VOC | No |
| 9.6 miles of pipeline | Mercer, NJ | $O_3$ | 25.0 tons $PM_{2.5}$<br>0.0 tpy SO2<br>6.7 tons NOx<br>0.8 tons VOC | 100 tpy $PM_{2.5}$<br>100 tpy SO2<br>100 tpy NOx<br>50 tpy VOC | No |

Notes:

    a/ Marginal or Moderate Nonattainment for the 2008 8-hour Ozone standard

    b/ Maintenance Area for the 1997 and/or 2006 $PM_{2.5}$ Standards

    c/ Emissions of all major construction activities would occur during one calendar year

**TABLE 4.10.1-5**

**Project Facility and Pipeline Construction Activity Combined Emissions**

| Project Total Emissions | Pollutants (Tons) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | $NO_x$ | CO | VOC | $PM_{10}$ | $PM_{2.5}$ | $SO_2$ | $CO_2e$ | HAPs |
| **Pipeline Diesel Non-Road Equipment Totals** | **95.9** | **25.1** | **9.9** | **6.3** | **6.1** | **0.27** | **30,227** | **0.72** |
| Diesel and Gas On-Road | 5 | 22.8 | 2.53 | 0.29 | 0.17 | 0.03 | 1,690 | 0.18 |
| Construction Activity Fugitive Dust | - | - | - | 1,927 | 287 | - | - | - |
| Roadway Fugitive Dust | - | - | - | 132 | 21 | - | - | - |
| **Comp. Station Construction Sub-Total** | **6** | **5** | **1** | **28** | **4** | **0.02** | **1,712** | **0.05** |
| **Total** | **107** | **53** | **13** | **2,093** | **318** | **0.32** | **33,629** | **0.95** |

180.    NJDEP comments on the final EIS that the emission factors and load factors used for on-road and off-road construction equipment appear to represent the use of (lower-emitting) Tier 3 and Tier 4 engines.  NJDEP further notes that while the final EIS includes a recommendation that Tier 3 and Tier 4 engines be used when possible, it

Docket No. CP15-558-000                                                    - 66 -

doesn't require this, leaving open the possibility that lower-tier, higher-emitting engines could be used.  NJDEP therefore requests that the emission factors, load factors, and estimated construction emissions be re-evaluated to better reflect the actual equipment that may be used, and that the General Conformity analysis and tables 4.10.1-4 and 4.10.1-5 be revised accordingly.

181.    Environmental Condition 53 requires that PennEast implement several measures for on-road vehicles and non-road diesel construction equipment, including a requirement that "all non-road diesel construction equipment greater than 100 horsepower used for more than ten days shall have engines that meet the EPA Tier 4 non-road emission standards or the best available control technology that is technologically feasible and verified by EPA or the California Air Resources Board as a diesel emission control strategy."  This requirement will ensure that PennEast will use low-emission-rated engines for all construction equipment that will be utilized long enough to potentially impact the construction emissions of the project.

182.    Air quality impacts associated with construction of the project will include emissions from fossil-fueled construction equipment and fugitive dust.  Local emissions may be elevated, and nearby residents may notice elevated levels of fugitive dust, but these will not be significant or permanent.  We agree with the final EIS's conclusion that, with implementation of PennEast's proposed mitigation measures and the environmental conditions in Appendix A of this order, air quality impacts from construction activities, such as elevated dust levels near construction areas, will be temporary or short term, and will not result in a significant impact on local and regional air quality.[187]

183.    PennEast conducted modeling of emissions from the proposed Kidder Compressor Station to analyze potential impacts associated with the operation of the proposed new sources, including monitored background.  Based on this modeling analysis, the final EIS concludes the air quality impacts from the sources at the proposed Kidder Compressor Station are estimated to be below the NAAQS for all pollutants.[188]

184.    We agree with the final EIS's conclusion that, with implementation of the environmental conditions in Appendix A of this order, operational emissions will not have a significant impact on local or regional air quality.[189]

---

[187] *See* final EIS at 4-245.

[188] *See* final EIS at 4-253.

[189] *See* final EIS at 5-15.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

### k.    Noise

185.    Pipeline construction noise impacts would be temporary as construction activities move along the corridor.  During construction, PennEast will employ a combination of noise mitigation methods, including equipment noise controls, temporary noise barriers, and administrative measures.[190]

186.    The primary source of operational noise for the project will be the Kidder Compressor Station.  Ambient sound measurements were collected in the vicinity of the Kidder Compressor Station location, as well as the vicinity of other operational sound sources like the mainline valves and meter stations, to establish existing conditions. PennEast will be required to meet the most restrictive noise level limits established by jurisdictional agencies.  The Commission limit of 55 decibel A-weighted (dBA) day-night sound level ($L_{dn}$), which is equivalent to a continuous noise level of 49 dBA, would be the governing limit for those areas where a more restrictive county, local, or station-specific regulation does not exist.[191]  We require in Environmental Condition 55 that PennEast conduct a noise survey of the Kidder Compressor Station area, while the station is operating at full load, to ensure that operational noise is at or below this limit.  With the implementation of PennEast's proposed mitigation measures and Environmental Condition 55, we conclude that the compressor station's operational noise will not result in significant noise impacts on residents and the surrounding areas.

187.    Notable sources of intermittent noise include blasting and drilling.  PennEast's Blasting Plan includes mitigation measures related to blasting noise,[192] and Environmental Condition 54 requires that PennEast provide an HDD Noise Mitigation Plan, which must be approved prior to construction.  On April 14, 2017, Emma A. Switzler commented on the final EIS regarding noise mitigation for HDD activities. However, with the implementation of PennEast's proposed mitigation measures and Environmental Condition 54, we conclude that construction of the project will not result in significant noise impacts on residents and the surrounding areas.

### l.    Safety

188.    As described in the final EIS, PennEast will design, construct, operate, and maintain the proposed facilities to meet or exceed the U.S. Department of Transportation's (DOT) Minimum Federal Safety Standards set forth in Title 49 Code of Federal Regulations Part 192.  DOT's Pipeline and Hazardous Materials Safety

---

[190] *See* final EIS at ES-15.

[191] *See* final EIS at ES-15.

[192] *See* final EIS at 4-294.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

Docket No. CP15-558-000                                         - 68 -

Administration's (PHMSA) Office of Pipeline Safety administers the national regulatory program to ensure the safe transportation of natural gas and other hazardous materials by

20180119-3110 FERC PDF (Unofficial) 01/19/2018

pipeline.[193]  In general, the Commission appropriately relies on PHMSA to monitor the pipeline's construction and operation of natural gas facilities to determine compliance with its design and safety standards.[194]

189.   Based on available data, we agree with the final EIS's conclusions that PennEast's implementation of the above-mentioned DOT minimum Federal safety standards, and implementation of the required Environmental Conditions, will minimize the risk of public harm related to the construction and operation of the project.

190.   Numerous commenters question the safety of the project, and take particular issue with the pipeline route's proximity to existing natural gas pipelines and quarries.  In addition, several commenters, including the Medical Society of New Jersey, express concerns regarding potential effects of a pipeline rupture and natural gas ignition (the area of potential effect is sometimes referred to as the potential impact radius).  While a pipeline rupture does not necessarily ignite in every instance, the DOT's regulations define high consequence areas where a gas pipeline accident could do considerable harm to people and property, and require an integrity management program to minimize the potential for an accident in these areas.  PennEast routed the pipeline to minimize risks to local residents and vulnerable locations/populations (e.g., hospitals, prisons, schools, daycare facilities, retirement or assisted-living facilities) and will follow federal safety standards for pipeline class locations based on population density.  PennEast has also followed federal safety standards with respect to pipeline spacing.[195]  The DOT regulations are designed to ensure adequate safety measures are implemented to protect all populations.  In addition, PennEast will take specific measures to reduce the risk of methane and volatile organic compound leaks.[196]

---

[193] Final EIS at 4-30; *see also* 49 U.S.C. § 60112 (authorizing the Department of Transportation to determine that a pipeline facility is hazardous and order the operator of the facility to take corrective action).

[194] *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 959 (D.C. Cir. 2016) (the "opinions and standards of – and [LNG operator's] future coordination with – federal and local authorities" were a reasonable component of the Commission's public safety evaluation); *City of Pittsburgh v. Fed. Power Comm'n,* 237 F.2d 741, 754 (D.C. Cir.1956) (explaining that the Commission "would . . . do well to respect the views of . . . other agencies as to those problems" for which those other agencies "are more directly responsible and more competent than this Commission").

[195] *See* 40 C.F.R. § 192.325 (2017).

[196] *See* final EIS at 4-250.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

191.    In its comments on the final EIS, the EPA recommends that the pipeline design be upgraded to Class 2 pipe specifications where there are significant liquefaction or landslide hazards identified in Phases 2 and 3 of the Geohazard Risk Evaluation. Because PennEast is conducting further field investigation and analysis regarding geohazard risks, we require in Environmental Condition 15 that PennEast provide the results of the outstanding Phase 2 and 3 portions of the Geohazard Risk Evaluation Report, as well as any specific measures and locations where specialized pipeline design will be implemented to mitigate the potential for soil stability or landslide hazards for staff review and approval prior to construction.

192.    Several commenters expressed concern that the final EIS does not sufficiently address safety concerns regarding routing the pipeline near active quarries, specifically two quarries in Plains Township, New Jersey, which would be located within 0.23 mile of the project area.  As noted in the final EIS, PennEast routed the project to avoid any future expansion of the quarries, and determined that the average radius of quarry blasting vibrations would have no effect on the pipeline.[197]  PennEast conducted similar site-specific outreach and blast monitoring for other quarry locations, and we are satisfied that PennEast has routed the project to adequately minimize the risk from blasting and other quarry operations.

### m.    Upstream and Downstream Impacts

193.    Several commenters, including U.S. Senators Cory Booker and Robert Menendez, and Oil Change International,[198] raise concerns regarding the potential for increased upstream natural gas production associated with construction and operation of the project. Commenters request that the final EIS include the greenhouse gas (GHG) emissions associated with the upstream production and downstream combustion of the natural gas to be transported by the project.  Oil Change International also submitted a white paper, which states that the final EIS fails to address upstream emissions, and takes issues with the final EIS' analysis of downstream emissions and methane leakage.

194.    CEQ's regulations direct federal agencies to examine the direct, indirect, and cumulative impacts of proposed actions.[199]  Indirect impacts are defined as those "which

---

[197] See final EIS at 4-4 – 4-5.

[198] Oil Change International filed comments on behalf of the Sierra Club, Earthworks, Appalachian Voices, Chesapeake Climate Action, 350.org, Bold Alliance, Environmental Action, Blue Ridge Environmental Defense League, Protect Our Water, Heritage and Rights (Virginia & West Virginia), Friends of Water, Mountain Lakes Preservation Alliance, Sierra Club West Virginia, and Sierra Club Virginia.

[199] 40 C.F.R. § 1508.25(c) (2017).

20180119-3110 FERC PDF (Unofficial) 01/19/2018
Case 3:18-cv-01938-BRM-DEA   Document 1   Filed 02/09/18   Page 96 of 168 PageID: 96

Docket No. CP15-558-000                                                    - 71 -

are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[200]  Further, indirect effects "may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."[201]  Accordingly, to determine whether an impact should be studied as an indirect impact, the Commission must determine whether it:  (1) is caused by the proposed action; and (2) is reasonably foreseeable.

195.  With respect to causation, "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause"[202] in order "to make an agency responsible for a particular effect under NEPA."[203]  As the Supreme Court explained, "a 'but for' causal relationship is insufficient [to establish cause for purposes of NEPA]."[204]  Thus, "[s]ome effects that are 'caused by' a change in the physical environment in the sense of 'but for' causation," will not fall within NEPA if the causal chain is too attenuated.[205]  Further, the Court has stated that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect."[206]

---

[200] *Id.* § 1508.8(b).

[201] *Id.* § 1508.8(b).

[202] *U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, at 767 (2004) (quoting *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, at 774 (1983)).

[203] *Id.*

[204] *Id.*; *see also Freeport LNG*, 827 F.3d at 46 (FERC need not examine everything that could conceivably be a but-for cause of the project at issue); *Sierra Club v. FERC*, 827 F.3d 59, 68 (D.C. Cir. 2016) (*Sabine Pass LNG*) (FERC order authorizing construction of liquefied natural gas export facilities is not the legally relevant cause of increased production of natural gas).

[205] *Metro. Edison Co.*, 460 U.S. at 774.

[206] *Pub. Citizen*, 541 U.S. at 770; *see also Freeport LNG*, 827 F.3d at 49 (affirming that *Public Citizen* is explicit that FERC, in authorizing liquefied natural gas facilities, need not consider effects, including induced production, that could only occur after intervening action by the DOE); *Sabine Pass LNG*, 827 F.3d at 68 (same); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955-56 (D.C. Cir. 2016) (same).

Docket No. CP15-558-000                                             - 72 -

196.    An effect is "reasonably foreseeable" if it is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision."[207]  NEPA requires "reasonable forecasting," but an agency is not required "to engage in speculative analysis" or "to do the impractical, if not enough information is available to permit meaningful consideration."[208]

### i.    Impacts from Upstream Natural Gas Production

197.    As we have previously concluded in natural gas infrastructure proceedings, the environmental effects resulting from natural gas production are generally neither caused by a proposed pipeline (or other natural gas infrastructure) project nor are they reasonably foreseeable consequences of our approval of an infrastructure project, as contemplated by CEQ regulations.[209]  A causal relationship sufficient to warrant Commission analysis of the non-pipeline activity as an indirect impact would only exist if the proposed pipeline would transport new production from a specified production area and that production would not occur in the absence of the proposed pipeline (i.e., there will be no other way to move the gas).[210]  To date, the Commission has not been presented with a proposed pipeline project that the record shows will cause the predictable development of gas reserves.  In fact, the opposite causal relationship is more likely, i.e., once production begins in an area, shippers or end users will support the development of a pipeline to move the produced gas.

---

[207] *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992).  *See also City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005).

[208] *N. Plains Res. Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067, 1078 (9th Cir. 2011).

[209] *See, e.g., Central New York Oil and Gas Co., LLC*, 137 FERC ¶ 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012), *petition for review dismissed sub nom. Coal. for Responsible Growth v. FERC*, 485 Fed. Appx. 472, 474-75 (2012) (unpublished opinion).

[210] *See cf. Sylvester v. U.S. Army Corps of Engineers*, 884 F.2d 394, 400 (9th Cir. 1989) (upholding the environmental review of a golf course that excluded the impacts of an adjoining resort complex project).  *See also Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 580 (9th Cir. 1998) (concluding that increased air traffic resulting from airport plan was not an indirect, "growth-inducing" impact); *City of Carmel-by-the-Sea v. U.S. Dep't of Transportation.*, 123 F.3d 1142, 1162 (9th Cir. 1997) (acknowledging that existing development led to planned freeway, rather than the reverse, notwithstanding the project's potential to induce additional development).

198.    Even accepting, *arguendo*, that a specific pipeline project will cause natural gas production, we have found that the potential environmental impacts resulting from such production are not reasonably foreseeable.  As we have explained, the Commission generally does not have sufficient information to determine the origin of the gas that will be transported on a pipeline.  It is the states, rather than the Commission, that have jurisdiction over the production of natural gas and thus would be most likely to have the information necessary to reasonably foresee future production.  There are no forecasts in the record which would enable the Commission to meaningfully predict production-related impacts, many of which are highly localized.  Thus, even if the Commission knows the general source area of gas likely to be transported on a given pipeline, a meaningful analysis of production impacts would require more detailed information regarding the number, location, and timing of wells, roads, gathering lines, and other appurtenant facilities, as well as details about production methods, which can vary per producer and depending on the applicable regulations in the various states.  Accordingly, the impacts of natural gas production are not reasonably foreseeable because they are "so nebulous" that we "cannot forecast [their] likely effects" in the context of an environmental analysis of the impacts related to a proposed interstate natural gas pipeline.[211]

199.    Nonetheless, we note that the Department of Energy has examined the potential environmental issues associated with unconventional natural gas production in order to provide the public with a more complete understanding of the potential impacts.[212]  The Department of Energy has concluded that such production, when conforming to

---

[211] *Habitat Education Center v. U.S. Forest Service*, 609 F.3d 897, 902 (7th Cir. 2010) (finding that impacts that cannot be described with enough specificity to make their consideration meaningful need not be included in the environmental analysis).  *See also Sierra Club v. U.S. Department of Energy*, D.C. Cir. No. 15-1489, slip op. at 16-18 (August 15, 2017) (accepting DOE's "reasoned explanation" as to why the indirect effects pertaining to induced natural gas production were not reasonably foreseeable where DOE noted the difficulty of predicting both the incremental quantity of natural gas that might be produced and where at the local level such production might occur, and that an economic model estimating localized impacts would be far too speculative to be useful).

[212] U.S. Department of Energy, *Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States*, 79 Fed. Reg. 48,132 (Aug. 15, 2014) (DOE Addendum), http://energy.gov/sites/prod/files/2014/08/f18/Addendum.pdf.  The U.S. Court of Appeals for the D.C. Circuit upheld DOE's reliance on the DOE Addendum to supplement its environmental review of the proposed export of LNG.  *See Sierra Club v. U.S. Department of Energy*, D.C. Cir. No. 15-1489, slip op. at 12, 19.

regulatory requirements, implementing best management practices, and administering pollution prevention concepts, may have temporary, minor impacts to water resources.[213] With respect to air quality, the Department of Energy found that natural gas development leads to both short- and long-term increases in local and regional air emissions.[214] It also found that such emissions may contribute to climate change.[215] But to the extent that natural gas production replaces the use of other carbon-based energy sources, the U.S. Department of Energy found that there may be a net positive impact in terms of climate change.[216] We find the information provided in the Department of Energy (DOE) Addendum to be helpful to generally inform the public regarding potential impacts of increased natural gas production and therefore consider the DOE Addendum to be supplemental material to our environmental review.

200.   The record in this proceeding does not demonstrate the requisite reasonably close causal relationship between the impacts of future natural gas production and the proposed project that would necessitate further analysis.  The fact that natural gas production and transportation facilities are all components of the general supply chain required to bring domestic natural gas to market is not in dispute.  This does not mean, however, that approving this particular project will induce further shale gas production.  Rather, as we have explained in other proceedings, a number of factors, such as domestic natural gas prices and production costs drive new drilling.[217]  If this project were not constructed, it is reasonable to assume that any new production spurred by such factors would reach

---

[213] DOE Addendum at 19; *see also Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands*, 80 Fed. Reg. 16,128, 16,130 (Mar. 26, 2015) (Bureau of Land Management promulgated regulations for hydraulic fracturing on federal and Indian lands to "provide significant benefits to all Americans by avoiding potential damages to water quality, the environment, and public health").

[214] DOE Addendum at 32.

[215] *Id.* at 44.

[216] *Id.*

[217] *Rockies Express Pipeline LLC,* 150 FERC ¶ 61,161, at P 39 (2015).  *See also Sierra Club v. Clinton*, 746 F. Supp. 2d 1025, 1045 (D. Minn. 2010) (holding that the U.S. Department of State, in its environmental analysis for an oil pipeline permit, properly decided not to assess the transboundary impacts associated with oil production because, among other things, oil production is driven by oil prices, concerns surrounding the global supply of oil, market potential, and cost of production); *Florida Wildlife Fed'n v. Goldschmidt*, 506 F. Supp. 350, 375 (S.D. Fla. 1981) (ruling that an agency properly considered indirect impacts when market demand, not a highway, would induce development).

Docket No. CP15-558-000                                                              - 75 -

intended markets through alternate pipelines or other modes of transportation.[218]  Again, any such production would take place pursuant to the regulatory authority of state and local governments.[219]

201.    Moreover, even if a causal relationship between our action here and additional production were presumed, the scope of the impacts from any induced production is not reasonably foreseeable.  That there may be incentives for producers to locate wells close to pipeline infrastructure does not change the fact that the location, scale, and timing of any additional wells are matters of speculation, particularly regarding their relationship to the proposed project.  As we have previously explained, a broad analysis, based on generalized assumptions rather than reasonably specific information, will not provide meaningful assistance to the Commission in its decision making, e.g., evaluating potential alternatives to a specific proposal.[220]

202.    As noted above, upstream impacts of the type described by commenters do not meet the definition of indirect impact, therefore, they are not mandated as part of the Commission's NEPA review.  However, to provide the public additional information, Commission staff, after reviewing publicly-available DOE and EPA methodologies, has prepared the following analyses regarding the potential impacts associated with unconventional natural gas production.  As summarized below, these analyses provide only an estimate of the upper limit of upstream effects using general Marcellus shale well information.

---

[218] *Rockies Express Pipeline LLC,* 150 FERC ¶ 61,161 at P 39.

[219] We acknowledge that NEPA may obligate an agency to evaluate the environmental impacts of non-jurisdictional activities.  That states, however, not the Commission, have jurisdiction over natural gas production and associated development (including siting and permitting) supports the conclusion that information about the scale, timing, and location of such development and potential environmental impacts are even more speculative.  *See Sierra Club v. U.S. Department of Energy*, D.C. Cir. No. 15-1489, slip op. at 18 (DOE's obligation under NEPA to "drill down into increasingly speculative projections about regional environmental impacts [of induced natural gas production] is also limited by the fact that it lacks any authority to control the locale or amount of export-induced gas production, much less any of its harmful effects") (citing *Pub. Citizen*, 541 U.S. at 768).

[220] *Rockies Express Pipeline LLC,* 150 FERC ¶ 61,161 at P 40.  *See also Sierra Club v. U.S. Department of Energy*, No. 15-1489, slip op. at 14 (D.C. Cir. August 15, 2017) (holding that the dividing line between what is reasonable forecasting and speculation is the "usefulness of any new potential information to the decision-making process").

20180119-3110 FERC PDF (Unofficial) 01/19/2018
Case 3:18-cv-01938-BRM-DEA  Document 1  Filed 02/09/18  Page 101 of 168 PageID: 101

Docket No. CP15-558-000                                              - 76 -

203.    The final EIS discusses the direct GHG impacts from construction and operation of the project and other projects that were considered in the Cumulative Impacts analysis, climate change impacts in the region, the regulatory structure for GHGs under the Clean Air Act.  The final EIS quantified GHG emissions from PennEast Project construction (33,276 metric tons, $CO_2$ equivalent [metric tons per year (tpy) $CO_{2e}$[221]) and operation (259,717 metric tpy $CO_{2e}$).[222]  The final EIS does not include upstream emissions.  However, presuming all gas transported represents new, incremental production (as opposed, e.g., to production which would otherwise have been transported on another pipeline), Commission staff has conservatively estimated the upstream GHG emissions as 910,000 metric tpy $CO_{2e}$ from extraction, 1.7 million metric tpy CO2e from processing, and 400,000 metric tpy $CO_{2e}$ from the non-project pipelines (both upstream and downstream transportation pipelines).  Again, this is an upper-bound estimate that involves a significant amount of uncertainty.

204.    With respect to upstream impacts, Commission staff estimated the impacts associated with the production wells that would be required to provide 100 percent of the volume of natural gas to be transported by the PennEast Project, on an annual basis for GHGs.  Commission staff also estimated land-use and water use within the Marcellus shale basin for the life of the project.  Commission staff estimated that approximately 1.48 acres of land is required for each natural gas well pad and associated infrastructure (i.e., road infrastructure, water impoundments, and pipelines).  Based upon the project volume and the expected estimated ultimate recovery of Marcellus shale wells, between 2,400 and 4,600 wells would be required to provide the gas over the estimated 30-year lifespan of the project.  Therefore, on a normalized basis, these assumptions result in an estimate of an upper limit of an additional 120 to 230 acres per year that may be impacted by well drilling.  This estimate of impacts is subject to a significant amount of uncertainty.

205.    Commission staff also estimates the amount of water required for the drilling and development of these wells over the 30 year period using the same assumptions.  Recent estimates show that an average Marcellus shale well requires between 3.88 and 5.69 million gallons of water for drilling and well development, depending on whether the producer uses a recycling process in the well development.  Therefore, the production of wells required to supply the project could require the normalized consumptive use of as much as 300 to 880 million gallons of water per year over the 30-year life of the project.

206.    Oil Change International's white paper provided an a estimated figure of 24 million metric tons of $CO_{2e}$ per year from upstream natural gas production, using the

---

[221] *See* final EIS at 4-245 (Table 4.10.1-5).

[222] *See* final EIS at 4-250 (Table 4.10.1-9).

Intergovernmental Panel on Climate Change's 20-year global warming potential (GWP) for methane, rather than the 100-year GWP that is used by EPA in its official GHG inventories, as well as in its mandatory GHG emission reporting program.[223]  The 20-year GWP for methane is 86, meaning that each unit of CH4 mass emissions is considered to have the same warming potential as 86 units of $CO_2$ mass emissions.  By comparison, the conventional 100-year GWP for methane is 25.  EPA supported the 100-year time period over the 20-year time period in its summary of comments and responses in the final rulemaking, *2013 Revisions to the Greenhouse Gas Reporting Rule and Final Confidentiality Determinations for New or Substantially Revised Data Elements.*[224]  Neither Sierra Club, nor Oil Change International present any reason why the 20-year GWP is preferable to the 100-GWP.  Further, the final EIS notes that fugitive methane leaks along the PennEast pipeline would only increase the potential annual GHG emissions by approximately 0.05 percent.[225]

### ii.  Impacts from Downstream Combustion of Project-Transported Natural Gas

207.    As noted above, Oil Change International takes issue with final EIS' analysis of impacts from the downstream combustion of natural gas transported by the project.  The court in *Sabal Trail* held that where it is known that the natural gas transported by a project will be used for end-use combustion, the Commission should "estimate[] the amount of power-plant carbon emissions that the pipelines will make possible."[226]  The

---

[223] 40 C.F.R. § 98, *et al.* (2017).

[224] 78 Fed. Reg. 71,904 (2013).

[225] *See* final EIS at 4-249.

[226] *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (*Sabal Trail*).  The Commission's environmental review of the PennEast Project is distinguishable from its environmental review of the project at issue in Sabal Trail.  In Sabal Trail, the court determined that the Commission should have examined the GHG impacts of burning the natural gas to be delivered by that project.  In this case, as discussed above, the Commission has estimated the GHG emissions associated with burning the gas to be transported by PennEast, consistent with the quantification that the Sabal Trail court required.  The methodology used here is similar to that in a number of recent cases.  *See NEXUS Gas Transmission, LLC et al.*, 160 FERC ¶ 61,022 at PP 172-173 (NEXUS Project *National Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145, at PP 189-190 (Northern Access 2016 Project); *Dominion Carolina Gas Transmission, LLC*, 158 FERC ¶ 61,126, at P 81 (Transco to Charleston Project); *Transcontinental Gas Pipe Line Co., LLC*, 158 FERC ¶ 61,125, at P 143 (Atlantic Sunrise Project); *Tennessee Gas Pipeline Co.*, 158 FERC ¶ 61,110, at P 104 (Orion Project); and *Rover Pipeline, LLC*, 158 FERC ¶ 61,109, at P 274 (Rover Pipeline Project).  Further, Sabal Trail and this case are *(continued ...)*

Docket No. CP15-558-000                                          - 78 -

final EIS does precisely this.[227]  Thus, the Commission and the public were fully
informed of the potential impacts from the project.

208.    The final EIS conservatively estimates that if all 1.1 million dekatherms per day of
natural gas were transported to combustion end uses, downstream end-use would result in
the emission of about 21.3 million metric tpy of $CO_{2e}$.  We note that this $CO_{2e}$ estimate
represents an upper bound for the amount of end-use combustion that could result from
the gas transported by this project.  This is because some of the gas may displace fuels
(i.e., fuel oil and coal) which could result in lower total $CO_{2e}$ emissions.  It may also
displace gas that otherwise would be transported via different means, resulting in no
change in $CO_{2e}$ emissions or be used as a feedstock.  This estimate also assumes the
maximum capacity is transported 365 days per year, which is rarely the case because
many projects are designed for peak use.  As such, it is unlikely that this total amount of
GHG emissions would occur, and emissions are likely to be significantly lower than the
above estimate.  In addition, these estimates are generic in nature because no specific end
uses have been identified.

209.    In an effort to put these emissions in to context, we examined both the regional[228]
and national emissions of GHGs.  If only the regions identified potentially served by the
Transco system and interstate interconnection are considered, the volume of GHG
emissions by the PennEast Project will result in a 0.7-1 percent increase of GHG

---

factually distinct, in that the record in Sabal Trail showed that the natural gas to be
transported on the new project would be delivered to specific destinations – power plants
in Florida – such that the court concluded that the burning of the gas in those plants was
reasonably foreseeable and the impacts of that activity warranted environmental
examination.  In contrast, the gas to be transported by PennEast will be delivered on
behalf of 12 separate shippers, consisting of LDCs, marketers, and an interstate pipeline,
into the interstate natural pipeline grid, and will serve a variety of end-uses.

    [227] *See* final EIS at 4-254.

    [228] Staff looked at the Transco, Columbia, and Texas Eastern systems to identify
the states those pipeline systems serve.  The natural gas can move anywhere on these
systems.  Thus we used the combined inventory of (1) states served by Transco's system,
(2) states served by Transco and Columbia, and (3) states served by Transco and Texas
Eastern (the Columbia system overlapped the Texas Eastern system).  We compared the
2014 inventory of these states served by the three systems in comparison to the
downstream emissions to arrive at the potential increase in GHG emissions.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

emissions from fossil fuel combustion in these states.[229]  From a national perspective, combustion of all the gas transported by the PennEast Project will result in a 0.4 percent increase of national GHG emissions.  Based on the myriad of existing and potential future interconnections with other pipeline systems, it is impossible to define which states and which facilities may ultimately consume gas transported by the PennEast Project.  From a practical sense, we know that as more states are considered, the percentage of increase contributed by the PennEast Project would decline.  Therefore, speculating on the wider distribution does little to clarify the impact.  In any case, the greatest possible contribution to GHG emissions at a regional level is 1 percent.

210.    The final EIS acknowledged that the emissions would increase the atmospheric concentration of GHGs, in combination with past and future emissions from all other sources, and contribute incrementally to climate change.[230]  However, as the final EIS explained, because the project's incremental physical impacts on the environment caused by climate change cannot be determined, it also cannot be determined whether the project's contribution to cumulative impacts on climate change would be significant.[231]

### n.    **Alternatives**

211.    Based on comments and feedback from landowners, agencies and municipalities, PennEast incorporated 70 route variations into the proposed route to avoid or reduce effects on environmental or other resources, resolve engineering or constructability issues, or address stakeholder concerns.[232]  The total length of these 70 route variations is 68.4 miles.[233]  Commission staff reviewed the route variations and agreed with PennEast's conclusions regarding their incorporation into the proposed route.  Alternatives considered, which are described in the final EIS, include the No Action alternative, system alternatives, major pipeline route alternatives, minor pipeline route variations, and aboveground facilities alternatives.

---

[229] The 22 states included in the GHG emissions analysis are:  Alabama, Arkansas, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia.

[230] *See* final EIS at 4-335.

[231] *Id.*

[232] *See* final EIS at 3-24 to 3-32.

[233] *See* final EIS at 3-26 to 3-31 (Table 3.3.2-1).

Docket No. CP15-558-000                                                      - 80 -

212.    Several commenters suggested renewable energy sources be considered as an alternative to the proposed project.  As noted in the final EIS, electric generation from renewable energy sources is a reasonable alternative for reviewing generating facilities powered by fossil fuels.  It is the states, however, not this Commission, that regulate generating facilities.  Authorizations related to how markets would meet demands for electricity are not part of the applications before the Commission.  Because the proposed project's purpose is to transport natural gas, and electric generation from renewable energy resources is not a natural gas transportation alternative, it was not considered in the EIS.[234]

213.    The final EIS evaluates five major route alternatives including three potential major route alternatives that would avoid the Sourland Mountain Region in New Jersey.[235]  After the close of the draft EIS comment period, several comments were filed regarding the viability of Sourland Mountain Alternative 1, which would cross into Bucks County, Pennsylvania.  Several of these comments appear to assume the Sourland Mountain Alternative 1 was incorporated into the proposed pipeline route, and expressed concern that there was not an opportunity to comment on the alternative, because it was filed by PennEast after the close of the draft EIS comment period.  We clarify here that the Sourland Mountain Alternative 1 is not part of the proposed route, as the final EIS did not determine that the Sourland Mountain Alternative 1 was preferable to the proposed route.

214.    The final EIS evaluates an alternate access road for the Kidder Compressor Station.[236]  On January 9, 2017, after the close of the draft EIS comment period, Sondra Wolferman filed comments regarding the alternate access road adjacent to the existing pipeline right-of-way for access to the Kidder Compressor Station.  Specifically, Ms. Wolferman disagrees with the claim that the access road will be located on an existing road, and asserts that the I-80 alternative to the proposed access road is both reasonable and preferable.  On November 28, 2016, PennEast filed a conceptual plan drawing and comparison of the proposed access road and the access road alternative in response to EPA's comments on the draft EIS.  As discussed in the final EIS, the potential advantages of the access road alternative are collocation of most of the station's new permanent access road with the new and existing pipeline rights-of-way, and reduced forest clearing.  Although the access road alternative would reduce forest clearing by about 2.3 acres and collocate the clearing with the pipeline right-of-way, it would result in greater permanent impacts on forested wetland, and would have to cross approximately 400 feet of waterbody, whereas the proposed access road would only cross approximately

---

[234] *See* final EIS at 3-3.

[235] *See* final EIS at 3-9 to 3-24.

[236] *See* final EIS at 3-16.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

120 feet of waterbody.  PennEast has sited the proposed access road to partially utilize (approximately 400 feet of the 2,000-foot-long road) an existing road (which would need improvements), and to avoid wetland areas.  Therefore, the final EIS determined that the compressor station access road alternative would not be environmentally preferable to the proposed access road location.  We agree.

215.    The final EIS evaluates an alternate site for the interconnection with Transco at a site approximately 2.1 miles southwest of the proposed interconnection.[237]  PennEast filed an analysis of this alternative on November 23, 2016.  The primary advantage of this alternative is that it would eliminate about 2.5 miles of the proposed pipeline within Hopewell Township, New Jersey, where the pipeline would cross residential areas, farmlands, a portion of planned Hopewell Township affordable housing, and a parcel planned for a Hopewell Township emergency services facility.  PennEast states that the Transco Interconnect Alternative would not meet the project's delivery needs as negotiated with Transco.  We believe that an alternative interconnect on the same Transco pipeline approximately 2.1 miles from the proposed interconnect may be similar enough to the proposed delivery point to allow the alternative to meet the project's delivery needs, and warrants further analysis.  Therefore, we require in Environmental Condition 13 that, prior to construction, PennEast provide additional details on the feasibility of incorporating the Transco Interconnect Alternative site.

## 4.    Environmental Analysis Conclusion

216.    We have reviewed the information and analysis contained in the final EIS regarding potential environmental effects of the project, as well as other information in the record.  We are adopting the environmental recommendations in the final EIS, as modified herein, and are including them as environmental conditions in Appendix A to this order.  Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analyses.  Thus, Commission staff carefully reviews all information submitted.  Only when satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of all environmental resources during construction and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

217.    Based on our consideration of this information and the discussion above, we agree with the conclusions presented in the final EIS and find that the project, if constructed

---

[237] *See* final EIS at 3-37 to 3-39.

and operated as described in the final EIS, is an environmentally acceptable
actions.  Further, for the reasons discussed throughout the order, as stated above, we find
that the project is in the public convenience and necessity.

218.    Any state or local permits issued with respect to the jurisdictional facilities
authorized herein must be consistent with the conditions of this certificate.  The
Commission encourages cooperation between interstate pipelines and local authorities.
However, this does not mean that state and local agencies, through application of state or
local laws, may prohibit or unreasonably delay the construction or operation of facilities
approved by this Commission.[238]

219.    The Commission on its own motion received and made part of the record in this
proceeding all evidence, including the application, as supplemented, and exhibits thereto,
and all comments submitted, and upon consideration of the record,

The Commission orders:

    (A)    A certificate of public convenience and necessity is issued to PennEast,
authorizing it to construct and operate the proposed PennEast Project, as described and
conditioned herein, and as more fully described in the application.

    (B)    The certificate authority issued in Ordering Paragraph (A) is conditioned
on:

        (1)    PennEast's proposed project being constructed and made available
        for service within two years of the date of this order pursuant to section
        157.20(b) of the Commission's regulations;

        (2)    PennEast's compliance with all applicable Commission regulations,
        particularly the general terms and conditions set forth in Parts 154, 157, and
        284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the
        Commission's regulations; and

        (3)    PennEast's compliance with the environmental conditions listed in
        Appendix A to this order.

---

[238] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit
considered to be inconsistent with Federal law)*; see also Schneidewind v. ANR Pipeline
Co.,* 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory
authority over the transportation of natural gas is preempted) and *Dominion
Transmission, Inc. v. Summers,* 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and
local regulation is preempted by the NGA to the extent it conflicts with federal
regulation, or would delay the construction and operation of facilities approved by the
Commission).

20180119-3110 FERC PDF (Unofficial) 01/19/2018

(C)     A blanket construction certificate is issued to PennEast under Subpart F of Part 157 of the Commission's regulations;

(D)     A blanket transportation certificate is issued to PennEast under Subpart G of Part 284 of the Commission's regulations;

(E)     PennEast shall file a written statement affirming that it has executed firm contracts for the capacity levels and terms of service represented in signed precedent agreements, prior to commencing construction.

(F)     PennEast's initial rates and tariff are approved, as conditioned and modified above.

(G)     PennEast is required to file actual tariff records reflecting the initial rates and tariff language that comply with the requirements contained in the body of this order not less than 30 days and not more than 60 days prior to the commencement of interstate service consistent with Part 154 of the Commission's regulations.

(H)     As described in the body of this order, PennEast must file any negotiated rate agreement or tariff record setting forth the essential terms of the agreement associated with the project at least 30 days, but not more than 60 days before the proposed effective date of such rates.

(I)     No later than three months after the end of its first three years of actual operation, as discussed herein, PennEast must make a filing to justify its existing cost-based firm and interruptible recourse rates.  PennEast's cost and revenue study should be filed through the eTariff portal using a Type of Filing Code 580.  In addition, PennEast is advised to include as part of the eFiling description, a reference to Docket No. CP15-558-000 and the cost and revenue study.

(J)     The requests for an evidentiary hearing are denied.

(K)     PennEast shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local

20180119-3110 FERC PDF (Unofficial) 01/19/2018

Docket No. CP15-558-000                                                         - 84 -

agencies on the same day that such agency notifies PennEast.  PennEast shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

By the Commission.  Commissioners LaFleur and Chatterjee are concurring with separate statements attached.  Commissioner Glick is dissenting with a separate statement attached.

( S E A L )

Nathaniel J. Davis, Sr.,
Deputy Secretary.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

Docket No. CP15-558-000                                              - 85 -

## Appendix A

## Environmental Conditions for the PennEast Pipeline Project

As recommended in the final environmental impact statement (EIS) and otherwise amended herein, this authorization includes the following conditions. The section number in parentheses at the end of a condition corresponds to the section number in which the measure and related resource impact analysis appears in the final EIS.

1. PennEast Pipeline, LLC (PennEast) shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EIS, unless modified by the order. PennEast must:

   a. request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

   b. justify each modification relative to site-specific conditions;

   c. explain how that modification provides an equal or greater level of environmental protection than the original measure; and

   receive approval in writing from the Director of the Office of Energy Projects (OEP) **before using that modification**.

2. The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the order, and take whatever steps are necessary to ensure the protection of all environmental resources during construction and operation of the project. This authority shall allow:

   a. the modification of conditions of the order;

   b. stop-work authority; and

   c. the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

3. **Prior to any construction**, PennEast shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, Environmental Inspectors (EIs), and contractor personnel will be informed of the EIs' authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs before becoming involved with construction and restoration activities.

Docket No. CP15-558-000                                         - 86 -

4.   The authorized facility locations shall be as shown in the EIS, as supplemented by filed alignment sheets. **As soon as they are available**, **and before the start of construction**, PennEast shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the order. All requests for modifications of environmental conditions of the order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

PennEast's exercise of eminent domain authority granted under the Natural Gas Act (NGA) section 7(h) in any condemnation proceedings related to the order must be consistent with these authorized facilities and locations. PennEast's right of eminent domain granted under NGA section 7(h) does not authorize it to increase the size of its natural gas facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.   PennEast shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage-yards, new access roads, and other areas that will be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species will be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of the OEP **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the FERC's *Upland Erosion Control, Revegetation, and Maintenance Plan* (Plan) and/or minor field realignments per landowner needs and requirements that do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.   implementation of cultural resources mitigation measures;

b.   implementation of endangered, threatened, or special concern species mitigation measures;

c.   recommendations by state regulatory authorities; and

d.   agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.   **At least 60 days prior to beginning construction**, PennEast shall file an Implementation Plan with the Secretary for review and written approval by the

Docket No. CP15-558-000                                                                    - 87 -

Director of the OEP.  PennEast must file revisions to the plan as schedules change.
The plan shall identify:

a.    how PennEast will implement the construction procedures and mitigation
      measures described in its application and supplements (including responses
      to staff data requests), identified in the EIS, and required by the order;

b.    how PennEast will incorporate these requirements into the contract bid
      documents, construction contracts (especially penalty clauses and
      specifications), and construction drawings so that the mitigation required at
      each site is clear to on-site construction and inspection personnel;

c.    the number of EIs assigned per spread, and how the company will ensure
      that sufficient personnel are available to implement the environmental
      mitigation;

d.    company personnel, including EIs and contractors, who will receive copies
      of the appropriate material;

e.    the location and dates of the environmental compliance training and
      instructions PennEast will give to all personnel involved with construction
      and restoration (initial and refresher training as the project progresses and
      personnel change), with the opportunity for OEP staff to participate in the
      training session(s);

f.    the company personnel (if known) and specific portion of PennEast's
      organization having responsibility for compliance;

g.    the procedures (including use of contract penalties) PennEast will follow if
      noncompliance occurs; and

h.    for each discrete facility, a Gantt or PERT chart (or similar project
      scheduling diagram), and dates for:

      (i)    the completion of all required surveys and reports;

      (ii)   the environmental compliance training of on-site personnel;

      (iii)  the start of construction; and

      (iv)   the start and completion of restoration.

7.    PennEast shall employ a team of EIs (i.e., two or more or as may be established by
      the Director of the OEP) per construction spread.  The EIs shall be:

a.    responsible for monitoring and ensuring compliance with all mitigation
      measures required by the order and other grants, permits, certificates, or
      other authorizing documents;

b.    responsible for evaluating the construction contractor's implementation of
      the environmental mitigation measures required in the contract (see
      condition 6 above) and any other authorizing document;

c.    empowered to order correction of acts that violate the environmental
      conditions of the order, and any other authorizing document;

Docket No. CP15-558-000                                        - 88 -

     d.     a full-time position, separate from all other activity inspectors;

     e.     responsible for documenting compliance with the environmental conditions of the order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

     f.     responsible for maintaining status reports.

8.    **Beginning with the filing of its Implementation Plan**, PennEast shall file updated status reports with the Secretary on a **weekly basis** until all construction and restoration activities are complete.  On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

     a.     an update on PennEast's efforts to obtain the necessary federal authorizations;

     b.     the construction status of each spread, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

     c.     a listing of all problems encountered and each instance of noncompliance observed by the EIs during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

     d.     a description of the corrective actions implemented in response to all instances of noncompliance, and their cost;

     e.     the effectiveness of all corrective actions implemented;

     f.     a description of any landowner/resident complaints that may relate to compliance with the requirements of the order, and the measures taken to satisfy their concerns; and

     g.     copies of any correspondence received by PennEast from other federal, state, or local permitting agencies concerning instances of noncompliance, and PennEast's response.

9.    PennEast shall develop and implement an environmental complaint resolution procedure, and file such procedure with the Secretary, for review and approval by the Director of OEP.  The procedure shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the project and restoration of the right-of-way.  **Prior to construction**, PennEast shall mail the complaint procedures to each landowner whose property will be crossed by the project.

     a.     In its letter to affected landowners, PennEast shall:

          (i)     provide a local contact that the landowners should call first with their concerns; the letter should indicate how soon a landowner should expect a response;

Docket No. CP15-558-000                                                - 89 -

    (ii)    instruct the landowners that if they are not satisfied with the response, they should call PennEast's Hotline; the letter should indicate how soon to expect a response; and

    (iii)    instruct the landowners that if they are still not satisfied with the response from PennEast's Hotline, they should contact the Commission's Landowner Helpline at 877-337-2237 or at LandownerHelp@ferc.gov.

    b.    In addition, PennEast shall include in its weekly status report a copy of a table that contains the following information for each problem/concern:

    (i)    the identity of the caller and date of the call;

    (ii)    the location by milepost and identification number from the authorized alignment sheet(s) of the affected property;

    (iii)    a description of the problem/concern; and

            an explanation of how and when the problem was resolved, will be resolved, or why it has not been resolved.

10.    PennEast must receive written authorization from the Director of OEP **before commencing construction of any project facilities**.  To obtain such authorization, PennEast must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

11.    PennEast must receive written authorization from the Director of the OEP **before placing the project into service**.  Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the project are proceeding satisfactorily.

12.    **Within 30 days of placing the authorized facilities in service**, PennEast shall file an affirmative statement with the Secretary, certified by a senior company official:

    a.    that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

    b.    identifying which of the Certificate conditions PennEast has complied with or will comply with.  This statement shall also identify any areas affected by the project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

13.    **Prior to construction**, PennEast shall file with the Secretary further details on the feasibility of incorporating the Transcontinental Gas Pipe Line (Transco)

20180119-3110 FERC PDF (Unofficial) 01/19/2018

Interconnect Alternative site along the CSX Railroad south of MP 111.8R2.  At a minimum, PennEast shall include:

  a.    a map showing the extent of the CSX Railroad right-of-way and Jersey Central Power & Light easement on the east side of the CSX right-of-way, and the CSX Railroad right-of-way adjacent to the Merrill Lynch property;

  b.    a map showing apparently undeveloped parcels adjacent to the Transco right-of-way where the Transco right-of-way crosses the CSX Railroad, and that could potentially be used for the interconnect;

  c.    a map showing wetlands along both the east and west sides of the CSX Railroad;

  d.    records of consultation with Transco regarding feasibility of using the alternative site as the project delivery point to the Transco system; and

  e.    details that support if the interconnect with Transco at the alternative site could meet delivery needs of the project shippers. *(Section 3.4.4)*

14.    **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, an updated report that verifies explosive weights used by the Trap Rock Quarry operator, including concurrence from Trap Rock Quarry that the correct inputs were used.  The results of this study shall be incorporated in the final design of the project. *(Section 4.1.4)*

15.    **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, results of the outstanding Phase 2 and 3 portions of the Geohazard Risk Evaluation Report and include the following in its pipeline design geotechnical report:

  a.    an evaluation of soil stability hazards along the pipeline route at the proposed compressor station site and at locations with above-ground facilities;

  b.    a final landslide hazard inventory;

  c.    any specific measures and locations where PennEast will implement specialized pipeline design to mitigate for potential soil stability or landslide hazards; and

  d.    a post-construction monitoring plan. *(Section 4.1.5.2)*

16.    **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, a final Karst Mitigation Plan that incorporates the results of all outstanding geophysical and geotechnical field investigations in karst areas including stream crossings proposed with the horizontal directional drill (HDD) method.  The final Karst Mitigation Plan shall incorporate all Best Management Practices developed based on the results of the final geophysical and geotechnical field investigations for construction through

Docket No. CP15-558-000                                                    - 91 -

karst areas, including any requirements of the Pennsylvania Department of Environmental Protection (PADEP), New Jersey Department of Environmental Protection (NJDEP), and local planning commissions. *(Section 4.1.5.4)*

17.  **Prior to construction**, PennEast shall file with the Secretary the results of its ongoing geotechnical evaluation of working, not active, and abandoned mines near the proposed crossing of the Susquehanna River.  The evaluation shall include final documentation of coordination with the Pennsylvania Bureau of Abandoned Mine Reclamation, along with the results of the geotechnical investigation to confirm the final design.  PennEast shall include this documentation in the Phase 2 and 3 portions of the Geohazard Risk Evaluation Report. *(Section 4.1.5.4)*

18.  **Prior to construction**, PennEast shall file with the Secretary an updated table identifying all areas that may require blasting.  This table shall incorporate the results of the on-going geophysical and geotechnical evaluations. *(Section 4.1.6)*

19.  **Prior to construction,** PennEast shall file with the Secretary the final design plans of each HDD crossing, for review and written approval by the Director of OEP. The final design plans will include the results for all geotechnical borings conducted at each HDD crossing (lithology, standard penetration testing, and bedrock quality designation), and an HDD feasibility assessment based on the soil boring results, including an assessment of the risk for hydrofracturing and inadvertent returns of drilling fluids at each crossing. *(Section 4.1.7)*

20.  **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, an unanticipated discovery plan for paleontological resources.  The discovery plan shall be developed in coordination with the New Jersey Geological and Water Survey and Dr. William Gallagher. The significance of each resource shall be defined in the discovery plan.  This plan shall describe proposed measures to avoid or minimize impacts on significant paleontological resources and include measures that will be implemented in the event of a discovery of paleontological resources during construction.

21.  **Prior to construction**, PennEast shall complete all necessary surveys for water supply wells and groundwater seeps and springs, identify public and private water supply wells within the construction workspace, and file with the Secretary a revised list of water wells and groundwater seeps and springs within 150 feet of any construction workspace (500 feet in areas characterized by karst terrain). *(Section 4.3.1.6)*

22.  **Prior to construction**, PennEast shall identify all septic systems within the construction work space, and file with the Secretary a list of septic systems within 150 feet of any construction workspace.  PennEast shall also file with the Secretary, a plan which describes how PennEast will avoid septic systems, as well as how PennEast will mitigate or restore septic systems to applicable regulatory requirements, for review and approval by the Director of OEP.

20180119-3110 FERC PDF (Unofficial) 01/19/2018

Docket No. CP15-558-000                                        - 92 -

23.   **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, a final Well Monitoring Plan that incorporates:

    a.    PennEast's response (Serfes 2016) to U.S. Department of the Interior (DOI) comments;

    b.    an analysis for radon, radium 226, and radium 228 for wells in Hunterdon and Mercer Counties, New Jersey, in accordance with the New Jersey Private Well Testing Act; and

    c.    revisions to section 3.0 of the Well Monitoring Plan to include the types of treatment that PennEast will provide to impacted groundwater users with increased arsenic in groundwater concentrations above the NJDEP established maximum contaminant level (MCL) of 5 microgram per liter ($\mu$g/L), and the U.S. Environmental Protection Agency (EPA) MCL of 10 $\mu$g/L for wells in Pennsylvania, as well as other contaminants detected in post-construction monitoring that are above their respective NJDEP or EPA MCL, and provisions for monitoring and maintenance of any treatment systems PennEast provides to impacted groundwater users. *(Section 4.3.1.6)*

24.   **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, an updated Unanticipated Discovery of Contamination Plan for the project that identifies the management and field environmental professionals responsible for notification for contaminated sites. *(Section 4.3.1.8)*

25.   **Prior to construction**, PennEast shall file with the Secretary the results of the investigations regarding any anticipated blasting near the Swan Creek Reservoir. *(Section 4.3.2.2)*

26.   **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, site-specific crossing plans for all waterbodies with contaminated sediments (see table 4.3.2-5).  The crossing method shall ensure that the potential suspension of sediments during construction shall be avoided or minimized to the greatest extent possible to limit any change to the bioavailability of any potential contaminants present.  PennEast shall include documentation of consultation with pertinent agencies and identify any recommended minimization measures. *(Section 4.3.2.2)*

27.   **Prior to construction**, PennEast shall file a revised Erosion and Sediment Control Plan (E&SCP) with the Secretary for review and written approval by the Director of the OEP.  The revised E&SCP shall:

    a.    include a complete review of waterbody crossings with steep slopes; and

20180119-3110 FERC PDF (Unofficial) 01/19/2018

b.    address waterbody crossing methods for steep embankments and bank stabilization issues, and include site-specific measures to address erosion, sedimentation, and restoration of steep embankments. *(Section 4.3.2.2)*

28.    **Prior to construction**, PennEast shall file with the Secretary its final hydrostatic test plan that identifies the final hydrostatic test water sources and discharge locations, and provides documentation that all necessary permits and approvals have been obtained for withdrawal from each source. PennEast's plan shall provide the approximate water volume that will be withdrawn and discharged as both a project-total amount, and a daily amount, for each pipeline segment. Also, PennEast's plan shall detail the decision process for determining when an alternative water source will be used during exceptional dry periods when low flow conditions may be encountered. *(Section 4.3.2.4)*

29.    **Prior to construction,** PennEast shall file with the Secretary documentation after consulting with appropriate local, state, and federal agencies regarding any in-water timing restrictions which are more restrictive than those required by the Federal Energy Regulatory Commission (FERC) Wetland and Waterbody Construction and Mitigation Procedures (Procedures) (e.g., June 1 through September 30 to protect coldwater fisheries; and June 1 through November 30 to protect coolwater and warmwater fisheries). *(Section 4.3.3.2)*

30.    **Prior to construction**, PennEast shall file with the Secretary a complete wetland delineation report for the entire project that includes all wetlands delineated in accordance with the U.S. Army Corps of Engineers (USACE) and the applicable state agency requirements. *(Section 4.4.1)*

31.    **Prior to construction**, PennEast shall survey all areas mapped as being potential vernal pool habitat and identify if any vernal pool habitat will be affected by project construction and/or operation. The results of these surveys shall be filed with the Secretary and the appropriate state agency(ies) for review. *(Section 4.4.1.2)*

32.    **Prior to construction**, PennEast shall file with the Secretary a final project-specific Wetland Restoration Plan developed in consultation with the USACE and applicable state agencies in Pennsylvania and New Jersey, and file the plan with the Secretary. PennEast shall provide documentation of its consultation with the applicable federal and state agencies. *(Section 4.4.2)*

33.    **Prior to the construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, an Invasive Species Management Plan that includes documentation of consultation with the appropriate state agencies and measures it will implement during construction and operation to minimize the spread of invasive and noxious plant species. *(Section 4.5.1.2)*

34.    **Prior to construction,** PennEast shall file with the Secretary, for review, a Migratory Bird Conservation Plan developed in consultation with the U.S. Fish

20180119-3110 FERC PDF (Unofficial) 01/19/2018

and Wildlife Service (FWS), along with documentation of consultation with the FWS. *(Section 4.5.2.3)*

35.   **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of OEP, a list of locations by MP where the FWS will require tree clearing restrictions that are specifically applicable to federally listed bat species. *(Section 4.6.1.1)*

36.   PennEast shall incorporate the conservation measures outlined in the FWS' November 29, 2017 Biological Opinion into its implementation plan, including:

   a.  implementing the reasonable and prudent measures;
   b.  abiding by the terms and conditions for the bog turtle;
   c.  adopting the monitoring and reporting requirements;
   d.  consulting with FWS on conservation recommendations for the bog turtle and northern long-eared bat; and
   e.  implementing specific requirements for bulrush as specified in the FWS BO.

   PennEast shall provide FERC and the FWS with all remaining survey results for their review and comment.

37.   **Prior to construction,** if rare flora or fauna are discovered during PennEast's planned surveys of groundwater seeps, PennEast shall develop a plan to avoid or minimize impacts on these species and consult with the FWS.  PennEast shall file with the Secretary documentation of its consultation with the FWS, as well as any recommended measures. *(Section 4.6.1.7)*

38.   **Prior to construction**, PennEast shall consult with the NJDEP regarding timing and activity restrictions that shall be applied within 300 feet of streams that contain wood turtles.  PennEast shall file with the Secretary documentation of this consultation with the NJDEP, as well as any recommendations made by the NJDEP, and whether PennEast agrees to implement these recommendations. Such information regarding this consultation process shall be filed with the Secretary. *(Section 4.6.2.7)*

39.   **Prior to construction**, PennEast shall file with the Secretary a comprehensive list of measures developed in consultation with applicable state wildlife agencies to avoid or mitigate impacts on state-listed species and state species of concern, which shall include but not be limited to measures applicable to the eastern small-footed bat, timber rattlesnake, eastern box turtle, northern cricket frog, long-tailed salamander, and Cobblestone tiger beetle, as well as all other State listed species that may be impacted.  The NJDEP has recommended that PennEast use the State's "Utility Right-of-Way No-Harm Best Management Practices" document while developing these project specific measures. *(Section 4.6.2.28)*

20180119-3110 FERC PDF (Unofficial) 01/19/2018

40.     **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, a revised Residential Access and Traffic Management Plan which includes the results of traffic counts and an inventory of roadway and intersection geometry, peak hour traffic volume collection, and related observations of traffic operations in the project area. PennEast shall also file any additional site-specific mitigation measures that it will implement to minimize impacts on local traffic in the project area, including any recommendations from state, county, and municipal agencies. *(Section 4.7.1.6)*

41.     **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, the following information for residences in close proximity to the project:

   a.    the results of previously unsurveyed areas along the pipeline route and an updated list of residences and commercial structures within 50 feet of the construction right-of-way;

   b.    for all residences identified within 25 feet of a construction work area, a final site-specific construction plan that includes all of the following: a dimensioned site plan that clearly shows the location of the residence in relation to the pipeline, the boundaries of all construction work areas, the distance between the edge of construction work areas and the residence and other permanent structures, and equipment travel lanes;

   c.    a description of how and when landowners will be notified of construction activities;

   d.    documentation of landowner concurrence if a structure within the construction work area will be relocated or purchased;

   e.    documentation of landowner concurrence if the construction work areas will be within 10 feet of a residence; and

   f.    a description of how PennEast will provide temporary housing for residents temporarily displaced during construction and whether PennEast will compensate landowners for this cost. *(Section 4.7.3.1)*

42.     **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, a final crossing plan for the Appalachian National Scenic Trail that includes: timing restrictions, closure schedules, and site-specific safety and mitigation measures including signage and barriers if needed; and documentation of consultation with the Pennsylvania Game Commission. *(Section 4.7.5.1)*

43.     **Prior to construction**, PennEast shall file with the Secretary, for review and written approval of the Director of the OEP, plans regarding a gating or boulder access system for the pipeline right-of-way across Pennsylvania state lands, developed in consultation with the Pennsylvania Department of Conservation and

Natural Resources (PADCNR), to prevent unauthorized vehicle access while maintaining pedestrian access. *(Section 4.7.5.2)*

44.   **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, additional information on the crossing of the Bethlehem Authority water transmission tunnel crossed at MPs 51.0R2 and 51.6R2.  Additional information shall include, but not be limited to:

   a.    a site-specific crossing plan for each crossing location, including construction methods and measures used to avoid impacts on the water transmission tunnel;

   b.    identification of any blasting that will be required within 2,000 feet of the water tunnel;

   c.    a vibration monitoring program that will be implemented during construction; and

   d.    documentation of working meetings with the Water Authority to ensure that concerns related to construction and operation of the pipeline over the water transmission tunnel are adequately addressed. *(Section 4.7.5.3)*

45.   PennEast shall file with the Secretary reports describing any documented complaints from a homeowner that a homeowner's insurance policy was cancelled, voided, or amended due directly to the grant of the pipeline right-of-way or installation of the pipeline and/or that the premium for the homeowner's insurance increased materially and directly as a result of the grant of the pipeline right-of-way or installation of the pipeline.  The reports shall also identify how PennEast has mitigated the impact.  **During construction**, these reports shall be included in PennEast's **weekly** status reports (see recommendation 8) and in quarterly reports for a **2-year period** following in-service of the project. *(Section 4.8.8.2)*

46.   **Prior to construction**, PennEast shall assess potential project impacts on the Hickory Run Recreation Demonstration Area and file with the Secretary a recommendation of effects and the Pennsylvania State Historic Preservation Office's (SHPO's) comments. *(Section 4.9.2.1)*

47.   **Prior to construction**, PennEast shall file with the Secretary all effects assessments related to historic districts crossed in New Jersey.  PennEast shall also include site avoidance or mitigation plans and documentation of New Jersey SHPO's comments. *(Section 4.9.2.2)*

48.   **Prior to construction**, PennEast shall provide an assessment of potential project effects to Bridge #D-449 Worman Road along with comments of the New Jersey SHPO and any needed avoidance or treatment plans for the resource. *(Section 4.9.2.2)*

20180119-3110 FERC PDF (Unofficial) 01/19/2018

49.   **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, a final vibration monitoring plan for historic properties within 150 feet of the construction workspace in consultation with the Pennsylvania and New Jersey SHPOs. *(Section 4.9.5)*

50.   **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, a revised Blasting Plan that includes a review of potential effects on cultural resources, including caves, rock shelters, and aboveground historic structures, and how those impacts will be addressed. *(Section 4.9.5)*

51.   PennEast **shall not begin construction** of facilities and/or use of all staging, storage, or temporary work areas, and new or to-be-improved access roads **until**:

   a.   PennEast files with the Secretary:
   
   (i)    remaining cultural resources survey report(s);
   
   (ii)   site or resource evaluation report(s) and avoidance/treatment plan(s), as required;
   
   (iii)  the project's recommended effects to historic properties in Pennsylvania and New Jersey; and
   
   (iv)   comments on the cultural resources reports and plans from the Pennsylvania and New Jersey SHPOs, as appropriate;

   b.   the Advisory Council on Historic Preservation is afforded an opportunity to comment if historic properties will be adversely affected; and

   c.   the FERC staff reviews and the Director of the OEP approves the cultural resources reports and plans, and notifies PennEast in writing that treatment plans/mitigation measures (including archaeological data recovery) may be implemented and/or construction may proceed.

   All materials filed with the Commission containing **location, character, and ownership information** about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering: **"CUI\\PRIV - DO NOT RELEASE."** *(Section 4.9.6)*

52.   If changes to the project construction schedule and/or design occur that will materially impact the amount of construction nitrogen oxide ($NO_x$) emissions generated in a calendar year, PennEast shall file with the Secretary, **prior to construction,** revised construction emissions estimates prior to implementing the revised construction schedule and/or design modification demonstrating that the annual $NO_x$ emissions resulting from the revised construction schedule and/or design do not exceed general conformity applicability thresholds.  In addition, if any such project revised construction schedule and/or design changes result in emissions that will exceed the general conformity applicability thresholds, then a draft general conformity determination will need to be prepared at that time, as

20180119-3110 FERC PDF (Unofficial) 01/19/2018
Case 3:18-cv-01938-BRM-DEA   Document 1   Filed 02/09/18   Page 123 of 168 PageID: 123

Docket No. CP15-558-000                                          - 98 -

required under Section 93.157(d) of the Federal General Conformity regulation at 40 Code of Federal Regulations Part 93, Subpart B. *(Section 4.10.1.3)*

53.  PennEast shall implement the following measures for on-road vehicles and non-road diesel construction equipment used for construction of the project;

   a.  all on-road vehicles and non-road construction equipment operating at, or visiting, a construction site shall comply with the three-minute idling limit, and anti-idling signs shall be posted;

   b.  all non-road diesel construction equipment greater than 100 horsepower used for more than ten days shall have engines that meet the EPA Tier 4 non-road emission standards or the best available control technology that is technologically feasible and verified by EPA or the California Air Resources Board as a diesel emission control strategy; and

   c.  all on-road diesel vehicles used to haul materials or traveling to and from a construction site shall use designated truck routes that are designed to minimize impacts on residential areas and sensitive receptors such as hospitals, schools, daycare facilities, senior citizen housing, and convalescent facilities. *(Section 4.10.1.4)*

54.  **Prior to construction**, PennEast shall file with the Secretary, for review and written approval by the Director of the OEP, a HDD noise mitigation plan for each HDD location to reduce the projected noise level attributable to the proposed drilling operations at the 31 noise sensitive areas (NSAs) with the predicted noise levels above 55 decibel A-weighted (dBA) day-night sound level ($L_{dn}$).  During drilling operations, PennEast shall implement the approved plan for all HDDs, monitor noise levels, include the noise monitoring results in its **weekly** status reports, and make all reasonable efforts to restrict the noise attributable to the drilling operations to no more than an $L_{dn}$ of 55 dBA at the NSAs. *(Section 4.10.2.3)*

55.  PennEast shall file a noise survey with the Secretary **no later than 60 days after placing the Kidder Compressor Station in service**.  If a full load noise condition survey is not possible, PennEast shall provide an interim survey at the maximum horsepower load and provide the full load survey **within six months**.  If the noise attributable to the operation of the compressor station at full load exceeds an $L_{dn}$ of 55 dBA at any nearby NSA, PennEast shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within one year of the in-service date.**  PennEast shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days after it installs the additional noise controls.** *(Section 4.10.2.3)*

20180119-3110 FERC PDF (Unofficial) 01/19/2018

Docket No. CP15-558-000                                                    - 99 -

56.     **Prior to construction**, PennEast shall consult with the Federal Aviation
        Administration and the appropriate authority at the Trenton-Mercer Airport
        regarding any requirements or guidelines that need to be followed during
        construction or operation of the project.  Records of these consultations, as well as
        any requirements made by the Federal Aviation Administration and the Trenton-
        Mercer Airport, shall be filed with the Secretary. *(Section 4.11.3)*

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PennEast Pipeline Company, LLC                    Docket No.  CP15-558-000

(Issued January 19, 2018)

LaFLEUR, Commissioner *concurring*:

In today's order, the Commission authorizes the development of the PennEast Project, a natural gas pipeline from Luzerne County, Pennsylvania to Mercer County, New Jersey.  I write separately to provide additional context regarding my conclusion that the PennEast Project is in the public interest.

Deciding whether a project is in the public interest requires a careful balancing of the economic need for the project and its environmental impacts.[1]  In applying this balancing test to the extensive record developed in this case, I am persuaded that on balance, the PennEast Project is in the public interest.  PennEast has demonstrated that approximately 90 percent of the project's capacity has been subscribed, primarily by state-regulated local distribution companies and owners of natural gas-fired electric generation facilities.  I believe that under existing Commission precedent, this evidence of precedent agreements supports the determination that the project is needed.

I have carefully considered the environmental impacts of the PennEast Project, and agree with the order's determination that, while the Project will result in some adverse environmental impacts, the environmental conditions imposed in today's order will ensure that such impacts are reduced to acceptable levels.  I do share the concerns of my colleagues that the record reflects a significant number of environmental surveys that are incomplete due to lack of access to landowner property.  I am persuaded, however, that Commission staff has developed a sufficient record to adequately evaluate the environmental impacts resulting from the PennEast Project.[2]  Moreover, today's order

---

[1] *See Atlantic Coast Pipeline*, LLC, 161 FERC ¶ 61,042 (2017) (LaFleur, Comm'r, *dissenting*); *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 (2017) (LaFleur, Comm'r, *dissenting*).

[2] The order explains that the Commission relied upon "PennEast's application and supplements, as well as information developed through Commission staff's data requests, field investigations, the scoping process, literature research, alternative analyses, and *(continued ...)*

Docket Nos. CP15-558-000                                                    2

imposes a number of environmental conditions which are intended to specifically allow
the Commission and Commission staff to carefully monitor PennEast's ongoing
compliance obligations, particularly related to the completion of those surveys, and any
necessary avoidance, minimization, and mitigation measures that may be needed.

I strongly support Chairman McIntyre's announcement that the Commission will
undertake a generic proceeding to look broadly at our pipeline certificate policies. I
believe this review should include both our needs determination and our environmental
review of proposed projects. Today's order highlights the issue of how pipeline
developers engage with landowners, which I believe should also be explored in the
upcoming generic proceeding. For now, I will continue to take a case-by-case approach
to pipeline applications, carefully applying the existing law that governs our certificate
process to the factual record developed in each case. In this case, that review led me to
conclude that the proposed pipeline is in the public interest.

For these reasons, I respectfully concur.

_____
Cheryl A. LaFleur
Commissioner

_____

contacts with federal, state, and local agencies, as well as with individual members of the
public."

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PennEast Pipeline Company, LLC                    Docket No.  CP15-558-000

(Issued January 19, 2018)

CHATTERJEE, Commissioner, *concurring*:

I concur in this order and agree with granting a certificate of public convenience and necessity to PennEast, authorizing it to construct and operate the proposed PennEast Project, subject to the conditions in the order. I believe a clear need has been demonstrated for the project. PennEast has executed long-term, firm precedent agreements with 12 shippers for approximately 90 percent of the project's capacity. This additional gas infrastructure will provide additional natural gas transportation capacity into Pennsylvania and New Jersey.

However, I do have concerns about the order's impact on landowners. For this project, there are incomplete surveys due to lack of access to landowner property. I recognize that the rights of landowners are important, and do not take their concerns lightly.  Under section 7 of the Natural Gas Act, once the Commission grants a certificate, a certificate holder is authorized to acquire the necessary land or property to construct the approved facilities by exercising the right of eminent domain if it cannot acquire the easement by an agreement with the landowner. It is important that the Commission have as much data as possible on which to base a determination that has such a momentous effect.

I am supporting the project despite these concerns, because I believe the Commission has sufficient information in the record on which to make its decision – the certificate application and supplements, information developed through Commission staff's data requests, field investigations, the scoping process, literature research, alternatives analysis, and contacts with federal, state, and local agencies, and individual members of the public.  Additionally, the order imposes conditions requiring the filing of additional environmental information for review and approval once survey access is obtained.

Docket No. CP15-558-000                                      -2-

But I would like to encourage pipeline companies and landowners to work with the Commission to maximize engagement and minimize the impacts on landowners going forward. I believe that a cooperative process leads to the best results for all stakeholders.

For these reasons, I respectfully concur.

_____
Neil Chatterjee, Commissioner

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PennEast Pipeline Company, LLC                    Docket No.      CP15-558-000

(Issued January 19, 2018)

GLICK, Commissioner, *dissenting*:

I respectfully dissent from today's order because I believe that the record in this proceeding fails to demonstrate that the PennEast Project satisfies the requirements for a certificate of public convenience and necessity under the Natural Gas Act.  Section 7 of the Natural Gas Act requires that, before issuing a certificate for new pipeline construction, the Commission find both a need for the pipeline and that, on balance, the pipeline's benefits outweigh its harms.[1]  I disagree with the Commission's conclusion that the PennEast Project meets these standards.

In today's order, the Commission relies exclusively on the existence of precedent agreements with shippers to conclude that the PennEast Project is needed.[2]  Pursuant to these agreements, PennEast's affiliates hold more than 75 percent of the pipeline's subscribed capacity.[3]  While I agree that precedent and service agreements are one of several measures for assessing the market demand for a pipeline,[4] contracts among

---

[1] 15 U.S.C. § 717f (2012).

[2] *PennEast Pipeline Company, LLC*, 162 FERC ¶ 61,053, at P 27 (2018) (explaining that "it is current Commission policy to not look beyond precedent or service agreements to make judgments about the needs of individual shippers"); *id.* P 29 ("Where, as here, it is demonstrated that specific shippers have entered into precedent agreements for project service, the Commission places substantial reliance on those agreement to find that the project is needed.").

[3] *Id.* P 6.

[4] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 61,747 (1999) (Certificate Policy Statement) ("[T]he Commission will consider all relevant factors reflecting on the need for the project.  These might include, but would not be limited to, precedent agreements, demand projections, potential cost savings to

*(continued ...)*

20180119-3110 FERC PDF (Unofficial) 01/19/2018

affiliates may be less probative of that need because they are not necessarily the result of an arms-length negotiation.[5]  By itself, the existence of precedent agreements that are in significant part between the pipeline developer and its affiliates is insufficient to carry the developer's burden to show that the pipeline is needed.

Under these circumstances, I believe that the Commission must consider additional evidence regarding the need for the pipeline.  As the Commission explained in the Certificate Policy Statement, this additional evidence might include, among other things, projections of the demand for natural gas, analyses of the available pipeline capacity, and an assessment of the cost savings that the proposed pipeline would provide to consumers.[6]  The Commission, however, does not rely on any such evidence in finding that there is a need for the PennEast Project.[7]  Accordingly, I do not believe that the Commission's order properly concludes that the PennEast Project is needed.

In addition to determining the need for a pipeline, the Natural Gas Act requires the Commission to find that, on balance, the pipeline's benefits outweigh its harms.  This includes weighing the risk of harm to the environment, landowners, and communities, as well as public safety more generally.[8]  And where, as in this proceeding, there is limited evidence of the need for the proposed project, it is incumbent on the Commission to engage in an especially searching review of the project's potential harms to ensure that

---

consumers, or a comparison of projected demand with the amount of capacity currently serving the market.").

[5] Certificate Policy Statement at 61,744.

[6] *Id.* at 61,747.

[7] Indeed, the Commission concludes that "the fact that 6 of the 12 shippers on the PennEast Project are affiliated with the project's sponsors does not require the Commission to look behind the precedent agreements to evaluate project need." *PennEast Pipeline Company, LLC*, 162 FERC ¶ 61,053 at P 33.

[8] As the United States Court of Appeals for the District of Columbia Circuit has explained, "[t]he broad public interest standards in the Commission's enabling legislation are limited to 'the purposes that Congress had in mind when it enacted this legislation.'" *Pub. Utils. Comm'n of Cal. v. FERC*, 900 F.2d 269, 281 (D.C. Cir. 1990) (quoting *NAACP v. FERC*, 425 U.S. 662, 670 (1976)).  The Court explained that, for the Natural Gas Act, these purposes include "'encourag[ing] the orderly development of plentiful supplies of . . . natural gas at reasonable prices'" as well as "'conservation, environmental, and antitrust issues.'"  *Id.* (quoting *NAACP*, 425 U.S. at 670 n.6).

Docket No. CP15-558-000                                    - 3 -

the project is in fact in the public interest.  In this case, PennEast's certificate application lacks evidence that I believe is important to making the public interest determination.[9]

The Commission addresses this lack of evidence by conditionally granting the certificate, subject to PennEast's compliance with the environmental conditions.  I recognize that the courts have upheld the Commission's authority to issue conditional certificates.  Nevertheless, doing so comes with significant consequences for landowners whose properties lie in the path of the proposed pipeline.  Although the certificate is conditional, it gives the pipeline developer the authority to exercise eminent domain and condemn land as needed to develop the pipeline.[10]  In my view, Congress did not intend for the Commission to issue certificates so that certificate holders may use eminent domain to acquire the information needed to determine whether the pipeline is in the public interest.[11]  Further, under the Natural Gas Act, this eminent domain authority is

_____

[9] For instance, 68 percent of the project alignment in New Jersey has yet to be surveyed for the existence of historic and cultural resources.  *PennEast Pipeline Company, LLC*, 162 FERC ¶ 61,053 at P 172.  In addition, PennEast has not yet completed the geotechnical borings work needed to ensure that the environmental impacts of planned horizontal directional drilling will be adequately minimized.  *Id.* P 120.

[10] 15 U.S.C. § 717f(h) (2012).  State supreme courts, including New Jersey's and Pennsylvania's, have long recognized that the power of eminent domain is a harsh and extraordinary power that should be strictly construed.  *See Levin v. Twp. Comm. of Twp. of Bridgewater*, 274 A.2d 1, 26 (N.J. 1971) ("Where . . . property is forcibly taken from one party for the purpose of being transferred to another, thereby excluding the consent of the owner and excluding all other prospective ultimate purchasers and developers except the one selected by the municipality, the facts which allegedly give rise to that municipal power should be closely scrutinized."); *Woods v. Greensboro Nat. Gas Co.*, 54 A. 470, 470-72 (Pa. 1903) ("The exercise of the right of eminent domain, whether directly by the state or its authorized grantee, is necessarily in derogation of private right, and the rule in that case is that the authority is to be strictly construed." (internal citations omitted)); *see also Harvey v. Aurora & G. Ry. Co.*, 51 N.E. 163, 166 (Ill. 1898) (similar); *Chesapeake & O. Ry. Co. v. Walker*, 40 S.E. 633, 636 (Va. 1902) (similar); *City of Little Rock v. Sawyer*, 309 S.W.2d 30, 36 (Ark. 1958) (similar); *La. Power & Light Co. v. Lasseigne*, 257 La. 72, 89 (1970) (similar).

[11] *See, e.g.*, *Walker v. Gateway Pipeline Co.*, 601 So. 2d 970, 975 (Ala. 1992) (explaining that section 7(h) of the Natural Gas Act addresses eminent domain needed for the "actual construction of facilities, not entries that may take place prior to such construction and in preparation for acquiring a certificate of public convenience and necessity from the FERC").

20180119-3110 FERC PDF (Unofficial) 01/19/2018

not limited to the extent needed to complete the surveys and other assessments used to satisfy the conditions imposed in the Commission's order.  As a result, there will not necessarily be any restriction on a pipeline developer's ability to exercise eminent domain while the Commission waits to confirm that the pipeline is in the public interest.

I recognize that part of the reason that the record in this proceeding is incomplete is that landowners have denied PennEast access to their land for the purpose of conducting the necessary studies and assessments.  However, the question whether landowners should be required to provide pipeline developers with access to their property for the purpose of determining whether it is suitable for a proposed pipeline is one that is and should be left to the states to decide.  The Commission should not use the pipeline certification process as an end run around states and landowners that choose not to grant access to their property before a certificate is issued.[12]

For these reasons, I respectfully dissent.

_____

Richard Glick
Commissioner

---

[12] Some states allow prospective interstate pipeline companies to rely on state law to access private property for surveying prior to obtaining a certificate of public convenience and necessity.  *See, e.g.*, *Texas E. Transmission, LP v. Barack*, 2014 WL 1408058, at *3 (S.D. Ohio Apr. 11, 2014) (granting a pipeline company access under Ohio law to a property for purpose of surveying, appraising, and conducting any necessary examinations ).  Other states, including New Jersey and Pennsylvania, do not provide pipeline companies this right prior to obtaining a certificate of public convenience and necessity from the Commission.

Document Content(s)

CP15-558-000.DOCX...................................................1-107

# Exhibit C

MTG
2-23-2005
3-22-2005

**Prepared by:**
Wells Fargo Bank, N.A.
2335 Briargate Parkway
Colorado Springs, CO   80920
BETINA WARREN
866-820-2030

*Betina Warren*
(Signature of Preparer)

Instr# 8536464          Dorothy K. Tirpok
Recorded/Filed          ASB  Hunterdon County Clerk
03/22/2005  13:05   Bk 2839 Pg 81  #Pg 7   MTG

**After Recording Return To:**
Wells Fargo Bank, N.A.
P. O. BOX 31557
BILLINGS, MT 59107
DOCUMENT MANAGEMENT

State of New Jersey —————— Space Above This Line For Recording Data ——————
REFERENCE # 20050317400008          ACCOUNT # 0664-664-0942797-1998

# OPEN-END MORTGAGE
### (With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is 02/23/2005 and the parties, their addresses and tax identification numbers, if required, are as follows:
   MORTGAGOR:
   MICHAEL F. VOORHEES, TENANCY NOT STATED AND ELIZABETH E. ODONNELL SIGNING AS NON-VESTED SPOUSE

   ☐ If checked, refer to the attached Addendum incorporated in this Security Instrument, for additional Mortgagors, their signatures and acknowledgements.

   LENDER: Wells Fargo Bank, N.A.
           P. O. BOX 31557
           BILLINGS, MT 59107

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which are acknowledged, and to secure the Secured Debt (defined below) and Mortgagor's performance under this Security Instrument, Mortgagor grants, bargains, conveys and mortgages to Lender the following described property:
   LOT 13, BLOCK 3.06
   WEST AMWELL TOWNSHIP//LOTS 13, BLOCK 3.06 A/K/A 72 ALEXAUKEN CREEK ROAD BEING THE SAME PROPERTY CONVEYED TO THE GRANTEE(S) BY DEED FROM MICHAEL F. VOORHEES, DATED 03-02-92 AND RECORDED 05-06-92 IN DEED BOOK 1071, PAGE 481.

   TAX ID# 3.06-13

**NEW JERSEY - MORTGAGE**
EQ130 A (06/2002)

The property is located in HUNTERDON _____ at 75 ALEXAUKEN CREEK RD.
(County)

_____ , LAMBERTVILLE _____ , New Jersey 08530 _____
(Address)                          (City)                              (ZIP Code)

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

3.  **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $278,000.00 _____ . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4.  **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
    A.  Debt incurred under the terms of the promissory note, revolving line of credit agreement, contract, guaranty or other evidence of debt dated 02/23/2005 , together with all amendments, extensions, modifications or renewals. The maturity date of the Secured Debt is 02/23/2045 .
    B.  All future advances from Lender to Mortgagor under such evidence of debt, whether obligatory or discretionary. All future advances are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances which exceed the amount shown in Section 3.
    C.  All sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

5.  **PAYMENTS.** Mortgagor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

6.  **WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor has or will have lawful ownership and possession of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell and mortgage the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

7.  **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:
    A.  To make all payments when due and to perform or comply with all covenants.
    B.  To promptly deliver to Lender any notices that Mortgagor receives from the holder.
    C.  Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

8.  **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

9.  **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Security Instrument is released.

10. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor shall not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property. Lender or Lender's agents

may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

11. **AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

12. **ASSIGNMENT OF LEASES AND RENTS.** Mortgagor irrevocably grants, bargains, conveys, and assigns to Lender as additional security all the right, title and interest in and to any and all existing or future leases, subleases, and any other written or verbal agreements for the use and occupancy of any portion of the Property, including any extensions, renewals, modifications or substitutions of such agreements (all referred to as "Leases") and rents, issues and profits (all referred to as "Rents"). Mortgagor will promptly provide Lender with true and correct copies of all existing and future Leases. Mortgagor shall have the right under a license granted hereby to collect, receive, enjoy and use the Rents so long as Mortgagor is not in default under the terms of this Security Instrument. Mortgagor agrees that this assignment is immediately effective between the parties to this Security Instrument and effective as to third parties on the recording of this Security Instrument. Mortgagor agrees that Lender is entitled to notify Mortgagor or Mortgagor's tenants to make payments of Rents due or to become due directly to Lender after such recording, however Lender agrees not to notify Mortgagor's tenants until Mortgagor defaults and Lender notifies Mortgagor of the default and demands that Mortgagor and Mortgagor's tenants pay all Rents due or to become due directly to Lender. On receiving notice of default, Mortgagor will endorse and deliver to Lender any payment of Rents in Mortgagor's possession and will receive any Rents in trust for Lender and will not commingle the Rents with any other funds. Any amounts collected will be applied as provided in this Security Instrument. Mortgagor warrants that no default exists under the Leases or any applicable landlord/tenant law. Mortgagor also agrees to maintain and require any tenant to comply with the terms of the Leases and applicable law.

13. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Mortgagor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the property is a unit in a Condominium Project or is part of a Planned Unit Development ("PUD"), Mortgagor agrees to the following:

    A. Obligations. Mortgagor shall perform all of Mortgagor's obligations under the Constituent Documents. The "Constituent Documents" are the: (I) Declaration or any other document which creates the Condominium Projects or PUD and any homeowners association or equivalent entity ("Owners Association"); (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Mortgagor shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

    B. Hazard Insurance. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project or PUD which is satisfactory to Lender and which provides insurance coverage in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," then Mortgagor's obligation under Section 19 to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owner's Association policy. Mortgagor shall give Lender prompt notice of any lapse in required hazard insurance coverage. In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to Property, whether to the unit or to common elements, any proceeds payable to Mortgagor are hereby assigned and shall be paid to Lender for application to the sums secured by this Security Instrument, with any excess paid to Mortgagor.

    C. Flood Insurance. Mortgagor agrees to maintain flood insurance for the life of the Secured Debt which is acceptable, as to form, amount and extent of coverage to Lender.

    D. Public Liability Insurance. Mortgagor shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

E. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Mortgagor in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 18.

F. **Lender's Prior Consent.** Mortgagor shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project or PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking caused by condemnation or eminent domain, (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management by the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

G. **Remedies.** If Mortgagor does not pay condominium or PUD dues and assessments when due, then Lender may pay them. Any amount disbursed by Lender under this section shall become additional debt of Mortgagor secured by this Security Instrument. Unless Mortgagor and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Secured Debt rate and shall be payable, with interest, upon notice from Lender to Mortgagor requesting payment.

14. **DEFAULT.** Mortgagor will be in default if any party obligated on the Secured Debt fails to make payment when due. Mortgagor will be in default if a breach occurs under the terms of this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt.

15. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Mortgagor is in default. "Accelerate the Secured Debt" means that at the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again. In case of default in the payment of interest, or any installment of principal, or of any premium for insurance on the Property, or if Mortgagor fails to procure insurance as required by this Security Instrument, or if any tax, assessment, or governmental or municipal lien upon the Property becomes due and payable, and if the interest, installment of principal, premium for insurance, tax assessment or governmental or municipal lien remains unpaid for 30 days, Lender shall have the right, without declaring the whole indebtedness due and payable, to foreclose against the Property or any part of it on account of such specific default. This Security Instrument shall continue as a lien (legal claim) on any of the Property not sold on foreclosure for such unpaid balance of the Secured Debt.

16. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** If Mortgagor breaches any covenant in this Security Instrument, Mortgagor agrees to pay all of Lender's expenses if: 1) The attorney is not a partner, officer, director, or employee of the Lender; 2) a suit is filed and decided in favor of the lender; 3) the Borrower receives, by certified or registered mail, return receipt requested, a statement of the Lender's intent to sue specifying the amount of principal, interest, and other charges due and owing; and 4) the fees that a second-mortgage lender may charge and collect may not exceed 15% of the first $500 of the loan, 10% of the next $500, and 5% of any excess amount. Mortgagor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Mortgagor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lenders' rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal

costs and expenses  This Security Instrument shall remain in effect until released.  Mortgagor agrees to pay for any recordation costs of such release.

17. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES**.  As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment.  The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

   A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property.  This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.

   B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

   C. Mortgagor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property.  In such an event, Mortgagor shall take all necessary remedial action in accordance with any Environmental Law.

   D. Mortgagor shall immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

18. **CONDEMNATION**.  Mortgagor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase take any or all of the Property through condemnation, eminent domain, or any other means.  Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims.  Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property.  Such proceeds shall be considered payments and will be applied as provided in this Security Instrument.  This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

19. **INSURANCE**.  Mortgagor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location.  This insurance shall be maintained in the amounts and for the periods that Lender requires.  The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld.  If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.  All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause."  Mortgagor shall immediately notify Lender of cancellation or termination of the insurance.  Lender shall have the right to hold the policies and renewals.  If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices.  Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender.  Lender may make proof of loss if not made immediately by Mortgagor.  Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option.  Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment.  Any excess will be paid to the Mortgagor.  If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

20. **ESCROW FOR TAXES AND INSURANCE**.  Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

21. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS**.  Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary.  Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and Lender's lien status on the Property.

NEW JERSEY - MORTGAGE
EQ130 E (06/2002)

22. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Mortgagor signs this Security Instrument but does not sign an evidence of debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender.

23. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

24. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

25. **WAIVER OF CLAIM OF CREDIT FOR TAXES.** Mortgagor will not make or claim credit on or deduction from the principal or interest on the Secured Debt by reason of any municipal or governmental taxes, assessments or charges assessed upon the Property, nor claim any deduction from the taxable value of the Property by reason of this Security Agreement.

26. **OTHER TERMS.** If checked, the following are applicable to this Security Instrument:

    [X] **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

    [N/A] **Construction Loan.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

    [N/A] **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property. This Security Instrument suffices as a financing statement and any carbon, photographic or other reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial Code.

    [N/A] **Additional Terms.**

27. **RIDERS.** If checked, the following are applicable to this Security Instrument. The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument.

    [N/A] Third Party Rider
    [N/A] Leasehold Rider
    [N/A] Other N / A _____

NEW JERSEY - MORTGAGE
EQ130 F (06/2002)

**SIGNATURES**:  By signing below, Mortgagor agrees to the terms and covenants contained in this Security Instrument and in any attachments.  Mortgagor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

_____ (Seal)     2-23-05
[Mortgagor] MICHAEL F. VOORHEES                          Date
         F. MFN
         Michael F Voorhees

_____ (Seal)     _____
[Mortgagor] ELIZABETH E. ODONNELL, SIGNING AS NON-VESTED SPOUS        Date
         Elizabeth E. ODonnell

_____ (Seal)     _____
[Mortgagor]                                              Date

_____ (Seal)     _____
[Mortgagor]                                              Date

_____ (Seal)     _____
[Mortgagor]                                              Date

**ACKNOWLEDGEMENT:**
(Individual)

State of    New Jersey            ), ss.

County of   Hunterdon            ), ss.


On this     23         day of  February      ,  2005      , before me personally
appeared MICHAEL F. VOORHEES
ELIZABETH E. ODONNELL  SIGNING AS NON-VESTED SPOUS
(Name(s) of Person(s) Acknowledged) who, I am satisfied,
the maker(s) of the instrument, and acknowledged that the instrument was executed as the maker's own act.

_____
(Signature of Notary Public)

JoAnn A. Serinaa
(Print or Type Name of Notary Public)

My commission expires: 3/26/2007

JoAnn A. Serienga
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 3/26/2007

**After Recording Return To:**
Wells Fargo Bank, N.A.
P. O. BOX 31557
BILLINGS, MT 59107
DOCUMENT MANAGEMENT

END OF DOCUMENT

NEW JERSEY - MORTGAGE
EQ130 G (06/2002)

Exhibit D

MTG
2090-737
11-24-2006
12-11-2006

4675984+1          00411660023583
VOORHEES, MICHAEL
DEED OF TRUST / MORTGAGE

**WHEN RECORDED MAIL TO:**
JPMorgan Chase Bank, N.A.
Retail Loan Servicing KY2-1606
P.O. Box 11606     201 E. Main St
Lexington, KY 40576-1606     40507

2006121100011044B     1/9
12/11/2006 12:45:24 PM  M
Bk: 3090 Pg: 737
Dorothy K. Tirpok
Hunterdon County Clerk

FOR RECORDER'S USE ONLY

This Mortgage prepared by: X   Breeanna Wright

Name of Signer: ASHLEIGH RYCROFT, PROCESSOR
BREEANNA WRIGHT

# MORTGAGE

**INDEX.** The following index is for convenience purposes only and is not to be used to interpret or to define any provisions of this Security Instrument.

1. **DEFINITIONS**
   (A) **Borrower**
   (B) **Credit Agreement**
   (C) **Existing Indebtedness**
   (D) **Lender**
   (E) **Owner**
   (F) **Property**
   (G) **Related Documents**
   (H) **Security Instrument**
   (I) **Sums Secured**
2. **OWNER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY**
3. **DESCRIPTION OF THE PROPERTY**
4. **OWNER'S RIGHT TO MORTGAGE THE PROPERTY AND OWNER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**
5. **OWNER'S WAIVERS**
6. **OWNER'S REPRESENTATIONS AND WARRANTIES**
7. **BORROWER'S PROMISE TO PAY**
8. **OWNER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS**
9. **NO CLAIM FOR CREDIT FOR TAXES**
10. **EXISTING INDEBTEDNESS**
    (A) **Existing Lien**
    (B) **No Modification**
11. **OWNER'S OBLIGATION TO MAINTAIN HAZARD INSURANCE**
12. **OWNER'S OBLIGATION TO MAINTAIN THE PROPERTY**
13. **LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY; MORTGAGE INSURANCE**
14. **POSSESSION AND USE**
15. **LENDER'S RIGHT TO INSPECT THE PROPERTY**
16. **AGREEMENTS ABOUT CONDEMNATION OF THE PROPERTY**
17. **CONTINUATION OF OWNER'S OBLIGATIONS AND OF LENDER'S RIGHTS**
    (A) **Owner's Obligations**
    (B) **Lender's Rights**
18. **OWNER'S OBLIGATIONS AND THOSE OF PERSONS TAKING OVER OWNER'S OBLIGATIONS**
19. **LOAN CHARGES**
20. **LEGISLATION AFFECTING LENDER'S RIGHTS**
21. **NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT**
22. **GOVERNING LAW**
23. **OWNER'S COPY**
24. **AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**
25. **DEFAULT**
26. **LENDER'S RIGHTS UPON DEFAULT**
    (A) **Accelerate Payment**
    (B) **Lender in Possession**
    (C) **Judicial Foreclosure**
    (D) **Nonjudicial Sale**
    (E) **My Payment of Rent**
    (F) **Deficiency Judgment**
    (G) **Election of Remedies**
    (H) **Expenses**
27. **LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT**
28. **IDENTITY OF LENDER**
29. **NON-WAIVER**
30. **SUPPLEMENT TO PERSONAL PROPERTY DEFINITION**
31. **DUE ON SALE - CONSENT BY LENDER**
32. **SUPPLEMENT TO OWNER'S OBLIGATION TO MAINTAIN HAZARD INSURANCE**

**MORTGAGE**
**(Continued)**

Page 2

Loan No: 411660023583

33. **JOINDER**
34. **MISCELLANEOUS PROVISIONS**
    (A) **Amendments**
    (B) **Merger**
    (C) **Time is of the Essence**
    (D) **Waivers and Consents**

1. **DEFINITIONS.** The following words are used often in this document. When they are used, they will have the following meanings:

(A) **Borrower.** MICHAEL F VOORHEES and all other persons and entities signing the Note will sometimes be called "Borrower".

(B) **Credit Agreement.** The note or credit agreement signed by Borrower and dated November 24, 2006 will be called the "Note." The Note is **in the original amount of $50,000.00.** This amount is called "principal." The word "Note" includes all renewals of, extensions of, modifications of and substitutions for the promissory note or credit agreement. The interest rate on the Note is a variable interest rate based upon an index. The index currently is 8.250% per annum. If the index increases, the payments tied to the index, and therefore the total amount secured hereunder, will increase. Any variable interest rate tied to the index shall be calculated as of, and shall begin on, the commencement date indicated for the applicable payment stream. Notwithstanding the foregoing, the variable interest rate or rates provided for in this Security Instrument shall be subject to the following maximum rate. NOTICE: Under no circumstances will the interest rate on the Credit Agreement be more than the lesser of 21.000% per annum or the maximum rate allowed by applicable law. Specifically, without limitation, this Security Instrument secures a revolving line of credit, under which Lender may make advances to Borrower so long as Borrower complies with all the terms of the Credit Agreement. The maturity date of this Security Instrument is November 24, 2036. **NOTICE TO OWNER: THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.**

(C) **Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Security Instrument.

(D) **Lender.** JPMorgan Chase Bank, N.A. will be called "Lender."

(E) **Owner.** MICHAEL F VOORHEES and ELIZABETH O DONNELL sometimes will be called "Owner" and sometimes simply "I", or "me." If I sign this Security Instrument, but I do not sign the Credit Agreement, I am signing this Security Instrument only to grant and convey my interest in the Property to Lender. In such a case, I will not be personally liable under the Credit Agreement except as otherwise provided by contract or law, such as a guaranty of the Credit Agreement.

(F) **Property.** The property that is described in the section titled "DESCRIPTION OF THE PROPERTY" will be called the "Property".

(G) **Related Documents.** All promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Sums Secured will be called "Related Documents".

(H) **Security Instrument.** This mortgage document will also be called the "Security Instrument."

(I) **Sums Secured.** The amounts described below in the section titled "OWNER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY" sometimes will be called the "Sums Secured." **The lien of this Security Instrument will not exceed at any one time the principal amount of $50,000.00, plus accrued interest, payments made by Lender for taxes and insurance, and any other payments made by Lender as provided in this Security Instrument.**

THIS MORTGAGE IS DATED November 24, 2006, BETWEEN MICHAEL F VOORHEES JOINED HEREIN PRO FORMA ELIZABETH O DONNELL, whose address is 75 ALEXAUKEN CREEK RD, LAMBERTVILLE, NJ 08530 (sometimes below will be called "Owner," "I," or "me"); and JPMorgan Chase Bank, N.A., whose address is Home Equity and Consumer Lending Division, 1111 Polaris Parkway, Columbus, OH 43240 (sometimes below will be called "Lender").

2. **OWNER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY.** I mortgage, grant and convey to Lender the Property, subject to the terms of this Security Instrument, to have and to hold all of the Property to Lender, and to its successors and assigns, forever. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who hold mortgages on real property. Those rights that the law gives to lenders who hold mortgages on real property include those rights known as "Mortgage Covenants." I am giving Lender these rights to protect Lender from possible losses that might result if Borrower or I fail to do any of the following:

(A) Pay all the amounts that Borrower and I owe Lender as stated in the Credit Agreement;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument.

3. **DESCRIPTION OF THE PROPERTY.** I mortgage, grant and convey to Lender the Property described in (A) through (I) below.

(A) This Property is located in HUNTERDON County, State of New Jersey:

    Parcel ID Number: 13 / 3.06 13Q FARM / 3.06
    THE PROPERTY CONSISTS OF THE LAND AND ALL THE BUILDINGS AND STRUCTURES ON THE LAND IN THE TOWNSHIP OF WEST AMWELL, COUNTY OF HUNTERDON AND STATE OF NEW JERSEY. BEGINNING AT A POINT ON THE NORTHWESTERLY SIDELINE OF NEW JERSEY STATE HIGHWAY ROUTE

**MORTGAGE**     Page 3
(Continued)

Loan No: 411660023583

202 (RIGHT OF WAY WIDTH VARIES) SAID POINT BEING THE FOLLOWING TWO COURSES FROM A BASELINE MONUMENT FOUND IN THE CENTER MEDIAN OF THE SAID HIGHWAY A) SOUTH 62 DEGREES 40 MINUTES 05 SECONDS WEST 100.00 FEET ALONG THE AFORESAID BASELINE TO ITS INTERSECTION WITH THE NORTHEASTERLY SIDELINE OF SAID LOT 13 EXTENDED, THENCE; B) NORTH 35 DEGREES 53 MINUTES 19 SECONDS WEST 91.86 FEET TO SAID POINT OF BEGINNING. 1) SOUTH 54 DEGREES 50 MINUTES 14 SECONDS WEST 14.10 FEET WITH SAID ROUTE 202 SIDELINE TO A POINT ON THE SAME, THENCE; 2) SOUTH 60 DEGREES 23 MINUTES 27 SECONDS WEST 122.29 FEET WITH THE SAME TO A POINT ON THE SAME. THENCE 3) SOUTH 74 DEGREES 02 MINUTES 51 SECONDS WEST 254.87 FEET WITH THE SAME TO A POINT ON THE SAME 4) NORTH 78 DEGREES 35 MINUTES 42 SECONDS WEST 96.02 FEET WITH THE SAME TO A POINT ON THE SAME, THENCE; 5) SOUTH 64 DEGREES 22 MINUTES 16 SECONDS WEST 175.01 FEET WITH THE SAME TO A POINT ON THE SAME, THENCE 6) SOUTH 43 DEGREES 26 MINUTES 19 SECONDS WEST 211.84 FEET WITH THE SAME TO A POINT ON THE SAME, THENCE 7) SOUTH 55 DEGREES 23 MINUTES 35 SECONDS WEST 117.39 FEET WITH THE SAME TO A POINT ON THE SAME; THENCE 8) SOUTH 55 DEGREES 44 MINUTES 46 SECONDS WEST 187.83 FEET WITH THE SAME TO A POINT ON THE SAME; THENCE 9) SOUTH 60 DEGREES 05 MINUTES 01 SECONDS WEST 457.57 FEET WITH THE SAME TO A POINT ON THE SAME, THENCE; 10) SOUTH 54 DEGREES 02 MINUTES 13 SECONDS WEST 271.33 FEET WITH THE SAME TO A POINT ON THE SAME BEING THE SOUTH EASTERLY MOST CORNER OF BLOCK 3.01 LOT 12 LANDS NOW OR FORMERLY OF JOHN E. AND WENONAH STOVER, THENCE; 11) NORTH 30 DEGREES 09 MINUTES 38 SECONDS WEST 80.37 FEET ALONG SAID LOT 12 AND THEN ALONG BLOCK 3.01 LOT 23 LANDS NOW OR FORMERLY OF PUBLIC SERVICE ELECTRIC AND GAL COMPANY TO A POINT BEING ON A LIEN OF SAID LOT 23 AND THE SOUTHWESTERLY CORNER OF BLOCK 3.01 LOT 22 LANDS NOW OR FORMERLY OF PUBLIC SERVICE ELECTRIC AND GAL, THENCE 12) NORTH 50 DEGREES 17 MINUTES 11 SECONDS EAST 1510.75 FEET ALONG LOT 22 TO A CORNER OF THE SAME, THENCE: 13) NORTH 46 DEGREES 16 MINUTES 01 SECONDS EAST 340.07 FEET ALONG THE SAME TO A POINT IN A LINE OF BLOCK 5.01 LOT 30 LAND NOW OR FORMERLY OF PUBLIC SERVICE ELECTRIC AND GAS COMPANY, THENCE; 14) SOUTH 35 DEGREES 33 MINUTES 19 SECONDS EAST 445.36 FEET ALONG LOT 30 TO THE POINT AND PLACE OF BEGINNING. BEGINNING AT A POINT IN COURSE NUMBER 12 OF THE ABOVE DESCRIPTION, SAID POINT BEING 519.75 FEET ALONG SAID COURSE 12 FROM THE TERMINUS OF COURSE 11, THENCE; A) NORTH 50 DEGREES 17 MINUTES 11 SECONDS EAST 362.24 FEET, THENCE; B) NORTH 62 DEGREES 14 MINUTES 08 SECONDS EAST 751.78 FEET, THENCE; C) SOUTH 35 DEGREES 53 MINUTES 19 SECONDS EAST 75.76 FEET, THENCE; D) SOUTH 62 DEGREES 14 MINUTES 08 SECONDS WEST 1116.88 FEET TO THE POINT AND PLACE OF BEGINNING. BEGINNING AT A POINT IN COURSE NUMBER 2 OF THE ABOVE DESCRIPTION SAID POINT BEING 53.18 FEET ALONG SAID COURSE 2 FROM THE TERMINUS OF COURSE 1, THENCE; A) SOUTH 60 DEGREES 23 MINU TES 27 SECONDS WEST 53.36 FEET, THENCE; B) NORTH 35 DEGREES 53 MINUTES 19 SECONDS WEST 417.00 FEET, THENCE; C) NORTH 46 DEGREES 16 MINUTES 01 SECONDS EAST 121.13 FEET, THENCE; D) SOUTH 35 DEGREES 53 MINUTES 19 SECONDS EAST 424.89 FEET, THENCE; E) SOUTH 41 DEGREES 54 MINUTES 41 SECONDS WEST 68.51 FEET TO THE POINT AND PLACE OF BEGINNING. BEGINNING AT A POINT IN COURSE NUMBER 2 OF THE ABOVE DESCRIPTION SAID POINT BEING 106.54 FEET ALONG SAID COURSE 2 FROM THE TERMINUS OF COURSE 1, THENCE; A) SOUTH 60 DEGREES 23 MINUTES 27 SECONDS WEST 15.75 FEET, THENCE; B) SOUTH 74 DEGREES 02 MINUTES 51 SECONDS WEST 89.72 FEET, THENCE; C) NORTH 35 DEGREES 53 MINUTES 19 SECONDS WEST 370.91 FEET, THENCE; D) NORTH 46 DEGREES 16 MINUTES 01 SECONDS EAST 100.95 FEET, THENCE; E) SOUTH 35 DEGREES 53 MINUTES 19 SECONDS EAST 417.00 FEET TO THE POINT AND PLACE OF BEGINNING. BEGINNING AT A POINT IN COURSE 12, SAID POINT BEING DISTANT 177.23 FEET ON A COURSE OF SOUTH 50 DEGREES 17 MINUTES 11 SECONDS WEST FROM THE TERMINUS, OF SAID COURSE 12, THENCE; (1) SOUTH 50 DEGREES 17 MINUTES 11 SECONDS WEST A DISTANCE OF 61.63 FEET, THENCE; (2) NORTH 03 DEGREES 56 MINUTES 11 SECONDS WEST A DISTANCE OF 143.77 FEET, THENCE (3) SOUTH 87 DEGREES 42 MINUTES 32 SECONDS WEST, A DISTANCE OF 89.70 FEET, THENCE; (4) NORTH 38 DEGREES 02 MINUTES 09 SECONDS WEST A DISTANCE OF 25.62 FEET TO A POINT IN THE SOUTHERLY LIEN OF ALEXAUKEN CREEK ROD, THENCE; (5) NORTH 51 DEGREES 57 MINUTES 51 SECONDS EAST A DISTANCE OF 50 FEET ALONG THE SAID SOUTHERLY LINE OF ALEXAUKEN CREEK ROAD, THENCE; (6) NORTH 87 DEGREES 42 MINUTES 32 SECONDS EAST A DISTANCE OF 112.66 FEET, THENCE; (7) SOUTH 03 DEGREES 56 MINUTES 11 SECONDS WEST A DISTANCE OF 156.32 FEET, TO THE POINT AND PLACE OF BEGINNING.

The Real Property or its address is commonly known as 75 ALEXAUKEN CREEK RD, LAMBERTVILLE, NJ 08530. The Real Property tax identification number is 13 / 3.06   13Q FARM / 3.06.

(B) All buildings and other improvements that are located on the Property described in subparagraph (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subparagraph (A) of this section. These rights are known as "easements, rights and appurtenances attached to the Property;"

(D) All rents and royalties from the Property described in subparagraph (A) of this section;

(E) All mineral, oil and gas rights and profits, water rights and stock that are part of the Property described in subparagraph (A) of this section;

(F) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subparagraph (A) of this section;

(G) All fixtures that are now or in the future will be on the Property described in subparagraphs (A) and (B) of this section;

(H) All of the rights and property described in subparagraphs (B) through (G) of this section that I acquire in the future; and

**MORTGAGE**
(Continued)

Loan No: 411660023583                                                    Page 4

---

(I)  All replacements of or additions to the Property described in subparagraphs (B) through (I) of this section.

**4.  OWNER'S RIGHT TO MORTGAGE THE PROPERTY AND OWNER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY.**  I promise that:  (A)  I lawfully own the Property;  (B)  I have the right to mortgage, grant and convey the Property to Lender; and  (C)  there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender.  This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have.  I promise that I will defend my ownership of the Property against any claims of such rights.

**5.  OWNER'S WAIVERS.**  I waive all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against me, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**6.  OWNER'S REPRESENTATIONS AND WARRANTIES.**  I warrant to Lender that:  (A)  this Security Instrument is executed at the request of Borrower and not at the request of Lender;  (B)  I have the full power and right to enter into this Security Instrument and to mortgage the Property;  (C)  I have established adequate means of obtaining from Lender on a continuing basis information about the financial condition of Lender; and  (D)  Lender has made no representation to me about Borrower or Borrower's creditworthiness.

**THIS MORTGAGE IS GIVEN TO SECURE  (A)  PAYMENT OF THE SUMS SECURED AND  (B)  PERFORMANCE OF ALL OF MY OBLIGATIONS UNDER THIS MORTGAGE.   I PROMISE AND I AGREE WITH LENDER AS FOLLOWS:**

**7.  BORROWER'S PROMISE TO PAY.**  This Security Instrument directly secures payment by Borrower to Lender on time of all principal and interest due under the Credit Agreement, together with any prepayment charges due under the Credit Agreement.

**8.  OWNER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS.**  I will pay all taxes, assessments, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument.  I will do this by making the payments on time to the person owed them.  (In this Security Instrument, the word "person" means any person, organization, governmental authority or other party.)  If I make direct payments, then promptly after making any of those payments I will give Lender a receipt which shows that I have done so.

Any claim, demand or charge that is made against the Property because an obligation has not been fulfilled is known as a "lien."  I must promptly pay or satisfy a superior lien unless:  (A)  I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation; or  (B)  in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up; or  (C)  I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that person.  If Lender determines that any part of the Property is subject to a superior lien, Lender may give me a notice identifying the superior lien.  I will then pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**9.  NO CLAIM FOR CREDIT FOR TAXES.**  Borrower or I will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges.  Borrower or I will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

**10.  EXISTING INDEBTEDNESS.**  The following provisions concerning Existing Indebtedness are a part of this Security Instrument:

**(A)  Existing Lien.**  The lien of this Security Instrument securing the Sums Secured may be secondary and inferior to the lien securing payment of an existing obligation.  The existing obligation has a current principal balance of approximately $118288.  I expressly covenant and agree to pay, or see to the payment of, the Existing Indebtedness and to prevent any default under the Existing Indebtedness.

**(B)  No Modification.**  I shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Security Instrument by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender.  I shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**11.  OWNER'S OBLIGATION TO MAINTAIN HAZARD INSURANCE.**  I will obtain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property.  The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage.  The insurance must be in the amounts and for the periods of time required by Lender.  If the Property is or becomes located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, I agree to obtain and maintain Federal Flood Insurance for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maxiumum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender.  I agree to maintain such insurance for the term of the loan.  In no event, however, shall I be required to provide hazard insurance in excess of the replacement value of the buildings and other improvements on the Property.  I may choose the insurance company, but my choice is subject to Lender's approval.  Lender may not refuse to approve my choice unless the refusal is reasonable.

All of the insurance policies and renewals of those policies must include what is known as a "standard mortgagee clause" to protect Lender.  The form of all policies and renewals must be acceptable to Lender.  Lender will have the right to hold the policies and renewals.  If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender.  If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

**MORTGAGE**
(Continued)

The amount paid by the insurance company is called "proceeds." The proceeds will be used to repair or to restore the damaged Property unless: (A) it is not economically feasible to make the repairs or restoration; or (B) the use of the proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (C) Lender and I have agreed in writing not to use the proceeds for that purpose. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the proceeds will be used to reduce the amount that is owed to Lender under the Credit Agreement and under this Security Instrument. If any of the proceeds remain after the amount that is owed to Lender has been paid in full, the remaining proceeds will be paid to me.

If I abandon the Property, or if I do not answer, within thirty (30) days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which is owed to Lender under the Credit Agreement, that use will not delay the due date or change the amount of any of the monthly payments under the Credit Agreement and under the Paragraph titled "MONTHLY PAYMENTS FOR TAXES AND INSURANCE" above. However, Borrower and Lender may agree in writing to those delays or changes.

If Lender acquires the Property as provided below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

**12.   OWNER'S OBLIGATION TO MAINTAIN THE PROPERTY.** I will keep the Property in good repair. I will not destroy, damage or substantially change the Property, and I will not allow the Property to deteriorate.

**13.   LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY; MORTGAGE INSURANCE.** If I fail to comply with any provision of this Security Instrument, including any obligation to maintain existing indebtedness in good standing, or if any action or proceeding is commenced that would materially affect Lender's interests in the Property, Lender on my behalf may, but will not be required to, take any action that Lender thinks to be appropriate. Any amount that Lender spends or incurs in so doing will bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of my repayment. All such expenses, at Lender's option, will (A)  be payable on demand, (B)  be added to the balance of the Credit Agreement and be apportioned among and be payable with any Installment payments to become due either during the term of any applicable insurance policy or during the remaining term of the Credit Agreement, or (C)  be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. This Security Instrument also will secure payment of these amounts. The rights provided for in this paragraph will be in addition to any other rights or any remedies to which Lender may be entitled on account of the default. Any action taken by Lender under this paragraph will not constitute a cure of any default so as to bar Lender from any remedy that it otherwise would have had under this Security Instrument.

If Lender required mortgage insurance as a condition for my loan, I will pay the premiums for that mortgage insurance. I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law.

**14.   POSSESSION AND USE.** Until in default, I may remain in possession and control of and operate and manage the Property.

**15.   LENDER'S RIGHT TO INSPECT THE PROPERTY.** Lender, and others authorized by Lender, may enter on and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before, or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

**16.   AGREEMENTS ABOUT CONDEMNATION OF THE PROPERTY.** A taking of property by any governmental authority by eminent domain is known as "condemnation." I give to Lender my right: (A)  to proceeds of all awards or claims for damages resulting from condemnation or other governmental taking of the Property; and (B) to proceeds from a sale of the Property that is made to avoid condemnation. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the amount that I owe to Lender will be reduced only by the amount of proceeds multiplied by the following fraction: (A)  the total amount of the Sums Secured immediately before the taking, divided by (B)  the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

If I abandon the Property, or if I do not answer, within thirty (30) days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which is owed to Lender under the Credit Agreement, that use will not delay the due date or change the amount of any of the monthly payments under the Credit Agreement. However, Lender and I may agree in writing to those delays or changes.

**17.   CONTINUATION OF OWNER'S OBLIGATIONS AND OF LENDER'S RIGHTS.**

   **(A)   Owner's Obligations.** Lender may allow a person who takes over my rights and obligations to delay or to change the amount of the monthly payments of principal and interest due under the Credit Agreement or under this Security Instrument. Even if Lender does this, however, that person and Borrower will both still be fully obligated under the Credit Agreement and under this Security Instrument.

   Lender may allow delays or changes for a person who takes over my rights and obligations, even if Lender is not requested to do so. Lender will not be required to bring a lawsuit against such a person for not fulfilling obligations under the Credit Agreement or under this Security Instrument, even if Lender is requested to do so.

**(B)  Lender's Rights.**  Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future.  Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right to demand immediate payment in full of the amounts that are owed to Lender under the Credit Agreement or under this Security Instrument.

**18.  OWNER'S OBLIGATIONS AND THOSE OF PERSONS TAKING OVER OWNER'S OBLIGATIONS.**  Any person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument.  Similarly, any person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

If more than one person signs this Security Instrument as Owner, each of us is fully obligated to keep all of Owner's promises and obligations contained in this Security Instrument.  Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together.  This means that any one of us may be required to pay all of the Sums Secured.  However, if one of us does not sign the Credit Agreement:  (A) that person is signing this Security Instrument only to give that person's rights in the Property to Lender under the terms of this Security Instrument; and  (B)  that person is not personally obligated to pay the Sums Secured; and (C)  that person agrees that Lender may agree with the other Owners to delay enforcing any of Lender's rights or to modify or make any accommodations with regard to the terms of this Security Instrument or the Credit Agreement without that person's consent.

**19.  LOAN CHARGES.**  If the Credit Agreement secured by this Security Instrument is subject to a law which sets maximum Credit Agreement charges, and that law is finally interpreted so that the interest or other Credit Agreement charges collected or to be collected in connection with the Credit Agreement exceed permitted limits:  (A)  any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and  (B)  any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Credit Agreement or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Credit Agreement.

**20.  LEGISLATION AFFECTING LENDER'S RIGHTS.**  If a change in applicable law would make any provision of the Credit Agreement or this Security Instrument unenforceable, Lender may require immediate payment in full of all Sums Secured by this Security Instrument as that phrase is defined above.  If Lender requires immediate payment in full under this Paragraph, Lender will take the steps and may act as specified below.

**21.  NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT.**  Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class, certified or registered mail unless applicable law requires use of another method.  The notice will be addressed to me at the address shown at the beginning of this Security Instrument.  A notice will be given to me at a different address if I give Lender notice of my different address.  Any notice that must be given to Lender under this Security Instrument will be given by mailing it to the Lender's address shown at the beginning of this Security Instrument.  A notice will be mailed to Lender at a different address if Lender gives me a notice of the different address.  A notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph or of applicable law.  Notwithstanding the foregoing, the address for notice for Lender is:  JPMorgan Chase Bank, N.A., P.O. Box 901008, Fort Worth, TX  76101-2008.

**22.  GOVERNING LAW.**  This agreement will be governed by and interpreted in accordance with federal law and the laws of the State of New Jersey except for matters related to: (1) interest and the exportation of interest, which will be governed by and interpreted in accordance with federal law (including, but not limited to, statutes, regulations, interpretations, and opinions) and the laws of the State of Ohio; and (2) the validity and enforcement of Lender's security interest in the Property, which will be governed by the laws of the State where the Property is located.  However, if there ever is a question about whether any provision of the agreement is valid or enforceable, the provision that is questioned will be governed by whichever of the governing state or federal laws that would find the provision to be valid and enforceable.  The loan transaction which is evidenced by this and other related documents has been approved, made and funded, and all necessary documents have been accepted by Lender in the State of Ohio.

**23.  OWNER'S COPY.**  I will be given one conformed copy of the Credit Agreement and of this Security Instrument.

**24.  AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED.**  Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission.  Lender also may require immediate payment in full if a beneficial interest in Owner is sold or transferred and Owner is not a natural person.  However, Lender will not require immediate payment in full if this is prohibited by federal law as of the date of this Security Instrument.

**25.  DEFAULT.**  At Lender's option, I will be in default under this Security Instrument if any of the following happen:  (A)  I commit fraud or make a material misrepresentation at any time in connection with the Credit Agreement.  This can include, for example, a false statement about Borrower's or my income, assets, liabilities, or any other aspects of Borrower's or my financial condition.  (B)  Borrower does not meet the repayment terms of the Credit Agreement.  (C)  My action or inaction adversely affects the collateral for the credit line account or Lender's rights in the collateral.  This can include, for example, failure to maintain required insurance, waste or destructive use of the Property, failure to pay taxes, death of all persons liable on the credit line account, transfer of title or sale of the dwelling, creation of a lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.(3)  My action or inaction adversely affects the collateral for the credit line account or Lender's rights in the collateral.  This can include, for example, failure to maintain required insurance, waste or destructive use of the Property, failure to pay taxes, death of all persons liable on the credit line account, transfer of title or sale of the dwelling, creation of a lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**MORTGAGE**
(Continued)

Page 7

Loan No: 411660023583

**26. LENDER'S RIGHTS UPON DEFAULT.** If I am in default under this Security Instrument, this is what Lender may do, in addition to any other rights or remedies provided by law:

(A) **Accelerate Payment.** Lender shall have the right at its option without notice to me to require that Borrower pay immediately the entire amount then remaining unpaid under the Credit Agreement and under this Security Instrument, including any prepayment penalty which Borrower would be required to pay.

(B) **Lender In Possession.** Upon acceleration of the Sums Secured or abandonment of the Property, Lender (in person, by agent or by judicially appointed receiver) shall be entitled to enter upon, take possession of and manage the Property and to collect the rents, including those past due. Any rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including but not limited to receiver's fees, premiums on the receiver's bonds and reasonable attorneys' fees and then to the other Sums Secured secured by this Security Instrument.

(C) **Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing my interest in all or any part of the Property.

(D) **Nonjudicial Sale.** If permitted by applicable law, Lender may foreclose my interest in the Property by non-judicial sale.

(E) **My Payment of Rent.** If there is a judgment for Lender in a lawsuit for foreclosure and sale, I will pay to Lender reasonable rent from the date the judgment is entered for as long as I occupy the Property. However, this does not give me the right to occupy the Property.

(F) **Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining on the Sums Secured after application of all amounts received from the exercise of the rights provided in this section.

(G) **Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of my obligations under this Security Instrument, after my failure to do so, that decision by Lender will not affect Lender's right to declare me in default and to exercise Lender's remedies.

(H) **Expenses.** To the extent not prohibited by applicable law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights, shall become a part of the loan payable on demand, and shall bear interest at the Note rate from the date of expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's expenses for bankruptcy proceedings (including efforts to modify or vacate the automatic stay or injunction) and appeals, to the extent permitted by applicable law.

**27. LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT.** When Lender has been paid all amounts due under the Credit Agreement and under this Security Instrument I elect to terminate the Credit Agreement, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will not be required to pay Lender for the discharge, but I will pay all costs of recording the discharge in the proper official records.

**28. IDENTITY OF LENDER.** Lender is JPMorgan Chase Bank, N.A., a national banking association organized and existing under the laws of the United States of America, with its main offices located in Columbus, Ohio.

**29. NON-WAIVER.** A waiver by any party of a breach of a provision of this Mortgage shall not constitute a waiver of or prejudice the party's right otherwise to demand strict compliance with that provision or any other provision.

**30. SUPPLEMENT TO PERSONAL PROPERTY DEFINITION.** It is the intention of Lender only to take a security interest in and retain a lien on that personal property considered fixtures under the Uniform Commercial Code as adopted in the jurisdiction where this Mortgage is filed of record as same may be amended from time to time or such other statute of such jurisdiction that defines property affixed to real estate and no other personal property.

**31. DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable federal or state law.

**32. SUPPLEMENT TO OWNER'S OBLIGATION TO MAINTAIN HAZARD INSURANCE.** The above referenced paragraph is amended to change the required Federal Flood Insurance amount as follows: If the Property is or becomes located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, I/We agree to obtain and maintain Federal Flood Insurance for the maximum amount of my/our credit line and the full unpaid principal balance of any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender. The remainder of the paragraph remains as stated in the above referenced paragraph.

**33. JOINDER.** Any Grantor who is joined herein pro forma is signing solely for the purpose of binding whatever rights or interests may be granted to such Grantor at law or in equity and not for the purpose of claiming or asserting any ownership interest in the Property by virtue of signing this document.

**34. MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Security Instrument:

(A) **Amendments.** What is written in this Security Instrument and in the Related Documents is my entire agreement with Lender concerning the matters covered by this Security Instrument. To be effective, any

| | MORTGAGE | Page 8 |
|---|---|---|
| Loan No: 411660023583 | (Continued) | |

change or amendment to this Security Instrument must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**(B) Merger.** There shall be no merger of the interest or estate created by this Security Instrument with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**(C) Time is of the Essence.** Time is of the essence in the performance of this Security Instrument. This means that all deadlines for performance provided under this Security Instrument must be strictly complied with and that failure to do so will result in a default.

**(D) Waivers and Consents.** Lender will not be deemed to have waived any rights under this Security Instrument unless such waiver is in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right will operate as a waiver of such right or any other right. A waiver by any party of a provision of this Security Instrument will not constitute a waiver of or prejudice the party's right otherwise to demand strict compliance with that provision or any other provision. No prior waiver by Lender, nor any course of dealing between Lender and me, will constitute a waiver of any of Lender's rights or any of my obligations as to any future transactions. Whenever consent by Lender is required in this Security Instrument, the granting of such consent by Lender in any instance will not constitute continuing consent to later instances where such consent is required.

I ACKNOWLEDGE HAVING READ ALL THE PROVISIONS OF THIS SECURITY INSTRUMENT, AND I AGREE TO ITS TERMS.

I ACKNOWLEDGE RECEIPT, WITHOUT CHARGE, OF A TRUE AND CORRECT COPY OF THIS SECURITY INSTRUMENT.

OWNER:

x _____
**MICHAEL F VOORHEES, Individually**

x _____
**ELIZABETH O DONNELL , Individually**

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _New Jersey_ )
) SS
COUNTY OF _Mercer_ )

BE IT REMEMBERED that on this _24_ day of _November_, 20 _06_, before me, the undersigned authority, personally appeared **MICHAEL F VOORHEES** who, I am satisfied, is the person named in the foregoing instrument, and I having first made known to him or her the contents thereof, he or she acknowledged that he or she signed, sealed and delivered the same as his or her voluntary act and deed. All of which is hereby certified.

_____
[Notary Public]  P. BRZOZA
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Aug. 12, 2008

Loan No: 411660023583

**MORTGAGE**
(Continued)

Page 9

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _New Jersey_ )
) SS
COUNTY OF _Mercer_ )

**BE IT REMEMBERED** that on this _24_ day of _November_, 20 _06_, before me, the undersigned authority, personally appeared **ELIZABETH O DONNELL** who, I am satisfied, is the person named in the foregoing instrument, and I having first made known to him or her the contents thereof, he or she acknowledged that he or she signed, sealed and delivered the same as his or her voluntary act and deed. All of which is hereby certified.

_____
[Notary Public]

P. BREZZA
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Aug. 12, 2009

---

LASER PRO Lending, Ver. 5.19.40.06  Copr. Harland Financial Solutions, Inc. 1997, 2006.  All Rights Reserved.  RUXOH  H:\CFI\PLLASAMPROCFPLPUP50.FC  TR-16623663  PR-HEUOFHU

```
2006121100011044O    9/9
12/11/2006 12:45:24 PM  M
Recording Fee: $118.00
Tax Fee: $.00
Consideration: $.00
Buyers Fee: $.00
AS811
```

# Exhibit E

# Exhibit G

Row
1092-257
5-12-1993
7-7-1993

BOOK **1092** PAGE **0257**

### RIGHT OF WAY AGREEMENT

The Agreement is made on  5-12  , 19 93 BETWEEN Michael F. Voorhees, whose address is 70 Alexauken Creek Rd., Lambertville, NJ  08530 referred to as Grantor, AND JERSEY CENTRAL POWER & LIGHT COMPANY AND NJ BELL TELCO., both New Jersey Corporations, referred to as Grantee. The words "Grantor" and "Grantee" shall mean all Grantors and Grantees listed above.

Grantor is the owner of a certain property located in the Township of West Amwell, County of Hunterdon, New Jersey, known and described as Block 3.01 Lot 13 on the Southerly side of Alexauken Creek Road on the official Tax Map of West Amwell Township being the same premises as conveyed to the Grantors as recorded in the office of the Hunterdon County Clerk in Deeds Book 1071 Page 481 on 5-6-92 referred to as the Property.

In Consideration of the sum of One Dollar ($1.00), paid by Grantee, which Grantor acknowledges receiving, by this Agreement Grantor grants and conveys to Grantee, its successors, assigns, licensees and lessees the perpetual right, privilege and authority from time to time to enter the Property without notice and to install, extend, erect, maintain, renew, rebuild, relocate, redesign, alter and remove transformers, transformer pads, switches, switch enclosures, switch enclosure pads, service pedestals, ducts, manholes, handholes, conduits, cables, poles, guys, anchors, guy stubs, cross arms, wires, cables and other fixtures and appurtenances which Grantee in its sole judgment deems necessary or proper for the transmission and distribution of electricity and the operation of CATV and communication systems, upon, over, under, across, along and beyond the Property, the course of said facilities to run as follows:

Generally in a Southerly direction from existing pole BT 544/49 on Lot 22 located along the Southerly sideline of Alexauken Creek Road entering the lands of Grantor traveling a total distance 350' ± to include new secondary enclosure SE-51 thence from SE-51 generally in an Easterly direction traveling underground a distance of 100' ± to Grantors premises, also Westerly a distance of 70' ± to meter pedestal.

The easement area for any underground facilities shall be a 15 foot wide strip of land lying 7 1/2 feet on either side of the installed electric cable.

Grantee has the right to trim, cut and/or remove or require the Grantor and Grantor's successors to remove such trees, tree branches, shrubs, roots, vegetation, structures and other objects or obstructions which do or may, in the sole judgment of the Grantee, interfere with the installation of, or the safe, proper or convenient use, maintenance, operation of, or access to, said facilities.

Grantor signs this Agreement as of the date written above.

WITNESS:

_____   Michael F. Voorhees   _____ (SEAL)

_____   _____ (SEAL)

_____   _____ (SEAL)

ATTEST:

SECRETARY _____   PRESIDENT _____

BOOK 1092 PAGE 0258

RECORDED
JUL 7  9 39 AM '93
HUNTERDON COUNTY
DOROTHY K. TIRPOK
CLERK

Individual

STATE OF NEW JERSEY, COUNTY OF ___HUNTERDON___

I certify that on ___May 12___, 19 93 Michael F. Voorhees personally appeared before me and acknowledged to my satisfaction, that he executed the attached instrument as his own act.

___Maryanna Horvath___
Notary Public of New Jersey
My Commission expires ___May 8, 1997___

MARYANNA HORVATH
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires on May 8, 1997

RECORDED
Hunterdon County, NJ
BOOK 193 PAGE 257
OF
JUL 7  1993
DOROTHY K. TIRPOK
COUNTY CLERK

80589

**COUNTY** Hunterdon    DATED ___MAY   12, 1993___    R/W FILE # 131174
W/O# WR-14113

**RECORD AND RETURN TO**
**JERSEY CENTRAL POWER AND LIGHT COMPANY**
**CUSTOMER SERVICE ENGINEERING**
**400 LINCOLN STREET**
**PHILLIPSBURG, NJ 08865**

# END OF DOCUMENT

10/28/1960
11/30/1960

BOOK **620** PAGE **590**

RIGHT OF WAY GRANT FOR ELECTRIC LINES

INDENTURE, made this _28th_ day of _October_ , 19 _60_

by and between _____ MARY R. VOORHEES and FRANCIS E. VOORHEES, her husband _____

of the _Townships_ of _West Amwell and Delaware_ County of _Hunterdon_

and State of New Jersey, (hereinafter called Grantors) and NEW JERSEY POWER & LIGHT COMPANY, a New Jersey corporation, having its principal office in the Township of Morris, Morris County, New Jersey (hereinafter called Grantee),

WITNESSETH:

That, in consideration of the sum of Ten Dollars ($10.00) received from the Grantee and the mutual agreements hereinafter set forth, Grantors hereby grant and convey with general warranty to Grantee, its successors and assigns, an

easement and right-of-way of the width of **as indicated on the attached drawing** feet with the right to construct, maintain and operate thereon one or more lines for the transmission or distribution of electric energy consisting of supporting structures, conductors, overhead and underground lightning protective wires, communication wires, guys, push braces and other accessory apparatus and equipment deemed by Grantee to be necessary

therefor, upon, over, across and under the lands of Grantors situated in the _____

_____ Townships _____ of _West Amwell & Delaware_ , County of _____

_____ Hunterdon _____ , State of New Jersey,

Being the same premises conveyed to Mary R. Voorhees by deed from Edward A. Riordan, et ux, et als dated May 12, 1937 and recorded in the Hunterdon County Clerk's Office on July 9, 1937 in Book 414 of Deeds, Page 385. The Right of Way is more fully shown on Grantee's drawing #L-1244A dated September 15, 1960 attached hereto and made a part hereof, but specifically

including within the side lines of said right-of-way and prolongations thereof any roads, rivers, streams, streets or highways bounding or crossing the same, subject, however, to the rights of the public or others therein.

Together with the right from time to time to patrol, inspect, redesign, rebuild or alter said lines and to install such additional lines, apparatus, appurtenances and equipment as Grantee may at any time deem necessary and the right to remove any line or any part thereof.

Together also with the right from time to time to remove or clear and keep clear any or all trees, underbrush, structures and other obstructions upon said right-of-way, and such trees beyond the same as in the judgment of Grantee may interfere with or endanger said lines or appurtenances when erected. Together also with the right of entry upon Grantors' said lands for all of the purposes aforesaid.

Except as provided by law and subject to Grantee's exercise of the rights granted hereby, Grantors may farm, cultivate, or use the ground within the limits of said right of way without substantial change of grade, provided that such use shall not interfere with, limit or obstruct any subsequent exercise of the rights hereby granted, and provided further that no building or other structure shall be erected within said right-of-way.

If Grantors' title to said premises be marketable and all liens prior to this grant have been satisfied or subordinated hereto, Grantee shall tender and Grantors shall accept Grantee's check for _Forty-eight Hundred Thirty eight_

($ _4838.00_ )Dollars, in full payment for all rights hereby granted, within _6 mos._ from the date hereof, and if such payment is due and such check is not tendered (either directly to, or by presentation for deposit with

_Hunterdon County National Bank of Lambertville_ , N. J., to credit
NAME OF BANK

of, the Grantors) within the time specified, the rights and privileges herein granted shall, without further act by the parties hereto, cease and determine and Grantee shall record a proper release of the rights granted hereby and be relieved from any further obligation hereunder. Otherwise, Grantee shall, from the date hereof, have and hold the rights hereby granted and conveyed until the construction of the first line hereunder and thereafter so long as any such line is maintained pursuant hereto and this Grant has not been released of record, subject to its covenant to pay the sum aforesaid without interest upon, and after notice of, Grantors' perfection of title and subordination of liens.

The words "Grantors" and "Grantee" shall include their heirs, executors, administrators, successors, and assigns, as the case may be. This Indenture contains the entire agreement between the parties with respect to said right-of-way.

IN WITNESS WHEREOF, Grantors signed and sealed this indenture the day and year first above written.

(Non-corporate) (Grantors)

WITNESS:

_Harold S. DuBois_

_Harold S. DuBois_

_Mary R Voorhees_ (SEAL)

MARY R. VOORHEES

_Francis E Voorhees_ (SEAL)

FRANCIS E. VOORHEES (SEAL)

(SEAL)

(Corporate) (Grantors)

ATTEST:

_____ Secretary

By_____
President



DEED 880 ---502

STATE OF NEW JERSEY } ss.
COUNTY OF *Hunterdon*

BE IT REMEMBERED, That on this _____28TH_____ day of _October_, 19 60
in the County and State aforesaid, personally appeared before me, the subscriber, a Notary Public of New Jersey,

MARY R. VOORHEES and FRANCIS E. VOORHEES, her husband

who, I am satisfied, __are__ the Grantor_s_ mentioned in the within Instrument, to whom I first made known the contents thereof, and thereupon __they__ acknowledged that __they__ signed, sealed and delivered the same as __their__ voluntary act and deed, for the uses and purposes therein expressed.

Notary Public of New Jersey
My commission expires _November 26_ 19 63

---

MT. AIRY - ALEXAUKEN 34kV
KV LINE

PARCEL NO. H770

Lines:

County: HUNTERDON

**RIGHT OF WAY GRANT**

W.A. Corp. For Electric Lines

MARY R. VOORHEES and FRANCIS E.
VOORHEES, her husband

**TO**

New Jersey Power & Light Company

Dated: , 19

Received in the Clerk's Office of the County
of HUNTERDON
New Jersey, on the 30 7H
day of _March_ A.D. 1962
at 11:30 o'clock in the _fore_ noon
and recorded in Book 620 of Deeds
for said County on page 580

County Clerk

RECORD AND RETURN TO
NEW JERSEY POWER & LIGHT COMPANY
RIGHT OF WAY DEPARTMENT
MORRISTOWN, N.J.

*10/28/1960*
*11/30/1960*

*Mary R. Voorhees and
Francis E. Voorhees, her husband*

*28*   *October*

**RIGHT OF WAY GRANT FOR ELECTRIC LINES**

INDENTURE, made this _____ day of _____ October _____, 19 60

by and between _____

of the _____ Township _____ of West Amwell, Delaware, County of **Hunterdon**

and State of New Jersey, (hereinafter called Grantor), and **NEW JERSEY POWER & LIGHT COMPANY,** a New Jersey corporation, having its principal office in the Township of Morris, Morris County, New Jersey (hereinafter called Grantee),

WITNESSETH:

That, in consideration of the sum of Ten Dollars ($10.00) received from the Grantee and the mutual agreements hereinafter set forth, Grantors hereby grant and convey with general warranty to Grantee, its successors and assigns, an

easement and right-of-way of the width of (100') ONE HUNDRED – – – – – – – – – – feet with the right to construct, maintain and operate thereon one or more lines for the transmission or distribution of electric energy consisting of supporting structures, conductors, overhead and underground lightning protective wires, communication wires, guys, push braces and other accessory apparatus and equipment deemed by Grantee to be necessary

therefor, upon, over, across and under the lands of Grantors situated in the _____

_____ Townships _____ of _____ West Amwell & Delaware _____, County of _____ Hunterdon _____

_____, State of New Jersey, said right of way lies 50 feet on each side of its center line which is parallel with and 110 feet westerly measured at right angles from a monumented center line established in 1960 by Studer & McEldowney, land surveyors for Public Service Electric and Gas Company, and shown on Grantee's drawing #L-1244, dated September 14, 1960, attached hereto and made a part hereof, and extends through Grantor's lands about 370 feet from lands now or formerly of Jennie M. Kohler to a point in line of lands now or formerly of Mary R. Voorhees. Being a portion of the premises conveyed to Mary R. Voorhees by Deed from Edward A. Riordan, et ux et als dated May 12, 1937 and recorded in the Hunterdon County Clerk's Office on July 9, 1937 in Book 411 of Deeds, Page 385, and specifically

including within the side lines of said right-of-way and prolongations thereof any roads, rivers, streams, streets or highways bounding or crossing the same, subject, however, to the rights of the public or others therein.

Together with the right from time to time to patrol, inspect, redesign, rebuild or alter said lines and to install such additional lines, apparatus, appurtenances and equipment as Grantee may at any time deem necessary and the right to remove any line or any part thereof.

Together also with the right from time to time to remove or clear and keep clear any or all trees, underbrush, structures and other obstructions upon said right-of-way, and such trees beyond the same as in the judgment of Grantee may interfere with or endanger said lines or appurtenances when erected. Together also with the right of entry upon Grantors' said lands for all of the purposes aforesaid.

Except as provided by law and subject to Grantee's exercise of the rights granted hereby, Grantors may farm, cultivate, or use the ground within the limits of said right of way without substantial change of grade, provided that such use shall not interfere with, limit or obstruct any subsequent exercise of the rights hereby granted, and provided further that no building or other structure shall be erected within said right-of-way.

If Grantors' title to said premises be marketable and all liens prior to this grant have been satisfied or subordinated hereto, Grantee shall tender and Grantors shall accept Grantee's check for *Four Hundred Seventy-five*

($ *475.00* )Dollars, in full payment for all rights hereby granted, within *6 mos* from the date hereof, and if such payment is due and such check is not tendered (either directly to, or by presentation for deposit with

*Hunterdon County National Bank of Lambertville* N.J., to credit

NAME OF BANK

of, the Grantors) within the time specified, the rights and privileges herein granted shall, without further act by the parties hereto, cease and determine and Grantee shall record a proper release of the rights granted hereby and be relieved from any further obligation hereunder. Otherwise, Grantee shall, from the date hereof, have and hold the rights hereby granted and conveyed until the construction of the first line hereunder and thereafter so long as any such line is maintained pursuant hereto and this Grant has not been released of record, subject to its covenant to pay the sum aforesaid without interest upon, and after notice of, Grantors' perfection of title and subordination of liens.

The words "Grantors" and "Grantee" shall include their heirs, executors, administrators, successors and assigns, as the case may be. This indenture contains the entire agreement between the parties with respect to said right-of-way.

IN WITNESS WHEREOF, Grantors signed and sealed this indenture the day and year first above written.

WITNESS:

_Harold F. DuBois_                    _Mary R Voorhees_                    (SEAL)
                                       MARY R. VOORHEES

_Harold F. DuBois_                    _Francis E Voorhees_                (SEAL)
                                       FRANCIS E. VOORHEES                 (SEAL)

(Non-corporate) (Grantors)

ATTEST:

By _____
                                       President

(Corporate) (Grantors)

_____
Secretary



STATE OF _____ }
COUNTY OF _____ } ss.

BE IT REMEMBERED, that on the _____ day of _October_, 19_60_,

in the County and State aforesaid, personally appeared before me, the subscriber, a Notary Public of New Jersey,

MARY R. VOORHEES and FRANCIS E. VOORHEES, her husband

who, I am satisfied, __are__ the Grantor__s__ mentioned in the within Instrument, to whom I first made known the

contents thereof, and thereupon _____they_____ acknowledged that ___they___ signed, sealed and de-

livered the same as ___their___ voluntary act and deed, for the uses and purposes therein expressed.

_Harold J. DuBois_
Notary Public of New Jersey

My commission expires _November 24_, 196_3_

---

PARCEL NO. 4178/

Line: TRIBER STATION LAMBERTVILLE

County: HUNTERDON

**RIGHT OF WAY GRANT**
For Electric Lines

MARY R. VOORHEES and FRANCIS E.
VOORHEES, her husband

TO

New Jersey Power & Light Company

Dated: _____, 19___

Received in the Clerk's Office of the County
of ____ HUNTERDON

New Jersey, on the _30_ th

day of _November_ A. D. 19_60_

at _11:30_ o'clock in the _fore_ — noon

and recorded in Book _630_ of Deeds

for said County on page _592_

_____
County Clerk

RECORD AND RETURN TO
NEW JERSEY POWER & LIGHT COMPANY
RIGHT OF WAY DEPARTMENT
MORRISTOWN, N.J.

*620/568*

*10/28/1960*
*11/30/1960*

BOOK **620** PAGE **568**

RIGHT OF WAY GRANT FOR ELECTRIC LINES

INDENTURE, made this ____*28th*____ day of ____*October*____ 19*60*

by and between ____*MARY R. VOORHEES and FRANCIS E. VOORHEES, her husband*____

of the ____*Townships*____ of ____*West Amwell and Delaware*____ County of ____*Hunterdon*____
and State of New Jersey, (hereinafter called Grantors) and PUBLIC SERVICE ELECTRIC AND GAS COMPANY, a New Jersey corporation, having its principal office in Newark, New Jersey (hereinafter called Grantee).

WITNESSETH:
That, in consideration of the sum of Ten Dollars ($10.00) received from the Grantee and the mutual agreements hereinafter set forth, Grantors hereby grant and convey with general warranty to Grantee, its successors and assigns, an

easement and right-of-way of the width of **(120')** ONE HUNDRED TWENTY — — — — — — — feet with the right to construct, maintain and operate thereon one or more lines for the transmission or distribution of electric energy consisting of supporting structures, conductors, overhead and underground lightning protective wires, communication wires, guys, push braces, appurtenances and other accessory apparatus and equipment deemed by Grantee to

be necessary therefor, upon, over, across and under the lands of Grantors situated in the _____

____*Townships*____ of ____*West Amwell & Delaware*____, County of ____*Hunterdon*____
State of New Jersey, **said right of way lies 60 feet on each side of its monumented center line established in 1959 by Studer & McEldowney, land surveyors for Grantee, and shown on Grantee's Drawing RL-TV#1, attached hereto and made a part hereof (the location of such monumented line shall be more particularly described by survey to be obtained by Grantee at its expense and shown on print to be filed for record with receipt for the payment mentioned below) and extending through Grantor's said lands about 249.5 feet from lands now or formerly of Jennie M. Kohler to a point in line of lands now or formerly of Mary R. Voorhees. Being a portion of the premises conveyed to Mary R. Voorhees by Deed from Edward A. Riordan, et ux, et als dated May 12, 1937 and recorded in the Hunterdon County Clerk's Office on July 9, 1937 in Book 413 in Book of Deeds, Page 385, and specifically**

including within the side lines of said right-of-way and prolongations thereof any roads, rivers, streams, streets or highways bounding or crossing the same, subject, however, to the rights of the public or others therein.

Together with the right from time to time to patrol, inspect, redesign, rebuild or alter said lines and to install such additional lines, apparatus, appurtenances and equipment as Grantee may at any time deem necessary and the right to remove any line or any part thereof.

Together also with the right from time to time to remove or clear and keep clear any or all trees, underbrush, structures and other obstructions upon said right-of-way, and such trees beyond the same as in the judgment of Grantee may interfere with or endanger said lines or appurtenances when erected. Together also with the right of entry upon Grantor's said lands for all of the purposes aforesaid.

Except as provided by law and subject to Grantee's exercise of the rights granted hereby, Grantors may farm, cultivate or use the ground within the limits of said right-of-way without substantial change of grade, provided that such use shall not interfere with, limit or obstruct any subsequent exercise of the rights hereby granted, and provided further that no building or other structure shall be erected within said right-of-way.

If Grantors' title to said premises is marketable and all liens prior to this grant have been satisfied or subordinated

hereto, Grantee shall tender and Grantors shall accept Grantee's check for ____*Six Hundred Fifty-seven*____

($ *657.00* ) Dollars, in full payment for all rights hereby granted, within ____*6 mos.*____ from the date hereof,

and if such payment is due and such check is not tendered (either directly to, or by presentation for deposit with

____*Hunterdon County National Bank of Lambertville*____
NAME OF BANK
N. J. to credit of, the Grantors) within the time specified, the rights and privileges herein granted shall, without further act by the parties hereto, cease and determine and Grantee shall record a proper release of the rights granted hereby and be relieved from any further obligation hereunder. Otherwise, Grantee shall, from the date hereof, have and hold the rights hereby granted and conveyed until the construction of the first line hereunder and thereafter so long as any such line is maintained pursuant hereto, and this Grant has not been released of record, subject to its covenant to pay the sum aforesaid without interest upon, and after notice of, Grantors' perfection of title and subordination of liens.

The words "Grantors" and "Grantee" shall include their heirs, executors, administrators, successors and assigns, as the case may be. This indenture contains the entire agreement between the parties with respect to said right-of-way.

IN WITNESS WHEREOF, Grantors signed and sealed this indenture the day and year first above written.

(Non-corporate)
(Grantors)

WITNESS:

*Harold S. Du Bois*

*Harold S. Du Bois*

(Corporate)
(Grantors)

ATTEST:

_____
Secretary

*Mary R. Voorhees* ............ SEAL
MARY R. VOORHEES ............ SEAL

*Francis E. Voorhees* ............ SEAL
FRANCIS E. VOORHEES ............ SEAL

By _____
President

*MB.*



STATE OF NEW JERSEY
COUNTY OF *Hunterdon* } SS.

BE IT REMEMBERED, That on this _____ 30th _____ day of _____ October _____ 19 60

in the County and State aforesaid, personally appeared before me, the subscriber, a Notary Public of New Jersey,

MARY R. VOORHEES and FRANCIS E. VOORHEES, her husband

who, I am satisfied, ____are____ the Grantor __s__ mentioned in the within Instrument, to whom I first made known the

contents thereof, and thereupon ____they____ acknowledged that ____they____ signed, sealed and de-

livered the same as ____their____ voluntary act and deed, for the uses and purposes therein expressed.

*Harold H. DuBois*
Notary Public of New Jersey
My commission expires *November 25* 19 63

---

W. A. 5194   PARCEL NO. 44774

Line: THUERK STATION LAMBERTVILLE

County: HUNTERDON

## RIGHT OF WAY GRANT
### For Electric Lines

MARY R. VOORHEES and FRANCIS E.
VOORHEES, her husband

TO

PUBLIC SERVICE ELECTRIC AND GAS CO.

Dated: _____ 19__

Received in the Clerk's Office of the County
of HUNTERDON
New Jersey, on the 30th
day of November A. D. 19 60
at 11:30 o'clock in the fore noon
and recorded in Book 620 of Deeds
for said County on page 568

*[signature] Clerk*

RECORD AND RETURN TO
PUBLIC SERVICE ELECTRIC AND GAS CO.
RIGHT OF WAY DEPARTMENT
NEWARK, N. J.

# Exhibit F



Form 86-26
Rev. 1/26/40

**DEED**

(1st Page)

COUNTY OF HUNTERDON
COMPARED WITH RECORD
RECORDED DEC 11 1973
DATED AT FLEMINGTON BY

BOOK 775 PAGE 465

**THIS INDENTURE,** Made the     day of     December

in the Year of Our Lord One Thousand Nine Hundred and seventy-three

**BETWEEN**

MARY E. VOORHEES and FRANCIS H. VOORHEES, wife and husband

89 Clinton Street

Lambertville, New Jersey

of the first part,

**AND**         **THE STATE OF NEW JERSEY**                 of the second part,

c/o New Jersey Department of Transportation, 1035 Parkway Avenue, Trenton, New Jersey

**WITNESSTH**     that the said party of the first part, in consideration of the sum of

Twenty Thousand, three hundred dollars ($20,300.00)

dollars, lawful money of the United States of America, to     them     in hand paid at or before

the ensealing and delivery of these presents by the said party of the second part, the receipt whereof

is hereby acknowledged, and other valuable consideration, have granted, bargained, sold, aliened,

remised, released, conveyed and confirmed, and by these presents do         grant, bargain, sell,

alien, remise, release, convey and confirm unto the said party of the second part and unto its successors

and assigns forever,

All     those     certain lots     or tracts     or parcels     of land     and premises, situate,

lying and being in the         Township         of         West Amwell

in the County of         Hunterdon         , and State of New Jersey, and more particularly

described as follows:

Parcels 17 and X17B, as indicated on a map entitled " New Jersey Department of
Transportation, GENERAL PROPERTY PARCEL MAP, ROUTE 202, FREEWAY SECTION 20, New Hope-
Lambertville Bridge to Route U.S. 202, showing existing right of way and parcels to
be acquired in the Township of Delaware, East Amwell and West Amwell and City of
Lambertville, County of Hunterdon, Scale: as indicated, March 1969";

Parcels 17 and X17B, including specifically all the land and premises located
at about Station 196+0 (Base Line Stationing), bounded on the northwest, north and
northwest by the proposed right of way line of State Highway Route 202 Freeway
Section 20 as laid down on the aforesaid map; on the northeast by lands now or formerly
of Leroy R. Stout, et ux; on the southeast and southwest by lands now or formerly
of John V. Deetjen; all as shown on the aforesaid map; Containing a total of 13.378
acres more or less;

TOGETHER WITH the owner's right of direct access to and from the Freeway;

SUBJECT, HOWEVER, to the easement of the Public Service Electric and Gas Company
and the New Jersey Power and Light Company and all other public utility easements,
recorded or unrecorded, affecting the herein described premises.

Form 941-30
(Rev. 7/1/43)  (WARRANTY DEED)
(2nd Sheet)

BOOK 775 PAGE 466

**Together** with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof and every part and parcel thereof.

**And also** all the estate, right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity, of the said party of the first part of, in and to the above-described premises and every part and parcel thereof with the appurtenances.

**To have and to hold,** all and singular the above mentioned and described premises, together with the appurtenances, unto the said party of the second part, its successors and assigns forever, to the only proper use, benefit and behoof of the said party of the second part, its successors and assigns forever.

And the said party of the first part, for themselves, their heirs, executors and administrators successors and assigns do hereby covenant that the title to said premises is vested in fee simple absolute in the said party of the first part; that they have the right and authority to convey the said premises to the said party of the second part; that the party of the second part shall have peaceable and quiet possession of the said premises free from all encumbrances; that the same are now free and clear of all encumbrances whatsoever; that the party of the first part will execute such further assurances and conveyances of the said land as may be reasonably required; and that the party of the first part will warrant and defend the premises hereby conveyed against all persons lawfully claiming the same.

**In witness whereof** the party of the first part have hereunto set their hands and seals the day and year first above written.

_Mary R. Voorhees_ [L.S.]
MARY R. VOORHEES

_Francis E. Voorhees_ [L.S.]
FRANCIS E. VOORHEES

WITNESS:

_Philip V. Faherty III_
PHILIP V. FAHERTY III

This Deed prepared by Samuel K. Bullock, Attorney at Law of New Jersey.

Form 93-48
Rev. 2/21/69

**Bargain and Sale Deed**

BOOK 775 PAGE 467

STATE OF NEW JERSEY

COUNTY OF

BE IT REMEMBERED, that on this

In the year One Thousand Nine Hundred and Seventy-

An Attorney at Law of New Jersey

personally appeared   MARY E. VOORHEES and FRANCIS E. VOORHEES, her husband,

who, I am satisfied, are the grantor s mentioned in the within instrument, to whom I first made known the contents thereof, and thereupon they acknowledged that they signed, sealed and delivered the same as their voluntary act and deed, for the uses and purposes therein expressed. The full and actual consideration paid or to be paid for the transfer of title to realty evidenced by the within deed, as such consideration is defined in P.L. 1968, c. 49, Sec. 1(c) is $ 20,300.00

Philip S. Fekety II
An Attorney at Law of New Jersey

Deed # 84359—Recorded December 17, 1973 at 1:20 P.M.